1  William C. Wilson, SBN: 149683
   bwilson@wilsongetty.com
2  Kim S. Cruz, SBN: 177406
   kcruz@wilsongetty.com
3  Ryan Canavan, SBN 313990
   rcanavan@wilsongetty.com
4  WILSON GETTY LLP
   12555 High Bluff Drive, Suite 270
5  San Diego, California 92130
   Telephone:     858.847.3237
6  Facsimile:     858.847.3365

7  Attorneys for Defendants SERRANO POST ACUTE, LLC dba HOLLYWOOD
   PREMIER HEALTHCARE CENTER and BENJAMIN LANDA

8

9

10          **UNITED STATES DISTRICT COUT**

11          **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 12  EMMA MARTIN, ELIZABETH GAGLIANO and KATHRYN SESSINGHAUS, individually and as heirs of VINCENT PAUL MARTIN, deceased, | Case No. [Removal from Superior Court California, County of Los Angeles, Case No. 20STCV19545] |
| 15              Plaintiffs, | **SERRANO POST ACUTE, LLC dba HOLLYWOOD PREMIER HEALTHCARE CENTER and BENJAMIN LANDA'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446** |
| 16  vs. | |
| 17  Serrano Post Acute LLC d/b/a HOLLYWOOD PREMIER HEALTHCARE CENTER, a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital; BENJAMIN LANDA, an individual; MARCEL ADRIAN SOLERO FILART, an individual; and DOES 1-50, | *[Filed concurrently with Civil Cover Sheet, Declaration of Kim Cruz, Corporate Disclosure Statement and Certificate of Interested Parties, Notice of Joinder in Removal of Action by Marcel Filart, MD]* |
| 22              Defendants. | |

23     **TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR**

24  **THE CENTRAL DISTRICT OF CALIFORNIA:**

25          PLEASE TAKE NOTICE AND NOTICE IS HEREBY GIVEN THAT

26  Defendants, Serrano Post Acute, LLC dba Hollywood Premier Healthcare Center

27  (hereinafter "Serrano Post Acute") and Benjamin Landa hereby remove this action from

28  the Superior Court of the State of California, County of Los Angeles to the United States

District Court for the Central District of California.  Removal is based on federal officer jurisdiction and federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441, 1442 (a)(1), and 1446.  Defendants, Serrano Post Acute and Benjamin Landa, reserve all defenses and objections to venue based on 42 U.S.C. §247d-6d(e)(1).

In support of this Notice of Removal, Defendants, Serrano Post Acute and Benjamin Landa, state as follows:

## I.    PLEADINGS

1.    On or about May 21, 2020, Plaintiffs commenced this action in the Superior Court  of the State of California for the County of Los Angeles, entitled *Emma Martin, et al. v. Serrano Post Acute LLC dba Hollywood Premier Healthcare Center, et al.*, Case No. 20STCV19545.  Pursuant to 28 U.S.C. §1446(a),  true and correct copies of all process, pleadings and orders served on Serrano Post Acute and Benjamin Landa in the Superior Court action are attached hereto as Exhibit 1.

2.    Plaintiffs, Emma Martin, Elizabeth Gagliano and Kathryn Sessinghaus, wife and children of Decedent Vincent Martin, allege as his heirs and successors in interest that Mr. Martin was a resident at skilled nursing facility, Serrano Post Acute LLC dba Hollywood Premier Healthcare Center from January, 2014 to his death on April 14, 2020.  (See Ex. 1- Complaint, pg. 9,  ¶ 27; pg.14, ¶s 43-44, pg. 18, ¶ 62.)  Plaintiffs allege that Benjamin Landa "owns and controls Serrano Post Acute."  They allege Defendant, Marcel Adrian Solero Filart ("Dr. Filart") is a physician affiliated with Serrano Post Acute, and provided care to Mr. Martin during his admission to the facility. (See Ex. 1- Complaint, pg. 9, ¶s 28-29.)

3.    Plaintiffs allege that during Mr. Martin's residency at Serrano Post Acute, due to the wrongful acts and omissions of defendants including deficiencies with respect to infection control, the use of personal protective equipment ("PPE") and COVID-19 testing, Mr. Martin became infected with the COVID-19 virus and died due to the virus on April 4, 2020. (See Ex. 1- Complaint, pg. 1, ¶ 1; pg. 4, ¶9; Pg. 4, ¶ 10; pg.  5, ¶ 11,

pg. 6; ¶ 15, pg. 14; ¶s 45-48;  pg. 15, ¶s 56-57; and pg. 18,  ¶ 64.)  Plaintiffs allege causes of action for Violations of the Elder and Dependent Adult Civil Protection Act (California Welfare & Institutions Code §15600, Negligence, and  Wrongful Death against all Defendants.  Causes of action for Fraudulent Concealment and Fraudulent Misrepresentation are alleged against Serrano Post Acute and Dr. Filart.  (See Ex. 1- Complaint, pg. 1, ¶ 1; pg. 4, ¶9; Pg. 4, ¶ 10; pg.  5, ¶ 11; pg. 6, ¶ 15; pg. 14; ¶s 45-48; pg. 15, ¶s 56-57 ; pg. 18,  ¶ 64; pgs. 19-20, ¶s 70-75; pgs. 20-22, ¶s 76-82; pgs. 22-24, ¶s 83-95; pgs. 25-26, ¶s 96-103; and pgs. 26-27, ¶s 104-113).

## II.   THE PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN MET

4.   Defendant, Serrano Post Acute was served via substitute service on May 29, 2020.  Defendant, Dr. Filart was served via substitute service on May 29, 2020. Under California law, this substitute service was effective ten days later on June 8, 2020. Defendant, Benjamin Landa, was personally served on June 1, 2020. (See Exhibit 2- Proofs of Service.)

5.   Defendants, Serrano Post Acute and Benjamin Landa's Notice of Removal is timely under 28 U.S.C. §1446(b) as this Notice has been filed within thirty (30) days of the service of a copy of the initial pleading setting forth the claims for relief.

6.   Defendants, Serrano Post Acute and Benjamin Landa, file this Notice with the explicit consent of Defendant, Dr. Filart.  Dr. Filart's  Notice of Joinder in Removal is concurrently filed with this Notice.

7.   Removal to the United States District Court for the Central District California, Western Division, is proper because the Complaint was filed in the Superior Court of the State of California for the County of Los Angeles, which is located within the jurisdiction of this District.  See 28 U.S.C. § 1441(a); and 28 U.S.C. § 84(c)(2).

8.   Pursuant to 28 U.S.C. §1446(d), a copy of this Notice of Removal is being served on Plaintiffs, and Defendant, Dr. Filart, and a copy is being filed with the Clerk

of the Court for the Superior Court of the State of California for the County of Los Angeles.

## III.   REMOVAL IS PROPER BECAUSE THIS COURT HAS JURISDICTION UNDER THE  FEDERAL OFFICER STATUTE

9.    Removal is proper under 28 U.S.C. §1442(a)(1), which provides for removal when a Defendant is sued for acts undertaken at the direction of a federal officer.  Removal is appropriate under §1442(a)(1), when the removing defendant establishes that:

(a)    Defendants are persons;

(b)    Defendants were acting under the direction of a federal officer when it engaged in the allegedly tortious conduct;

(c)    There is causal nexus between the plaintiff's claims and the defendant's actions under federal direction; and

(d)  Defendants have raised a colorable defense based upon federal law.

See *Goncalves v. Rady Children's Hospital San Diego* 865 F.3d 1237, 1244 (9th Cir. 2017).  Courts have a duty to broadly interpret § 1442 in favor of removal, which "should not be frustrated by a narrow, grudging interpretation" of the statute. *Id*. at pg. 1244 [quotations and citations omitted.]  Here, Serrano Post Acute and Benjamin Landa satisfy all elements for removal under  §1442(a)(1).

10.    Defendants are persons for the purpose of the federal officer.  The term "person" includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1; See also *Goncalves*, 865 F.3d at 1244.

11.    The United States Supreme Court has held that the phrase "acting under" involves "an effort to *assist*, or help *carry out*, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos*., 551 US 142, 152 (2007); see also In re *Commonwealth's Motion to Appoint Counsel Against or Directed to Defender*

-4-

*Association of Philadelphia*, 790 F.3d 457 (3rd. Cir. 2015)  The "acting under" requirement is broad and is to be liberally construed. *Watson*, 551 US at pg. 147.

12.   "[R]emoval by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations. Cf. Bakalis v. Crossland Savings Bank, 781 F.Supp. 140, 144-145 (E.D.N.Y. 1991)   ('The rule that appears to emerge from the case law is one of 'regulation plus ...'.")." *Ryan v. Dow Chemical Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) "This control requirement can be satisfied by strong government intervention and the threat that a defendant will be sued in state court 'based upon actions taken pursuant to federal direction.'"  See *Fung v. Abex, Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

13.   Defendants meet the "acting under" prong for removal based on the federal officer statute. Here, Plaintiffs contend that the acts and omissions of Defendants with respect to their response to the COVID-19 pandemic caused decedent, Vincent Martin, to contract the virus and led to his death therefrom.   In the response to the pandemic and the national state of emergency declared by President Trump, Defendants were following detailed directives and regulations issued by the Centers for Medicare and Medicaid Services ("CMS") and the Centers for Disease Control and Prevention ("CDC"), which were coordinating the national effort to respond to and contain the COVID-19 pandemic.  State surveyors, contracted with CMS, were supervising skilled nursing facilities with respect to all aspects of infection control and the pandemic response and ensuring strict compliance with the CMS directives.

14.  These directives included the following:

A.   As early as February 1, 2020, the CDC issued the "Update and Interim Guidance on the Outbreak of 2019 Novel Coronavirus" to  provide guidance to state and local health departments and healthcare providers regarding 2019-nCoV 2019 (the 2019 Novel Coronavirus, now known as COVID-19).  ***The guidance was part of***

SERRANO POST ACUTE, LLC dba HOLLYWOOD PREMIER HEALTHCARE CENTER and BENJAMIN
LANDA'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446

the *"ongoing US public health response . . . to identify and contain [the] outbreak and prevent sustained spread of 2019-nCoV in the United States"* and addressed infection prevention and control specific to 2019-nCoV. [Emphasis added.] This document provided directives related to screening of patients in healthcare facilities, and coordination with local health departments for testing and reporting of results.

B.     On February 6, 2020, CMS took direct action to prepare healthcare facilities for the national response to the emerging 2019 Novel Coronavirus by issuing a Memorandum to State Survey Agency Directors.   The memo stated that "[e]very Medicare participating facility in the Nation's healthcare system must adhere to standard for infection prevention and control." CMS directed healthcare staff to "comply with basic infection control practices" including standard, contact and airborne precautions, and "adhere to CDC recommendations on standard hand hygiene practices."  It provided very specific instructions with respect to hand hygiene and instructed facilities to have "PPE measures and protocols" in place.

C.     On March 4, 2020, CMS issued a Memorandum to State Survey Agency Directors regarding Infection Control and Prevention of Coronavirus Disease 2019 (COVID-19) in nursing homes.   The Memorandum included instructions for limiting the transmission of COVID-19 in nursing homes by monitoring and limiting visitors and monitoring and restricting health care facility staff with respiratory symptoms, as well as instructions regarding when to transfer a resident with a suspected or confirmed COVID-19 infection to a hospital, and under what conditions a nursing home may accept patients diagnosed with COVID-19. Defendants followed these directives and the directives issued prior to this, in an effort to assist and help carry out the CDC and CMS' goal of containing and responding to the pandemic.

D.     On March 10, 2020, CMS issued a Memorandum to State Survey Agency Directors updating their instructions for health care workers involved in the care of patient with known or suspected COVID-19.   With the release of the Memo,

healthcare workers and providers would have a "more expansive range of options to protect themselves and those receiving their care." CMS noted it would "continue to explore flexibilities and innovative approaches within our regulations to allow health care entities to meet the critical health needs of the country."  The Memo addressed the supply, allocation and use of PPE utilized to prevent the spread of the virus including facemasks, respirators, eye protection, medical gowns, gloves and airborne infection isolation rooms.

E.     Then on March 13, 2020, CMS issued revised infection control and prevention directives for nursing homes to prevent the transmission of COVID-19.  In the Memo, facilities were ordered to restrict visitation of all visitors and non-essential health care personnel, cancel communal dining and all group activities, implement active screening of residents and staff for fever and respiratory symptoms, screen all staff at the beginning of their shift for fever and respiratory symptoms, and identify staff that work at multiple facilities and actively screen and restrict them to ensure they do not place individuals in the facility at risk for COVID-19.  Additional direction was provided regarding patient transfers and acceptance of patients with COVID-19.  With respect to patients being admitted from a hospital where COVID-19 was present, nursing homes were advised to "dedicate a unit/wing exclusively for any residents coming or returning from a hospital" to "serve as a step-down unit where they remain for 14 days with no symptoms. . ."

F.     On March 13, 2020, President Trump declared the COVID-19 outbreak a national emergency. Following this proclamation, the CDC and CMS took swift action to waive restrictions and expand capacity for healthcare providers and suppliers to coordinate the national response to the nationally declared state of emergency.

G.     On April 2, 2020, CMS issued new guidelines aimed at long-term care facilities to "mitigate the spread" of COVID-19.  In doing so, CMS noted that

"[l]ong-term care facilities are a critical component of America's healthcare system." And that "[i]n recent weeks, CMS and CDC, at President Trump's direction have worked together to swiftly issue unprecedented targeted direction to the long-term care facility industry, including a general prohibition of visitors implemented on March 13, 2020, as well as strict infection control and other screening recommendations." CMS further noted that the CDC and CMS were providing "critical, needed leadership for the Nation's long-term care facilities to prevent further spread of COVID-19" and that long term care facilities were to immediately implement symptom screening for all persons (residents, staff, visitors, outside healthcare workers, vendors, etc.) entering a long term care facilities. Facilities were ordered to specifically ask about COVID-19 symptoms and to check the temperature of all visitors, as well as limit access points and ensure that all accessible entrances have a screening station. Every resident was also to be assessed for symptoms and have their temperature checked every day, and patients and residents entering facilities screened for COVID-19 through testing, if available. CMS further directed long term care facility staff to wear a facemask while in the facility for the duration of the state of emergency, to wear full PPE for the care of any resident with known or suspected COVID-19, and if COVID-19 transmission occurs in the facility, healthcare personnel were to wear full PPE in the care of all residents irrespective of COVID-19 diagnosis and symptoms. Further, to avoid transmission within long-term care facilities, the facilities were advised to use separate staffing teams for COVID-19 positive residents, and to work with State and local leaders to designate separate facilities or units within a facility to separate COVID-19 negative residents from COVID-19 positive residents and individuals with unknown COVID-19 status.

15.    At all relevant times, Serrano Post Acute and Benjamin Landa were acting at the specific direction and oversight of the federal government, including but not limited to, the direction of the CDC, and CMS, as well as by representatives of the State Survey Agency, acting under contract with CMS, to address the on-going federal effort

**SERRANO POST ACUTE, LLC dba HOLLYWOOD PREMIER HEALTHCARE CENTER and BENJAMIN LANDA'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

and national state of emergency to contain the COVID-19 pandemic, and prevent the spread of the virus.   All actions taken by Serrano Post Acute and Benjamin Landa in preparation for and response to the COVID-19 pandemic, were taken "in an effort to assist, or help carry out, the duties or tasks" as ordered by the CDC and CMS, and were performed pursuant to the direct orders and comprehensive and detailed regulations issued by CMS.  Serrano Post Acute and Benjamin Landa were acting at the direction of the federal government to prevent, treat and contain COVID-19 at the facility.

16.     Next to establish removal under the federal officer statute, Defendants must show "a causal nexus between the plaintiff's claims and the defendant's actions under federal direction." *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 398 (5th Cir. 1998).

17.     Here, Defendants, Serrano Post Acute and Benjamin Landa's response to the COVID-19 pandemic as it relates to the claims of Plaintiffs (i.e., the care and treatment of Vincent Martin) was directly related to what Defendants were ordered and directed to do by the federal government, including but not limited to, the direction of the CDC, and CMS, as well as by representatives of the State Survey Agency, acting under contract with CMS.  There is a clear causal nexus between the claims against Defendants and the actions taken by Defendants at the direction of the federal government including, but not limited to, the direction of CDC, CMS, as well as by representatives of the State Survey Agency, acting under contract with CMS, with respect to the response to the pandemic at the facility and the administration of care to Vincent Martin.   Plaintiffs' Complaint alleges deficiencies in infection control, the use of PPE by facility staff and COVID-19 testing.  (See Ex. 1- Complaint, pg. 1, ¶ 1; pg. 4, ¶9; Pg. 4, ¶ 10; pg.  5, ¶ 11, pg. 6; ¶ 15, pg. 14; ¶s 45-48;  pg. 15, ¶s 56-57; and pg. 18, ¶ 64.)  The nexus element is met as Defendants were following the orders/directives of CMS with regard to infection control, COVID-19 testing and the use of PPE.

18.     Lastly, Serrano Post Acute and Benjamin Landa meet the final requirement as they intend to assert colorable federal defenses.   For purposes of removal, the defense must be "colorable"  and need not be "clearly sustainable" as the purpose for the removal statue is to secure the validity of the defense may be tried in federal court. *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). The colorable federal defense element is  met where a defendant alleges its actions were justified as the defendant was complying with federal directives with respect to the alleged wrongful acts. See *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994); and *Mesa v. California*, 489 U.S. 121, 126-127.  See also *Rural Community Workers Alliance v. Smithfield*,  No. 5:20-CV-06063-DGK, --- F.Supp.3d ---- (W.D. Missouri, 2020) finding that compliance with federal guidelines aimed to protect employees from COVID-19 exposure served as a defense to civil liability.) (See Ex. 3 hereto)  Here, Defendants, Serrano Post Acute and Benjamin Landa were complying with Federal directives and regulations issued by CMS and the CDC in responding to all aspects of the COVID-19 pandemic.

19.     As a colorable defense, Defendants, Serrano Post Acute and Benjamin Landa, also assert immunity under the Public Readiness and Emergency Preparedness Act ("PREP Act") as set forth at 42 U.S.C. 247d-6d(a)(1).   This Act provides for immunity of "covered persons" from "suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of covered countermeasure" provided there has been a declaration issued by the Secretary of Health and Human Services with respect to such countermeasure.   On March 10, 2020, United States Health and Human Services Secretary Alex M. Azar issued a Declaration invoking the PREP Act for  the COVID-19 pandemic.    The Declaration was effective as of February 4, 2020. (See Exhibit 4 hereto).   Defendants are "covered persons" under the act.

20.     Under the PREP Act and Secretary Azar's initial Declaration,  the "covered countermeasures" include any qualified pandemic or epidemic product; and any drug,

biologic product or device. A "qualified pandemic or epidemic product" is defined as a drug, biologic product or device, which is a product manufactured, used, designed, developed,  modified, licensed or procured to diagnose, mitigate, prevent, treat or cure a pandemic or epidemic; or to limit the harm such pandemic or epidemic might otherwise cause.  Secretary Azar's Declaration also included as covered countermeasures "any antiviral drug, any biologic, any diagnostic, any other device or any vaccine used to treat, diagnose, cure, prevent, or mitigate COVID-19, or the transmission of SARS-CoV-2 or a virus mutating therefrom, or any device used in the administration of any such product. . ."

21.    In the initial Declaration, Secretary Azar declared that "Administration of Covered Countermeasures means physical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures."

22.    Secretary Azar subsequently  issued an Amended Declaration under the PREP Act, which was effective as of March 27, 2020.  (See Exhibit 5 hereto) The Amendment added respiratory protective devices approved by NIOSH (National Institute for Occupational Safety and Health) as a covered countermeasure under the PREP Act.  In the Amendment, the Secretary stated that  "any respiratory protective devices approved by NIOSH . . . is a priority for use during the public health emergency that [the Secretary] declared on January 31, 2020 .  . . for the entire United States to aid in response of the nation's health care community to the COVID-19 outbreak."

23.    Plaintiffs' Complaint alleges deficiencies with respect to infection control and in the use of PPE by facility staff.  (See Ex. 1- Complaint, pg. 1, ¶ 1; pg. 4, ¶9; Pg. 4, ¶ 10; pg.  5, ¶ 11, pg. 6; ¶ 15, pg. 14; ¶s 45-48;  pg. 15, ¶s 56-57; and pg. 18,  ¶ 64.) The allegations in this action relate to Defendants' administration or use of "qualified

pandemic products" used to diagnose, mitigate, prevent, treat or cure COVID-19, or to limit the harm COVID-19 might otherwise cause including "NIOSH approved respiratory protective devices" and COVID-19 testing kits.  Thus, Defendants' actions as it relates to Plaintiffs' Complaint are "covered countermeasures" under the PREP Act, which qualify for and trigger immunity from liability for the claims in this action.

24.    Removal to federal court is proper in this case, as Defendants, Serrano Post Acute and Benjamin Landa, have established that all elements for removal under the federal officer statute have been met.

## IV.    JURISDICTION EXITS UNDER 28 U.S.C. §1331 (FEDERAL QUESTION)

25.    Plaintiffs Complaint alleges that Defendants failed to protect decedent, Vincent Martin, from the COVID-19 virus.  The Complaint alleges that this case involves "one of the worst outbreaks of COVID-19 in any nursing home in the United States" with an "incredible number of sixteen (16) elderly residents" now dead and seventy-two (72) residents and thirty-seven (37) staff infected.  Plaintiffs state that they "intend to uncover how COVID-19 was allowed to rage uncontrolled through Hollywood Premier Healthcare Center. . ." The  Complaint alleges deficiencies with respect to infection control and in the use of PPE by facility staff.  (See Ex. 1-Complaint, pg. 1, ¶ 1; pg. 4, ¶9; Pg. 4, ¶ 10; pg.  5, ¶ 11, pg. 6; ¶ 15, pg. 14; ¶s 45-48; pg. 15, ¶s 56-57; and pg. 18,  ¶ 64.)   The allegations in this action relate to Defendants' administration or use of qualified pandemic products used to diagnose, mitigate, prevent, treat or cure COVID-19, or to limit the harm COVID-19 might otherwise cause including NIOSH approved respiratory protective devices (facemasks) and COVID-19 testing kits.  Defendants' actions as it relates to Plaintiffs' Complaint are "covered countermeasures" under the PREP Act and therefore the Complaint presents a Federal Question.

26.    The Public Readiness and Emergency Preparedness Act, 42 U.S.C. §§ 247d-6d and 247d-6e (2006) (the "PREP Act")  along with the Declarations of United

-12-

States Health and Human Services Secretary Alex M. Azar, are federal statutes that apply to healthcare providers and skilled nursing facilities, such as Defendants, with respect to the administration of countermeasures to diagnose, treat, prevent and mitigate the spread of COVID-19.

27.    As Plaintiffs have alleged a claim which is preempted under a federal statute, this Court has original jurisdiction pursuant to 28 U.S.C. §1331,  which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."   "A case 'aris[es] under' federal law for §1331 purposes if 'a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.' [Citations omitted.]"   *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 678 (2006).  "[A] state claim may be removed to federal court in only two circumstances—when Congress expressly so provides . . . or when a federal statute wholly displaces the state-law cause of action through complete pre-emption.  When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law."  *Beneficial National Bank v. Anderson*, 539 U.S. 1, 8 (2003).

28.    Here, Plaintiffs' claims are preempted by the PREP Act.  Under the PREP Act, Congress has provided an exclusive remedy for the substance of the allegations and relief sought in the Complaint thereby preempting State law with respect to the claims raised in the Complaint. Moreover, Defendants, Serrano Post Acute and Benjamin Landa's administration of countermeasures, such as the use of facemasks and other PPE, and COVID-19 testing, to diagnose, treat, prevent or mitigate the spread of COVID-19, which forms the basis of this action, presents a federal question under the PREP Act giving this Court original jurisdiction preempting the state claims asserted by Plaintiffs in the Complaint.

29.     The PREP Act provides liability protections for pandemic and epidemic products.   The legislation empowers the Secretary of Health and Human Services to issue a declaration providing immunity for "covered persons" to suits and liability under federal and state law with respect to claims relating to the administration of a "covered countermeasure" during a health emergency. 42 U.S.C. §§ 247d-6d(a)(1).   Specifically, 42 U.S.C. 247d-6d(a)(1) provides as follows: "Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure."

30.     A "covered person" under the PREP Act includes a person or entity that "is qualified person who prescribed, administered, or dispensed such countermeasure. . ." Under the Act, "person" includes "an individual, partnership, corporation, association, entity, or public or private corporation." 42 U.S.C. §247d-6d (i)(2) and (4).   Defendants qualify as "covered persons" under the PREP Act as they are licensed healthcare providers, or owners/officers of licensed healthcare facilities authorized to administer "covered countermeasures" including COVID-19 tests and respiratory protective devices and other PPE.

31.     Here, the PREP Act has been invoked with respect to the COVID-19 pandemic.   United States Health and Human Services Secretary Alex M. Azar issued a Declaration, effective as of February 4, 2020, to provide liability immunity for activities related to medical countermeasures against COVID-19.     Secretary Azar issued an Amendment to this Declaration to specifically include "respiratory protective devices proved by NIOSH" to aid the nation's care community's response to the COVID-19 outbreak.   This Amendment was effective as of March 27, 2020.   (See Exhibits 4 and 5).

32.     The PREP Act further provides: "During the effective period of a declaration . . . or at any time with respect to conduct undertaken in accordance with such declaration, no State or political subdivision of a State may establish, enforce, or continue in effect with respect to a covered countermeasure any provision of law or legal requirement that – (A) is different from, or is in conflict with, any requirement applicable under this section; and (B) relates to . . . use, any aspect of safety or efficacy, or the prescribing, dispensing, or administration by qualified persons of the covered countermeasure, or to any matter included in a requirement applicable to the covered countermeasure under this section . . ." 42 U.S.C. 247d-6d (b)(8).

33.     PREP Act immunity applies to "any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure, including a causal relationship with the purchase, . . . dispensing, prescribing, administration, licensing or use of such countermeasure." 42 U.S.C. 247d-6d(a)(2)(B).  The sole exception to this immunity from suit and liability (other than actions by and against the United States), "shall be for an exclusive Federal cause of action against a covered person for death or serious injury proximately caused by willful misconduct." 42 U.S.C. 247d-6d(d)(1). "Willful misconduct" under the PREP Act, is defined as "an act or omission that is taken—(i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit." 42 U.S.C. 247d-6d  (c)(1)(A).  Plaintiffs have the burden of proving by clear and convincing evidence, "willful misconduct" by each covered person sued and that such "willful misconduct" caused death or serious injury. 42 U.S.C. 247d-6d  (c)(3).

34.     A "program planner or qualified person shall not have engaged in 'willful misconduct' as a matter of law where such program planner or qualified person acted consistent with applicable directions, guidelines, or recommendations by the Secretary

-15-

regarding the administration or use of a covered countermeasure that is specified in the declaration . . . provided either the Secretary or a State or local health authority, was provided with notice of information regarding serious physical injury or death from the administration or use of a covered countermeasure that is material to the plaintiff's alleged loss within 7 days of the actual discovery of such information by such . . . qualified person." 42 U.S.C. 247d-6d(c)(4).

35.   At the time of the allegations set forth in the Complaint, Defendants, Serrano Post Acute and Benjamin Landa, were acting as "program planners" that supervised and/or administered the infection control and COVID-19 specific programs in the treatment of COVID-19 patients, under which countermeasures, including, but not limited to, the use of NIOSH approved respiratory protective devices (facemasks), and other personal protective equipment and the administration of COVID-19 testing  to prevent the spread of COVID-19 while Vincent Martin was admitted to Serrano Post Acute.

36.   At the time of the allegation set forth in the Complaint, Defendants, Serrano Post Acute and Benjamin Landa (an owner of the facility), were also acting as "qualified persons."   Serrano Post Acute is a skilled nursing facility licensed by the California Department of Public Health.  Serrano Post Acute employs licensed nursing personnel, including Registered Nurses and Licensed Vocational Nurses, who are authorized to prescribe, administer, or dispense the covered countermeasures set forth herein (i.e., NIOSH approved respiratory protective devices (facemasks), other personal protective equipment, COVID-19 testing) under the laws of the State of California.

37.   For claims barred pursuant to the immunity under 42 U.S.C. §247d-6d that do not assert "willful misconduct," the exclusive remedy for relief is established under §247d-6e, which permits an individual to make a claim for a "covered injury directly caused by the administration or use of a covered countermeasure."  Even a claimant alleging "willful misconduct" must first apply for benefits under §247d-6e before filing

-16-

an action under §247d-6d (d) relating to the "willful misconduct" thus further illustrating Congress' intent for the Act to cover all claims related to a "covered countermeasure."

38.     Congress has clearly manifested the intent to preempt state law with respect to claims that invoke PREP Act immunity, and has created an exclusive federal remedy for such preempted claims.  Thus, state law has been completely preempted for purposes of federal question jurisdiction.

39.     Plaintiffs' claims for loss were caused by, arise out of, relate to, or resulted from Defendants' administration of covered countermeasures/qualified pandemic products used to diagnose, mitigate, prevent, treat or cure COVID-19, or to limit the harm COVID-19 might otherwise cause including NIOSH approved respiratory protective devices and COVID-19 testing kits.   Thus, Defendants' actions as it relates to Plaintiffs' Complaint are "covered countermeasures" under the PREP Act, which qualify for and trigger immunity from liability for the claims in this action.   Plaintiffs' Complaint therefore invokes a federal question and Plaintiffs state law claims are completely preempted under the PREP Act.   Removal is therefore proper under 28 U.S.C. §§ 1331, and 1441(a).

40.     Federal jurisdiction is further appropriate as this state action "arises under" federal law and raises a substantial federal issue.  See *Grable & Sons Metal Products. v. Darue Enginerring & Manufacturing*, 545 U.S. 308 (2005).  The applicability of the PREP Act poses a substantial federal issue which would serve to clarify and determine vital issues of federal law.

WHEREFORE, Defendants, Serrano Post Acute and Benjamin Landa, having established that this case is properly removed to Federal Court, Defendants provide notice pursuant to 28 U.S.C. §1446, that the action pending in the Superior Court of the State of California County of Los Angeles, Case No. 20STCV19545, is properly removed to the United States District Court for the Central District of California, and respectfully requests that this Court exercise jurisdiction over this case.   Should

Plaintiffs file a Motion to Reman this action, Defendants, Serrano Post Acute and Benjamin Landa request an opportunity to oppose the Motion and more fully respond in a supplemental memorandum.

Dated: July 1, 2020                                WILSON GETTY LLP


                                        By:  _/s/ Kim S. Cruz_____
                                             William C. Wilson
                                             Kim S. Cruz
                                             Ryan Canavan

                                        Attorneys for Defendant SERRANO POST
                                        ACUTE, LLC dba HOLLYWOOD PREMIER
                                        HEALTHCARE CENTER

EXHIBIT 1

Electronically FILED by Superior Court of California, County of Los Angeles on 05/21/2020 12:25 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton,Deputy Clerk
Case 2:20-cv-05937-DSF-SK   Document 1   Filed 07/01/20   Page 20 of 116   Page ID #:20
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Gregory Alarcon

ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California  94010
Telephone:  (650) 697-6000

GARY ALLAN PRAGLIN (SBN 101256)
gpraglin@cpmlegal.com
KELLY WINTER WEIL (SBN 291398)
kweil@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008

*Attorneys for Plaintiffs*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| **EMMA MARTIN,**<br>**ELIZABETH GAGLIANO** and<br>**KATHRYN SESSINGHAUS,** individually<br>and as heirs of **VINCENT PAUL MARTIN**,<br>deceased,<br><br>               Plaintiffs,<br><br>        v.<br><br>**Serrano Post Acute LLC** d/b/a<br>**HOLLYWOOD PREMIER**<br>**HEALTHCARE CENTER,**<br>a/k/a Serrano Healthcare,<br>a/k/a Serrano North Convalescent Hospital;<br>**BENJAMIN LANDA**, an individual;<br>**MARCEL ADRIAN SOLERO FILART**,<br>and individual; and,<br><br>**DOES 1-50**.<br><br>               Defendants. | Case No. 2 0 S T C V 1 9 5 4 5<br><br>**COMPLAINT:**<br><br>1. **VIOLATIONS OF THE ELDER AND**<br>   **DEPENDENT ADULT CIVIL**<br>   **PROTECTION ACT (**Welfare &<br>   Institutions Code §15600 *et seq.*)<br><br>2. **NEGLIGENCE**<br><br>3. **WRONGFUL DEATH**<br><br>4. **FRAUDULENT CONCEALMENT**<br><br>5. **FRAUDULENT**<br>   **MISREPRESENTATION**<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

# Table of Contents

Page(s)

I.  INTRODUCTION ................................................................................................. 1

II.  JURISDICTION AND VENUE ......................................................................... 7

III.  PARTIES ............................................................................................................ 8

    A.  Plaintiffs ....................................................................................................... 8

    B.  Defendant HPHC .......................................................................................... 9

    C.  Defendant Benjamin Landa ......................................................................... 9

    D.  Defendant Marcel Adrian Solero Filart ...................................................... 9

    E.  DOE Defendants .......................................................................................... 9

IV.  AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY ... 10

V.  STANDING TO BRING THIS SURVIVAL ACTION .................................. 10

VI.  FACTUAL BACKGROUND ........................................................................... 11

    A.  The Background of Elder Abuse and Neglect In California and at HPHC ..... 11

    B.  Understaffing at HPHC .............................................................................. 12

    C.  Mr. Martin Entered HPHC for Post-Surgery Care .................................... 14

    D.  The Family's Final Visits to Mr. Martin in February 2020 ....................... 14

    E.  COVID-19 Takes Hold at HPHC and HPHC Goes Into Lockdown ........... 14

    F.  Staff Admits to Mr. Martin's Family That There Is a Staffing Crisis: Two Nurses Were Caring for Eighty-Three Residents .......................................... 15

    G.  Timeline of Vince Martin's Last Days ...................................................... 15

    H.  HPHC Refuses Requests by Mr. Martin's Family for Information ............ 18

VII.  CAUSES OF ACTION ................................................................................... 19

    FIRST CAUSE OF ACTION ELDER ABUSE AND NEGLECT UNDER THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT ............................. 19

    SECOND CAUSE OF ACTION NEGLIGENCE ............................................... 20

    THIRD CAUSE OF ACTION WRONGFUL DEATH ........................................ 22

    FOURTH CAUSE OF ACTION FRAUDULENT CONCEALMENT ............... 25

    FIFTH CAUSE OF ACTION FRAUDULENT MISREPRESENTATION .......... 26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VIII. PRAYER FOR RELIEF**................................................................................27

DEMAND FOR JURY TRIAL ................................................................28

Plaintiffs **Emma Martin**, **Elizabeth Gagliano** and **Kathryn Sessinghaus**, individually and as heirs, and successors in interest of **Vincent Paul Martin**, deceased, bring this action for damages against defendants **Serrano Post Acute LLC d/b/a Hollywood Premier Healthcare Center a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital** ("Defendant") or ("HPHC"); **Benjamin Landa**; and **Dr. Marcel Filart**.

## I. INTRODUCTION

1. This case is one of the worst outbreaks of COVID-19 in any nursing home in the United States, the incredible number of sixteen (16) elderly residents are now **dead** and seventy-two (72) residents have been infected, along with thirty-seven (37) staff (109 infections), **hidden** from the public are others. This case involves just one of the individuals that has died—eighty-four-year-old Vincent Paul Martin ("Mr. Martin" or "Vince"). Mr. Martin's wife and daughters intend to uncover how COVID-19 was allowed to rage uncontrolled through Hollywood Premier Healthcare Center ("HPHC").



(Source: Family picture of Mr. Martin celebrating his birthday at HPHC in August 2015)

**COMPLAINT**                                                                                           1

2.      Several of the individuals involved with the nursing home have had past brushes with the law – Defendant Landa was found liable for human trafficking of Filipino nursing staff – Defendant Filart was named as having received kickbacks in an illegal Medicare-Medi-Cal scam that resulted in a $42 million dollar settlement with the U.S. Government.

3.      Mr. Martin did not lose his life because of an unavoidable act-of-God, rather he lost his life because HPHC's owners and managers had a long-standing practice of keeping the nursing home understaffed and skirting safety and infection controls as set forth below.

4.      Mr. Martin died in the early hours of Saturday April 4, 2020. HPHC knew that Mr. Martin was COVID-19-suspected but delayed testing him. HPHC only tested Mr. Martin after his family plead for the test. Even then, staff told the family that they could not order the COVID-19 test right away because a doctor had to approve it. When HPHC finally tested Mr. Martin, it was too late. Mr. Martin's positive test result came back the day **after** he died.

5.      HPHC, individually and through its staff and employees, **admitted** to the family that the 99-bed nursing home had only two nurses working, just days before Mr. Martin's death. Shortly after Mr. Martin's death, HPHS made national news due to the severity of the COVID-19 outbreak at the facility. The fraudulent concealment of the conditions was overwhelming.

6.      This situation at the HPHC nursing home became so serious and deadly that HPHS was one of a handful of facilities in LA County where the National Guard was deployed. This help came too late for Mr. Martin and many of the other residents to prevent their deaths.

7.      The National Guard was deployed to HPHC in late April, however, Defendants knew that there was a serious outbreak at the facility by mid-March 2020 when HPHC's Administrator Juhn Cayabyab, NHA, contracted COVID-19, yet HPHC did not test its residents and staff for COVID-19.

/./
/./
/./
/./
/./

**COMPLAINT**                                                                 2



National Guard Sgt. Joseph Schlitz enters the Hollywood Premier Healthcare Center, which has seen 25 coronavirus cases among staff and 29 among residents. (Brian van der Brug/Los Angeles Times)

/././

/././

/././

/././

/././



8.     There have been at least eighty-one (81) COVID-19 infections at HPHC as of May 14, 2020. (See, **Exhibit 1** (May 14 and 19, 2020 letters posted on HPHC website). There have been at least sixteen (16) deaths. Prior to May 14, 2020, HPHC purposely underreported COVID-19 infection rates to the State of California and to residents and their families. As reflected in **Exhibit 1** HPHC is now only accepting COVID-19 positive residents.

9.     In Mr. Martin's case the nursing home's doctor, Dr. Marcel Filart, failed to put COVID-19 on Mr. Martin's death certificate, despite Mr. Martin's positive COVID-19 test result. (**Exhibit 2**). In addition, HPHC intentionally did not inform the funeral home that Mr. Martin was COVID-19 positive or COVID-19 suspected, which put the funeral home staff in grave danger. Undisputedly, HPHC knew that it was experiencing an outbreak at this point – even its own Administrator was out sick with COVID-19 since March.

10.     Mr. Martin's wife, Plaintiff Emma Martin is a pediatric nurse practitioner and was deeply troubled when she last visited the facility in March to drop off items for her husband and observed the lack of personal protective equipment ("PPE") being used at HPHC despite the emerging pandemic. What she did not know at the time was that HPHC had been cited by the State of California in June 2019 for deficient PPE practices, as discussed in greater detail in

**Exhibit 3**, pages 4-5.  Again, this is not a situation where a well-run nursing home was caught off guard by the pandemic—HPHC's deficient and dangerous practices predate the pandemic.

11.     Just three days after Mr. Martin's death, one of the HPHC nursing staff posted the following picture on Facebook – which is notable both for the claim that this staff member had been working 20 hour shifts – and because she was at a nursing station with no PPE:



12.    Mr. Martin's family has been requesting HPHC's nursing records pertaining to Mr. Martin's care since April 10, 2020. As of the date of this Complaint, **HPHC has refused** to provide them, saying that medical records requests must go through "corporate offices" per facility policies. The records department staff told Lisa that "corporate" needs to approve the disclosure of records before they are provided to family members. HPHC's delay is illegal under state and federal law. *See*, 42 CFR § 483.10; Cal. Health and Safety Code § 123110.

13.    There are many heroes among our Country's nurses, however, the owners and operators of HPHC are not heroes. They have profited on the backs of senior citizens, their families, as well as Medicare and Medi-Cal – and on the backs of their overworked staff. According to court records, one of the owners of HPHC, Benjamin Landa, was found liable for human trafficking of Filipino nursing staff last year. (See, **Exhibit 4**)[1]

14.    Mr. Martin's death was preventable, as was much of his pain and suffering.  His last days were spent in horrific circumstances, in a room with at least two other residents and without his wife and daughters by his side.

15.    It was entirely foreseeable that COVID-19 would rage like a wildfire through the rooms of Hollywood Premier Healthcare Center, given that there were not enough staff to isolate and care for positive residents. When staff are forced to travel between COVID-19 positive and COVID-19 negative seniors, they spread highly infectious disease in their wake. Also contributing to the fire-storm was HPHC's practice of cramming small resident rooms with multiple elderly residents. Mr. Martin was housed in a small room with two other residents.

16.    As a nursing home, HPHC was charged with providing much needed care and rehabilitation services to dependent and elderly adults in Los Angeles County.  Like other skilled nursing facilities ("SNFs"), HPHC was entrusted with highly vulnerable individuals who often

---

[1] *See*, **Exhibit 4**, which includes the cover sheets of the relevant court rulings: *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17-cv-1302 (NG) (JO), 2019 U.S. Dist. LEXIS 165587 (E.D.N.Y. Sep. 23, 2019), *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17-cv-1302 (NG) (JO), 2020 U.S. Dist. LEXIS 4837 (E.D.N.Y. Jan. 9, 2020). Only discovery will tell whether such human rights abuses extended to HPHC's nursing staff.

had multiple physical and cognitive impairments that required extensive assistance in the basic activities of daily living such as dressing, feeding, and bathing.

17.     Like the other residents housed at HPHC, Mr. Martin was entirely dependent on HPHC. HPHC's most important duty was to protect its residents from health and safety hazards. HPHC failed to provide adequate care and Mr. Martin contracted COVID-19, succumbed to the disease, and died without family by his side. HPHC must be held accountable.

18.     The California Legislature has recognized the important role of civil litigation in remedying abuse and neglect of elders and dependent adults. As stated in the "Elder Abuse and Dependent Adult Civil Protection Act" ("EADCPA"):

> The Legislature … finds and declares that infirm elderly persons and dependent adults are a disadvantaged class, that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits.

19.     California Welfare & Institutions Code Section 15600. Plaintiffs want to ensure that Mr. Martin's death is not just another sad statistic.

## II.     JURISDICTION AND VENUE

20.     Venue is proper in this County because Defendant is located and/or performs business in this County, and a substantial part of the events, acts, omissions and transactions complained of herein occurred in this County. Defendant operates the SNF at issue in this case at 5401 Fountain Avenue Los Angeles, CA 90029.

21.     Each Defendant has sufficient minimum contacts with California, and has purposely availed itself of benefits and protections of California, and does business in California so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

22.     The amount in controversy exceeds the jurisdictional minimum of this Court.

/././

/././

/././

**COMPLAINT**                                                                                           7

III.   **PARTIES**

    A.   **Plaintiffs**

    23.   Plaintiff Emma Martin ("Emma") is, and at all times herein mentioned was, the wife and successor in interest and heir of the decedent, Vince Martin.  Emma Martin was actively involved in her husband's care and visited Mr. Martin frequently.  Emma Martin is 82-years old and is a retired pediatric nurse practitioner. Plaintiff Emma Martin is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48.

    24.   Plaintiff Elizabeth Gagliano ("Lisa") is, and at all times herein mentioned was, the daughter and successor in interest and heir of the decedent, Vince Martin.  Elizabeth Gagliano was involved in her father's care and visited Mr. Martin when in town. Plaintiff Elizabeth Gagliano is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48.

    25.   Plaintiff Kathryn Sessinghaus ("Kathy") is, and at all times herein mentioned was, the daughter and successor in interest and heir of the decedent, Vince Martin.  Kathy was actively involved in her father's care and visited Mr. Martin frequently.  Plaintiff Kathy Sessinghaus is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48.

    26.   Plaintiffs Elizabeth Gagliano and Kathy Sessinghaus are the only surviving children of Vince Martin.

/././

/././

/././

/././

/././

/././

**COMPLAINT**                                                                                                    8

**B.** **Defendant HPHC**



27. Serrano Post Acute LLC d/b/a Hollywood Premier Healthcare Center was, at all times relevant herein, a skilled nursing facility which provides services at 5401 Fountain Avenue Los Angeles, CA 90029, which is also its principal place of business.

**C.** **Defendant Benjamin Landa**

28. Mr. Landa owns and/or controls HPHC. Mr. Landa is a resident of Brooklyn, New York.

**D.** **Defendant Marcel Adrian Solero Filart**

29. Defendant Marcel Adrian Solero Filart ("Filart") is, and at all times relevant hereto was, a resident of Los Angeles County, California; a physician licensed to practice medicine in the State of California; and affiliated with HPHC. As reflected in **Exhibit 5**, Filart was named in a 2016 False Claims Act case as having received kickbacks—the case was later settled by the Department of Justice for $42 million dollars.

**E.** **DOE Defendants**

30. Plaintiffs are ignorant of the names of those Defendants sued as DOES 1 through 50 and for that reason has sued DOE Defendants by fictitious names.  Plaintiffs further allege that each of said fictitious DOE Defendants is in some manner responsible for the acts and

occurrences hereinafter set forth.  Plaintiffs will seek leave of the court to amend this Complaint to show their true names and capacities when the DOE Defendants are ascertained, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Plaintiffs.

## IV.   AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY

31.    Plaintiffs are informed and believe, and upon such basis allege, that at all times herein mentioned, each of the Defendants, including those named as DOE defendants, herein was an agent, servant, employee and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, and/or joint venture.

32.    Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of his/her primary wrongdoing and realized that his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

33.    Defendants, and each of them, conspired with each other and with others, to perpetrate the unlawful scheme on Plaintiffs, as alleged in this Complaint.  In so doing, each of the Defendants have performed acts and/or made statements in furtherance of the said conspiracy, while at all times acting within the scope of and in furtherance of the conspiracy alleged in this Complaint, and with full knowledge of the goals of that conspiracy.

## V.   STANDING TO BRING THIS SURVIVAL ACTION

34.    Pursuant to the provisions of Code of Civil Procedure section 377.32 and Welfare Institutions Code section 15657.3(d), Plaintiffs Emma Martin, Lisa Gagliano and Kathy Sessinghaus ("Plaintiffs"), as successors-in-interest to decedent Vince Martin, are lawfully entitled to pursue all survival claims and causes of action for damages on behalf of decedent Vince Martin.

35.     Additionally, pursuant to the provisions of Welfare and Institutions Code section 15657.3(d) and section 48 of the Probate Code, Plaintiffs are interested persons, as defined by section 48 of the Probate Code, and are thus each lawfully entitled to pursue all claims and causes of action in a survival action on behalf of decedent Vince Martin.

## VI.   FACTUAL BACKGROUND

36.     84-year old, Vince Paul Martin died of COVID-19 on Saturday April 4, 2020. He was a resident of HPHC, which is located in Hollywood (5401 Fountain Avenue Los Angeles, CA 90029). Vince born in Brooklyn, New York. He served in both the U.S. Army and the Army Reserve, having served in the 1950s and 1960s. After getting out of the Army he attended the Pratt Institute in New York to become a graphic designer. He then worked in advertising in the entertainment industry, including time on the Jack Parr Show, and worked at advertising agencies in New York and Los Angeles.  In the 1960s he moved to Los Angeles where he worked as a graphic artist for the City of Los Angeles, both with the Los Angeles Public Libraries and the Department of Water and Power. He retired in the mid-90s.

37.     Vince was married to Emma from 1964 until his death at HPHC. He and Emma had two daughters (Plaintiffs Lisa and Kathy) and five grandchildren.

### A.     The Background of Elder Abuse and Neglect In California and at HPHC

38.     While SNFs are expected to keep their residents safe from harm, the truth is that abuse and neglect in such facilities has become a problem throughout the nation and the State of California. HPHC has a history of providing sub-standard care. In 2019 alone, the United States Department of Health and Social Services cited HPHC for the following deficiencies:

- Nursing staff failed to don a gown and mask when caring for an infected resident who was in isolation, instead the staff member touched the resident and then did not wash their hands;

- Failed to ensure proper infection controls due to failure to remove and clean equipment with the "potential to spread infection and transmission of communicable disease";

- Failed to label oxygen tubing with a resident's name, a "deficient practice" that "had the potential to result in infection to the resident";

**COMPLAINT**                                                                                11

- Putting four residents in a 420 square foot room (HPHC actually had a fifth unoccupied bed in this small space);
- Not reporting an injury of unknown source to the State;
- Failed to protect from fall hazards;
- Illegally implementing advance care directives (end of life plans) without needed consent, with the potential of denying residents necessary treatments;
- Keeping call lights out of reach of residents;
- Improper use of physical restraints;
- Failing to put care plans in place for residents;
- Failing to provide needed eyewear, and instead allowing a resident to use glasses that were taped together with packaging tape and duct tape;
- Failing to properly angle a resident's bed to prevent the development of pneumonia;
- Failing to post daily staffing information for review by residents and visitors.

Again, HPHC was cited for all the above deficiencies in 2019 (plus additional deficiencies that are not listed). The situation was equally bleak in 2018. Under the circumstances that prevailed at HPHC pre-COVID-19, it was inevitable that the nursing home would be ravaged by COVID-19. This is supported by a GAO study dated May 20, 2020, which described the prevalence of infection prevention and control deficiencies in nursing homes prior to the COVID-19 pandemic and drew a correlation between facilities with deficiencies in 2018-2019 and current COVID-19 outbreaks. *Infection Control Deficiencies Were Widespread and Persistent in Nursing Homes Prior to COVID-19 Pandemic*, GAO-20-576R: Published: May 20, 2020 (accessible at https://www.gao.gov/assets/710/707069.pdf).

## B. Understaffing at HPHC

39. HPHC has been chronically understaffed for years. This set up the perfect storm when the COVID-19 pandemic hit.

/././

/././

/././

40.     According to a 2016 UCSF study, HPHC (f/k/a Serrano North Convalescent Hospital), had 95.80% turnover—among the worst in the State of California.[2] That same report noted that the facility had below average staffing of supervisors, Registered Nurses ("RNs"), Licensed Vocational Nurses ("LVNs") and Licensed Practical Nurse ("LPN"), instead relying on Nursing Assistants with minimal qualifications. HPHC chose to staff the nursing home with underqualified staff in order to save money and increase profits for the owners.

41.     In keeping with the earlier UCSF study, Medicare.gov currently rates HPHC as "below average":



## HOLLYWOOD PREMIER HEALTHCARE CENTER

**Overall rating** ⓘ: ⭐⭐● ● ●

Below Average

Also, per Medicare.gov, HPHC has overall below average staffing levels:

**Staffing**

The information in this section includes registered nurses (RN), licensed practical/vocational nurses (LPN/LVN), nurse aides, and physical therapists (PT). Physical therapists aren't included in the 'all staffing' star rating.

The "staffing" star rating takes into account that some nursing homes have sicker residents and may therefore need more staff than other nursing homes whose residents aren't as sick.

| | HOLLYWOOD PREMIER HEALTHCARE CENTER | CALIFORNIA AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| Staffing rating | ⭐⭐●●● Below Average | | |
| Average number of residents per day | 97.4 | 86.6 | 85.9 |
| Total number of licensed nurse staff hours per resident per day | 1 hour and 19 minutes | 1 hour and 46 minutes | 1 hour and 34 minutes |
| RN hours per resident per day | 22 minutes | 38 minutes | 41 minutes |
| LPN/LVN hours per resident per day | 57 minutes | 1 hour and 8 minutes | 52 minutes |
| Nurse aide hours per resident per day ⓘ | 2 hours and 25 minutes | 2 hours and 35 minutes | 2 hours and 18 minutes |
| Physical therapist staff hours per resident per day ⓘ | 4 minutes | 6 minutes | 5 minutes |

**Registered Nurse (RN) staffing only**

Registered nurses (RNs) are licensed healthcare professionals who are responsible for the coordination, management and overall delivery of care to the residents. Some nursing home residents who are sicker than others may require a greater level of care, and nursing homes that have more RN staff may be better able to meet the needs of those residents.

| | HOLLYWOOD PREMIER HEALTHCARE CENTER | CALIFORNIA AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| Registered Nurse (RN) staffing rating | ⭐⭐●●● Below Average | | |
| Average number of residents per day | 97.4 | 86.6 | 85.9 |
| RN hours per resident per day | 22 minutes | 38 minutes | 41 minutes |

42.     As noted by a leading UCSF study, "[m]any California studies have demonstrated that serious quality of care problems have been associated inadequate staffing levels, and most

---

[2] "California Nursing Home Chains by Ownership Type Facility and Resident Characteristics, Staffing, and Quality Outcomes in 2015" UCSF, Dr. Charlene Harrington and Dr. Leslie Ross.

**COMPLAINT**                                                                                    13

1   importantly, low RN staffing (Kim, *et al.*, 2009a 2009b; Schnelle, *et al.*, 2004).” “California

2   Nursing Home Chains by Ownership Type Facility and Resident Characteristics, Staffing, and

3   Quality Outcomes in 2015” UCSF, Dr. Charlene Harrington and Dr. Leslie Ross.

4   **C.**   **Mr. Martin Entered HPHC for Post-Surgery Care**

5   43.   Vince Martin went to HPHC in January 2014 due to spinal stenosis after

6   undergoing surgery. At the time, Mr. Martin’s family were presented with few options for where

7   Mr. Martin could go. The monthly fees quickly drained Emma and Vince Martin’s retirement

8   funds. Plaintiffs wished they could afford different care, but like many families needing nursing

9   home care for a loved one, their options are limited by their insurer, spots available, and family

10   finances.

11   44.   Prior to the outbreak, Plaintiffs visited Mr. Martin frequently. However, as the

12   pandemic hit California in February Plaintiffs noted that it seemed like there were no protocols

13   in place at HPHC to deal with the outbreak.

14   **D.**   **The Family’s Final Visits to Mr. Martin in February 2020**

15   45.   Because of the COVID-19 pandemic, the last time the family was able to visit in

16   person with Vince was in February. More specifically, Emma visited her husband either February

17   27 or 28. Emma did not observe PPE on the staff.

18   46.   On February 29, 2020, Kathy visited her father – she also noticed the lack of PPE

19   on the staff.

20   47.   Subsequently in March 2020, Emma went to drop off items for Vince and was met

21   by a staff member at the door. Emma was distressed when she observed that the staff member

22   did not have PPE on—that HPHC was not taking basic precautions—especially given that the

23   facility was in lock-down.

24   **E.**   **COVID-19 Takes Hold at HPHC and HPHC Goes Into Lockdown**

25   48.   By the first week of March the family was told that visitors were no longer allowed.

26   Family could still bring supplies and presents to the door of the facility. During the week of

27   March 2, Kathy brought a book and snacks to HPHC – she was met by a staff member at the

28   door who took the items – this staff member was not wearing a mask.

**COMPLAINT**                                                                                  14

49.     During March, Emma would call to check in and sometimes the staff picked up and sometimes they did not. It was a frustrating and scary time for the Martin family since they had no way of really knowing how Mr. Martin was doing day to day.

50.     On March 19, 2020, Lisa called HPHC and asked if she could mail Vince a care package of historical magazines (Mr. Martin took immense pleasure in reading) but was told that it was best not to mail anything.

51.     On April 1, 2020 Kathy asked nurse "Elizabeth" if there were any active COVID-19 cases at HPHC – Elizabeth reluctantly told her that there was at least one case.  Later in the conversation Elizabeth (nursing staff) admitted to Kathy that there were actually *four* active cases in the facility. The family was very concerned in part because it is not a large facility – there is not a lot of space and the residents were packed into tight quarters. The staff member told Kathy that the facility was managing the situation by keeping all the COVID-19 cases on the other side of the facility from Vince. Unbeknownst to Mr. Martin's family, the Administrator of HPHC was out battling COVID-19 since March 2020. Even after its own Administrator became infected with COVID-19, HPHC failed to take steps to protect residents and staff and failed to test its residents and staff for COVID-19.

**F.     Staff Admits to Mr. Martin's Family That There Is a Staffing Crisis: Two Nurses Were Caring for Eighty-Three Residents**

52.     During one call on April 1, 2020 "Elizabeth" (nursing staff) admitted to Lisa that the situation was dire and that there were only two nurses for eighty-three residents. Lisa was alarmed, she knew that there was no way that two nurses could care for eighty-three patients without transmitting COVID-19 between the residents.

53.     Lisa could hear that "Elizabeth" was exhausted when she told Lisa that "more staff are coming."

**G.     Timeline of Vince Martin's Last Days**

54.     On or about Wednesday April 1, 2020, HPHC's staff called Emma Martin and said that Vince had a fever, was not eating or drinking and was confused. This was the first time that Vince's family was informed that he was sick. Emma Martin called her daughters.

**COMPLAINT**                                                                                    15

55.     In the early evening of April 1, daughter Kathy called HPHC to see how her father was doing. Nurse Elizabeth said Vince had a fever, was confused, had trouble breathing and was not eating or drinking. Kathy asked if tests had been ordered and Elizabeth said they had not been ordered yet. Kathy insisted that the facility conduct a urine test and a COVID-19 test. "Elizabeth" (nursing staff) said that they needed a doctor's approval for the COVID-19 test, which they would request the next day. Elizabeth admitted to Kathy that there were four COVID-19 positive residents at HPHC. Kathy asked where the COVID-19 positive residents were in the building. Elizabeth responded that they were in the other side of the facility. Elizabeth also mentioned how she was exhausted and cried in the shower before coming to work due to the situation at HPHC with staff not coming to work.

56.     Later that same evening, just after 10 p.m. Lisa called and spoke to nurse Elizabeth to see how her father was doing.  Elizabeth said that Vince seemed to be doing better than earlier and that he was responsive when spoken to. Lisa confirmed with Elizabeth that a COVID-19 and urinalysis were going to be done per the phone conversation Elizabeth had with Kathy earlier that evening.  Lisa asked if other typical blood drawn labs could be done, especially ones that would check white blood cell count and red blood cell count and to see how Vince's kidneys and liver were doing. Elizabeth confirmed she would ask to get approval for these tests too.  Lisa asked about the COVID-19 positive residents and if they were separated from patients that did not have COVID-19.  Elizabeth said they were separated. Lisa asked if her father was awake and Elizabeth said probably not. Lisa mentioned that if he was awake, she wanted to be put on speaker phone to talk to him. Elizabeth mentioned another day would be best because there were just two nurses there for 83 patients.

57.     Only recently did the family learn that HPHS had done a chest x-ray on Wednesday April 1, 2020. HPHS did not notify the family that this was being done.  This fact strongly suggests that the facility understood that Mr. Martin was likely COVID-19 positive. Recently Mr. Martin's family learned that HPHC did not tell the mobile imaging company that there was an active COVID-19 infection in the building.

58.     Kathy called the facility on Thursday April 2, 2020 to find out if her father's test results were available. During an early evening call, a staff member told her father's test results were not in/reported. Kathy asked if the COVID-19 test was done and if the urinalysis were taken too and the staff member said "yes, but no results yet." Emma had also corresponded with HPHC on Vince's status at some point during the day. According to lab reports that were texted to Lisa on April 3, 2020, those lab results were received earlier on April 2, 2020 for Vince's blood work (except COVID-19 and Troponin I), but this information was not disclosed to the family.

59.     On Friday April 3, 2020 Lisa called in the late afternoon to see how her father was doing and to find out about his test results. A member of the nursing staff "Joanne" mentioned that Vince was doing worse than when she saw him the previous day.  Joanne mentioned Vince was given hydration/saline earlier in the day and reported that Vince was still not eating and drinking, was confused, had trouble talking and was congested.  Lisa asked if blood test results, results from the COVID-19 test and the urinalysis were in/reported.  Joanne said a urinalysis was never done and the COVID-19 result was not in yet. Lisa asked why the urinalysis was not done. Joanne did not have an answer. Lisa asked Joanne to take a picture of Vince's labs and text them to her. After the call, "Joanne" texted Lisa pictures of her father's lab results. The lab results show that the labs were done on Thursday, April 2, 2020 at 11:30 a.m., and were reported only a half an hour later at 12:01 p.m. and then faxed to HPHC at 1:20 p.m. the same day.  It appears that one lab test lagged with results on April 3, 2020 at 10:03 a.m. (As of the date of this Complaint, the family still has not received the Troponin I test results.)

60.     Later that evening Lisa called HPHC to check and see if the antibiotics were given, see if urinalysis was done and to see if she could talk to Vince on the speaker phone. Joanne had left for the day.  Elizabeth said that a urinalysis still had to be done. Elizabeth put Lisa on speaker phone with her father. Lisa heard her father try to speak, but it was hard to understand him, and he was unable to carry on a conversation. This was the last time that anyone in the family spoke to Vince.

61.     After Vince's death, his family learned that the COVID-19 testing kit was received by the lab in the early afternoon of April 3, 2020.

62. Vince died in the early hours of Saturday April 4, 2020. Vince was one of three residents housed in a single room.

63. The funeral home picked up Vince's body two hours after Vince died. The funeral home was not told by the facility that Vince was COVID-19-positive or COVID-19-suspected, thus their staff did not know to don PPE. Upon information and belief, HPHC had a practice of bringing in outside vendors and not informing them that there was a COVID-19 outbreak.

64. On Sunday April 5, 2020, after Vince had died, the COVID-19 positive test result came back, although HPHC did not tell the family until Emma specifically called to ask on April 7, 2020.

65. The death certificate, issued on April 9, 2020, and certified by Dr. Marcel Filart, lists cardiac arrest, hypertension and coronary artery disease as the cause of death. (**Exhibit 2**). Mr. Martin's COVID-19 test result was reported on April 5 before Dr. Filart signed off on the causes of death on April 9. Further, it was Dr. Filart who authorized the COVID-19 test (after Mr. Martin's family insisted on the test), so there is no doubt that he was aware that Mr. Martin had been tested and that the results would be available when he fraudulently prepared the death certificate. It was only at the insistence of Mr. Martin's family that Dr. Filart sought to amend Mr. Martin's death certificate. (**Exhibit 6**). More specifically, Dr. Filart had no intention of correcting Mr. Martin's death certificate until Lisa Gagliano insisted that it was fraudulent to leave COVID-19 off Mr. Martin's death certificate. Defendants intended to hide COVID-19 results in order to keep vital information from residents, families, staff and the government.

**H.    HPHC Refuses Requests by Mr. Martin's Family for Information**

66. Plaintiff Lisa Gagliano has been trying to get her father's records from HPHS since April 10, 2020 (by phone and e-mail). She has been told that "corporate needs to review the records request before records are released." "Elizabeth" (in records) was originally the person Lisa was interacting with in HPHC's records department, however, over the past couple of weeks, Lisa has been told that "Elizabeth" in records has "not been in." It has sense been confirmed that she is out due to COVID-19.

1   67. To this day, Mr. Martin's urinalysis results still have been withheld. This calls

2 into question whether the urinalysis was ever done in the first place.

3   68. On April 10, 2020, Lisa spoke to Elizabeth (nursing staff), and in response to

4 Lisa asking if she was going to get tested, Elizabeth said "I don't want a test, no test for me."

5   69. Any applicable statute of limitations have been tolled by virtue of HPHC's failure

6 to provide records to Plaintiffs.

7 **VII. <u>CAUSES OF ACTION</u>**

8          **FIRST CAUSE OF ACTION**

9   **ELDER ABUSE AND NEGLECT UNDER THE ELDER ABUSE AND**

10     **DEPENDENT ADULT CIVIL PROTECTION ACT**

11        (Against All Defendants)

12   70. Plaintiffs incorporate by reference and re-allege all of the allegations contained in

13 the preceding paragraphs of this Complaint as though fully set forth herein.

14   71. At all relevant times, Vincent Paul Martin was an elder as defined by Welfare &

15 Institutions Code section 15610.27.  He was 84 years old at the time of Defendants' conduct.

16   72. The actions described above constitute abuse of an elder as defined by the Welfare

17 and Institutions Code section 15610.07.  Defendants HPHC and Dr. Marcel Filart neglected Mr.

18 Martin, abandoned their obligations to Mr. Martin and engaged in other mistreatment that

19 resulted in physical harm, pain and mental suffering. Defendants HPHC and Dr. Filart, as Mr.

20 Martin's care custodians, deprived Mr. Martin of services that were necessary to avoid physical

21 harm and mental suffering. Defendants HPHC and Benjamin Landa failed to provide adequate

22 funding and staffing to ensure that HPHC provided necessary care to Mr. Martin.

23   73. The actions described above constitute neglect as defined by the Welfare and

24 Institutions Code section 15610.57 in that the Defendants negligently failed to exercise a degree

25 of care that a reasonable person in a like position would exercise.  Among other things,

26 Defendants failed to:  (1) exercise the degree of care that a reasonable person in a like position

27 would exercise; (2) protect Mr. Martin from health and safety hazards; (3) provide necessary care

28 and protection; (4) provide medical care for physical and mental health needs; (5) prevent

malnutrition and dehydration; (6) create and update an adequate plan of care to protect Mr. Martin given the COVID-19 outbreak at HPHC; (7) provide adequate staffing levels to provide Mr. Martin with the assistance that he needed; and (8) adequately train staff to assess and respond to infectious outbreaks.  As described in this Complaint, Defendants' conduct constitutes neglect of an elder under Welfare and Institutions Code section 15610.57 (a)(1) and (b)(1)-(4).

74.     Mr. Martin has been harmed by Defendants' conduct as described herein.  The pattern of substandard care and neglect to Mr. Martin put him at extremely high risk for infections and resulting complications, including injury and death. Defendants' conduct was a substantial factor in causing Mr. Martin to suffer physical, emotional, and economic harm, as well as other damages in an amount to be determined according to proof.

75.     Defendants acted with recklessness, malice, oppression, and/or fraud.  Among other things, Defendants neglected to take the necessary precautions to prevent Mr. Martin's injuries.  Plaintiffs, individually and as successors-in interest to Mr. Martin are entitled to compensatory damages, as well as punitive damages in an amount to be determined according to proof, as well as attorney's fees and costs pursuant to Welfare and Institutions Code section 15657.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CAUSE OF ACTION

### NEGLIGENCE

(Against All Defendants)

76.     Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

77.     By virtue of their roles as caretakers and by virtue of the fact that Mr. Martin was a dependent adult residing at the HPHC, Defendants had a duty to exercise a degree of care that a reasonable person in a like position would exercise.  Defendants failed to do so.  Among other things Defendants had a duty to:

a.   Adequately staff HPHC;

**COMPLAINT**                                                                                              20

      b.  Ensure that each worker received adequate training before working with Mr. Martin;

      c.  Provide services that meet professional standards of quality;

      d.  Ensure that an adequate patient care plan was developed, reviewed, revised and carried out, including specifically, because Mr. Martin was exposed to COVID-19 at HPHC;

      e.  Take all reasonable and necessary precautions to ensure that Mr. Martin did not contract COVID-19;

      f.  Provide Mr. Martin with necessary tests promptly and report those results promptly;

      g.  Protect Mr. Martin from health and safety hazards;

      h.  Treat Mr. Martin with respect, dignity, and without abuse.

78.    During the period of his residency at HPHC, Defendants breached their duty to Mr. Martin.  Among other things, and without limiting the generality of the foregoing, Defendants failed to:

      a.  Adequately staff HPHC;

      b.  Ensure that each worker received adequate training before working with Mr. Martin;

      c.  Provide services that meet professional standards of quality;

      d.  Ensure that an adequate patient care plan was developed, reviewed, revised and carried out, including specifically, because Mr. Martin was exposed to COVID-19 at HPHC;

      e.  Take all reasonable and necessary precautions to ensure that Mr. Martin did not contract COVID-19;

      f.  Protect Mr. Martin from health and safety hazards;

      g.  Provide Mr. Martin with necessary tests promptly and report those results to his promptly;

      h.  Treat Mr. Martin with respect, dignity, and without abuse.

**COMPLAINT**           21

79.     Defendants' negligence, carelessness, recklessness, and unlawfulness was a substantial factor in causing Mr. Martin to suffer tremendous physical, emotional, economic, and fatal harm as well as other damages to be proven at the time of the trial.

80.     As a direct and legal result of the wrongful acts and omissions of Defendant and DOES 1-50, Mr. Martin was harmed.

81.     By reason of the wrongful death of Mr. Martin that resulted from the wrongful acts and omissions of Defendants, Plaintiffs suffered and continue to suffer loss of love, companionship, comfort, affection, solace, and moral support of Mr. Martin in the amount to be determined at trial.

82.     By reason of the wrongful death of Mr. Martin, resulting from the wrongful acts and/or omissions of Defendants and DOES 1-50, and each of them, Plaintiffs hereby seek recovery of other such relief as may be just, including as provided for under the Civil Code section 377.61.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION

### WRONGFUL DEATH

(Against All Defendants)

83.     Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

84.     Defendants and DOES 1-50, and each of them, negligently, carelessly, recklessly, and/or unlawfully operated HPHC so as to cause the death of Vince Martin.

85.     Defendants HPHC, Dr. Marcel Filart, Benjamin Landa and DOES 1-50 were agents, servants, employees, successors in interest, and/or joint venturers of one another, and were, as such, acting within the course, scope, and authority of said agency, employment and/or venture when they negligently, carelessly, recklessly, and/or unlawfully withheld necessary care from Vince Martin so as to cause the death of Vince Martin.

86.     As a direct and legal result of the wrongful acts and omissions of Defendants, Vince Martin died.

**COMPLAINT**                                                                                    22

87.     By reason of the wrongful death of Vince Martin resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, Plaintiffs have incurred funeral and burial expenses, and related medical expenses, in an amount to be determined at trial.

88.     By reason of the wrongful death of Vince Martin, resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, and each of them, Plaintiffs suffered, and continue to suffer, loss of love, companionship, comfort, affection, solace and the moral and economic support of their husband and father.

89.     As a direct and legal result of the aforementioned acts of Defendants HPHC, Dr. Filart, Mr. Landa and DOES 1 through 50, inclusive, Plaintiffs, by reason of the wrongful death of Vince Martin, resulting from the wrongful acts and/or omissions of Defendants, hereby seek recovery of other such relief as may be just and provided for under Code of Civ. Proc. § 377.61.

90.     Plaintiffs are informed and believe, and thereon allege, that in the days leading up to Vince Martin's death, and continuing through his death, Defendants HPHC, Dr. Filart, Mr. Landa and DOES 1 through 50, and each of them, at all times mentioned, were under a statutory duty to comply with all applicable federal and state laws and regulations governing nursing homes in California, including but not limited to the following:

- 42 CFR §483.10(a) & (e) (respect, dignity, & without abuse);
- 42 CFR §483.21 (care plan);
- 42 CFR §483.25 (quality care must be provided; protecting for health and safety hazards);
- 42 CFR §483.30 (adequate physician oversight);
- Cal Health & Safety Code § 1279.6 (safety plan);
- Cal Health & Safety Code § 1337.1 (adequate training);
- Cal Health & Safety Code §1599.1(a) (adequate and qualified staff);
- Title 22 CCR §72311 (care plan and prompt reporting);
- Title 22 CCR §72315 (required services);
- Title 22 CCR §§72329(a) & 72501(e) (adequate staffing);
- Title 22 CCR § 72517 (adequate training);
- Title 22 CCR §72523(adequate policies and procedures);

**COMPLAINT**                                                                                              23

1    • Title 22 CCR § 72527(a)(11) (respect, dignity, & without abuse);

2    • Title 22 CCR § 72537 (reporting of communicable diseases);

3    • Title 22 CCR § 72539 (reporting of outbreaks);

4    • Title 22 CCR § 72541 (reporting of unusual occurrences);

5    • 42 USC §1396r(b)(2) (adequate plan of care);

6  Defendants' violations of these laws and regulations were a contributing factor to the death of

7  Vince Martin.

8        91.    Vince Martin was one of the class of persons whose protection the aforementioned

9  laws and regulations, as well as Welfare and Institutions Code §§ 15600 *et seq.* was afforded.

10       92.    As a direct and legal result of the wrongful acts and omissions of Defendants,

11  including DOES 1 through 50, and each of them, Vince Martin died.

12       93.    By reason of the wrongful death of Vince Martin resulting from the wrongful acts

13  and omissions of Defendants, and DOES 1 through 50, Plaintiffs have incurred funeral and burial

14  expenses, and related medical expenses, in an amount to be determined at trial.

15       94.    By reason of the wrongful death of Vince Martin, resulting from the wrongful acts

16  and omissions of Defendants, and DOES 1 through 50, and each of them, Plaintiffs suffered, and

17  continue to suffer, loss of love, companionship, comfort, affection, solace and the moral and

18  economic support of their husband and father.

19       95.    As a direct and legal result of the aforementioned acts of Defendants HPHC. Dr.

20  Marcel Filbart, Benjamin Landa, and DOES 1 through 50, inclusive, Plaintiffs, by reason of the

21  wrongful death of Vince Martin, resulting from the wrongful acts and/or omissions of

22  Defendants, hereby seek recovery of other such relief as may be just and provided for under Code

23  of Civ. Proc. § 377.61.

24  /./../

25  /./../

26  /./../

27  /./../

28  /./../

**COMPLAINT**                                                                                    24

WHEREFORE, Plaintiffs pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

## FRAUDULENT CONCEALMENT

(Against Defendants HPHC and Marcel Filart)

96.     Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

97.     Mr. Martin was an elderly resident of the nursing home run by HPHC. Mr. Martin relied upon Defendants HPHC and Dr. Filart for his care needs.

98.     Prior to Vince Martin's death, HPHC and Dr. Filart became aware that they could not provide adequate care to Mr. Martin and knew of their duty to disclose these matters. In fact, Plaintiffs were repeatedly told that Mr. Martin was "doing ok" or words to that effect prior to April 1, 2020. Further, Plaintiffs were told that Mr. Martin would be cared for. This was untrue. By March 2020, Defendants HPHC and Dr. Filart knew that there was an outbreak of COVID-19 at HPHC, yet they kept the fact of the outbreak and the severity of the outbreak concealed.

99.     When a member of HPHC's staff eventually told Plaintiffs that there were one or more COVID-19 cases at HPHC, they intentionally failed to disclose the full extent of the outbreak, making the disclosure deceptive.

100.    Defendants intentionally failed to disclose, first the fact that there was COVID-19 in the facility, then that there was a serious outbreak of COVID-19, and then that Mr. Martin had been exposed to COVID-19, then that Mr. Martin was likely COVID-19 positive. These facts were known only to Defendants and are not facts that Plaintiffs could have discovered. Plaintiffs did not learn that Mr. Martin was COVID-19 positive until after his death. Even after the COVID-19 positive test, Defendants HPHC and Dr. Filart concealed that Mr. Martin's death was caused by COVID-19—instead, COVID-19 was left off of Mr. Martin's death certificate.

101.   Defendants HPHC and Dr. Filart breached their duties to disclose these facts to Plaintiffs and engaged in the above-listed concealments and misrepresentations with the intention of deceiving and misleading Plaintiffs.

102.   Had the omitted information been disclosed, Plaintiffs would have behaved differently, including that they would have insisted that Mr. Martin receive a COVID-19 test earlier and that he be treated for COVID-19.

103.   Mr. Martin was injured and died as a result of Defendants HPHC's and Dr. Filart's acts of misrepresentation and concealment. Plaintiffs also sustained damages and injuries, including emotional distress.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### FIFTH CAUSE OF ACTION

### FRAUDULENT MISREPRESENTATION

(Against Defendants HPHC and Marcel Filart)

104.   Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

105.   Mr. Martin was an elderly resident of the nursing home run by HPHC. Mr. Martin relied upon Defendant HPHC and its staff for his care needs.

106.   HPHC and its staff repeatedly represented to Plaintiffs that Mr. Martin was "doing ok" or words to that effect during the lockdown prior to April 1, 2020. Further, HPHC and its staff represented to Plaintiffs that Mr. Martin would be cared for. This was untrue.

107.   HPHC and its staff told Plaintiffs that there were less COVID-19 case in the facility than there really were. HPHC and its staff further assured Plaintiffs that all COVID-19 positive residents were placed in a separate part of the nursing home from Mr. Martin, which was not correct.

108.   Dr. Marcel Filart misrepresented the cause of Mr. Martin's death on Mr. Martin's death certificate dated April 9, 2020, as cardiorespiratory arrest, essential hypertension and coronary artery disease, hiding Mr. Martin's COVID-19 positive result and the real cause of death.

109.   HPHC and its staff falsely claimed that labs were completed when they were not in fact done.

110.   HPHC and its staff falsely claimed that Mr. Martin could not be transferred to a hospital for care in the days leading up to his death, he was unlikely be accepted, and would be harmed.

111.   Defendants HPHC and Dr. Filart breached their duties to disclose true facts to Plaintiffs and engaged in the above-listed misrepresentations with the intention of deceiving and defrauding Plaintiffs.  Defendants HPHC and Dr. Filart knew that these representations were false when they made them, or made the representations recklessly and without regard for its truth.  Defendants intended that Plaintiffs rely on these representations to hide what harm Mr. Martin was suffering.  Plaintiffs reasonably relied on Defendants' representations, and Mr. Martin was thus injured and harmed.  Plaintiffs' reliance on HPHC and Dr. Filart's representations was a substantial factor in causing Mr. Martin's death.

112.   Had the omitted information been disclosed, Plaintiffs would have behaved differently, including that they would have insisted that Mr. Martin receive a COVID-19 test earlier and that he be treated for COVID-19.

113.   Mr. Martin was harmed and died as a result of Defendants HPHC's and Dr. Filart's acts of misrepresentation. Plaintiffs also sustained damages and injuries, including emotional distress.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Emma Martin, Elizabeth Gagliano and Kathy Sessinghaus pray for relief as follows:

1.     General and special compensatory damages according to proof;

2.     Punitive damages according to proof, including treble punitive damages per Civil Code section 3345;

3.     For prejudgment and post-judgment interest upon such judgment at the maximum rate provided by law;

4.      Reasonable costs of suit;

5.      Attorney's fees and costs per Welfare and Institutions Code section 15657; and

6.      Such other further relief as the Court may deem proper.

Dated:  May 21, 2020                **COTCHETT, PITRE & McCARTHY, LLP**


By: _____
                                        ANNE MARIE MURPHY
                                        *Attorneys for Plaintiffs*


**DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury on all issues so triable.

Dated:  May 21, 2020                **COTCHETT, PITRE & McCARTHY, LLP**


By: _____
                                        ANNE MARIE MURPHY
                                        *Attorneys for Plaintiffs*

# Exhibit 1



**Hollywood Premier
Healthcare Center**
5401 Fountain Ave,
Los Angeles, CA 90029
323.465.2106

May 19, 2020

To Our Residents and Family Members:

We want to inform you that at **Hollywood Premier Healthcare Center**, we have 87 confirmed cases of COVID-19.
(Please note that Hollywood Premier has been designated as a Dedicated Covid-19 Facility by the Los Angeles County
Dept. of Public Health and is currently only accepting confirmed Covid-19 patients).

The safety and wellbeing of our residents is our top priority. We are doing what we can to limit the spread of COVID-19
within **Hollywood Premier Healthcare Center**, including staying in very close communication with local and state
health officials to ensure we are taking all the appropriate steps under current circumstances.

We are taking steps based on guidance from the Centers for Disease Control and Prevention (CDC) and the Center for
Medicare and Medicaid Services (CMS) to reduce the spread and impact of COVID-19, such as:

- Enhanced infection control precautions
- Screening residents, staff, and essential visitors for an expanded list of symptoms
- Restricting visitation and entry of people to the building
- Testing staff and residents for COVID-19 based on current protocols and availability of tests
- Postponing communal activities

Due to government privacy requirements, we cannot divulge specific information about the individuals who have
confirmed or suspected COVID-19, unless they are your family member and you have the necessary permissions to
receive such information.

We know you are concerned about your loved one, but it is crucial that we restrict visitation to reduce the spread of this
virus to others. We will contact you directly if your loved one is suspected or diagnosed with COVID-19.

We also understand that connecting with family members is incredibly important to our residents. Family members are
encouraged to connect with their loved ones through video chat, calling, texting, or on social media. Hollywood Premier
has implemented a Zoom Video Conferencing System that is available for our residents and their loved ones.

We need your help in battling COVID-19. Please visit the CDC website ([www.cdc.gov/coronavirus](www.cdc.gov/coronavirus)) to learn how you can
help prevent the spread in our community, since continued spread in the larger community increases the chance the
virus will work its way into our building.

This is a difficult time for everyone. We will continue to provide you with updates. Please know that we are adhering to
guidelines from the local and state health departments, which continue to evolve as we learn more about this virus.

We know that you may have questions and we encourage you to contact our center. Please call us at **323-465-2106**,
email us at **socialservices@serranopostacute.com**, or visit our website for updates on the status of your loved one.

Sincerely, **Hollywood Premier Healthcare Center**



**Hollywood Premier
Healthcare Center**
5401 Fountain Ave,
Los Angeles, CA 90029
323.465.2106

May 14, 2020

To Our Residents and Family Members:

We want to inform you that at **Hollywood Premier Healthcare Center**, we have 81 confirmed cases of COVID-19. (Please note that Hollywood Premier has been designated as a Dedicated Covid-19 Facility by the Los Angeles County Dept. of Public Health and is currently only accepting confirmed Covid-19 patients).

The safety and wellbeing of our residents is our top priority. We are doing what we can to limit the spread of COVID-19 within **Hollywood Premier Healthcare Center**, including staying in very close communication with local and state health officials to ensure we are taking all the appropriate steps under current circumstances.

We are taking steps based on guidance from the Centers for Disease Control and Prevention (CDC) and the Center for Medicare and Medicaid Services (CMS) to reduce the spread and impact of COVID-19, such as:

- Enhanced infection control precautions
- Screening residents, staff, and essential visitors for an expanded list of symptoms
- Restricting visitation and entry of people to the building
- Testing staff and residents for COVID-19 based on current protocols and availability of tests
- Postponing communal activities

Due to government privacy requirements, we cannot divulge specific information about the individuals who have confirmed or suspected COVID-19, unless they are your family member and you have the necessary permissions to receive such information.

We know you are concerned about your loved one, but it is crucial that we restrict visitation to reduce the spread of this virus to others. We will contact you directly if your loved one is suspected or diagnosed with COVID-19.

We also understand that connecting with family members is incredibly important to our residents. Family members are encouraged to connect with their loved ones through video chat, calling, texting, or on social media. Hollywood Premier has implemented a Zoom Video Conferencing System that is available for our residents and their loved ones.

We need your help in battling COVID-19. Please visit the CDC website ([www.cdc.gov/coronavirus](www.cdc.gov/coronavirus)) to learn how you can help prevent the spread in our community, since continued spread in the larger community increases the chance the virus will work its way into our building.

This is a difficult time for everyone. We will continue to provide you with updates. Please know that we are adhering to guidelines from the local and state health departments, which continue to evolve as we learn more about this virus.

We know that you may have questions and we encourage you to contact our center. Please call us at **323-465-2106**, email us at [socialservices@serranopostacute.com](socialservices@serranopostacute.com), or visit our website for updates on the status of your loved one.

Sincerely, **Hollywood Premier Healthcare Center**

# Exhibit 2

# Registered Envelope Service

## Death Certificate amendment

GA

**Glen Arnold <garnold@vitalhealthmed.com>**
05/06/2020 08:06:43 PM GMT
To:    coviddeath@ph.lacounte.gov
CC:    garnold@vitalhealthmed.com

Dear Madam. It was brought to our attention the need for a medical amendment to the death certificate of Mr. Vincent Martin ( DOB 08/31/1935 ). After receiving and reviewing laboratory results reported on 04/05/2020 it is pertinent to amend and add COVID-19 as a cause of death. Please feel free to reach out to me at any time if you need any further assistance. Thank you.
Regards;

Glen Arnold
Administrator
Marcel Filart MD
Vital Health Medical Group
1711 W. Tempe St.
Los Angeles CA. 90026
Mobile (323)794-4383
eFax    (323)488-9294

# Exhibit 3

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING ____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER HOLLYWOOD PREMIER HEALTHCARE CENTER | STREET ADDRESS, CITY, STATE, ZIP 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |
|---|---|

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0558<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | Reasonably accommodate the needs and preferences of each resident.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and record review, the facility failed to accommodate the needs of two of 18 sampled residents (Resident 24 and 19).<br>a. For Resident 24, the facility failed to ensure the resident's wheelchair was able to fit through the activities room doors for the resident to attend the group activities in the activities room. This deficient practice resulted in the resident feeling bored not being able to participate in the activities and socialize with other residents.<br>b. For Resident 19, the facility failed to place the resident's call light within the resident's reach. As a result, the resident was not able to reach the call light when the resident required assistance from the staff.<br>Findings:<br>a. A review of Resident 24's Admission Record indicated the resident was admitted to the facility on [DATE] and was readmitted on [DATE]. Resident 24's [DIAGNOSES REDACTED].<br>A review of the Minimum Data Set (MDS- a standardized assessment and care planning tool) dated 12/12/18, indicated that Resident 24 had no cognitive impairment (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses) and required extensive assistance with one-person assist from staff for bed mobility, toilet use, personal hygiene and dressing.<br>On 2/19/19, at 3:31 p.m., during an observation and a concurrent interview, Resident 24 was in a wheelchair, outside the activities room. Resident 24 was looking into the activities room through the open door. Resident 24 stated, she would like to participate in the activities with the other residents. She would like to play bingo, participate in bible study, and socialize with the other residents in the activity room. Resident 24 stated, unfortunately, her wheel chair was too wide and does not fit through the activities room door. Resident 24 stated, the only activities she does was in her room. She attends bible study by sitting in her wheel chair out in the hallway. Resident 24 complained of being bored and usually spends her time in the wheelchair in the hallway.<br>On 2/25/19, at 9:30 a.m., during an interview, the Activities Director (AD) stated, Resident 24 used to attend the activities in the activities room every day. However, the resident was provided with a new wheelchair that was more appropriate to the resident and now the wheelchair is too wide to fit through the door of the activity room. The AD stated, if the resident likes the activities going on in the activities room, she would sit outside by the door. The AD stated, it would be better for the resident to be inside the activities room and be able to actively participate in the activities. The AD stated, Resident 24 liked to socialize with the other residents in the activity room but was unable to now because her wheelchair will not fit through the doors.<br>A review of the facility policy and procedures titled, Quality of Life- Accommodation of Needs, revised 8/2009, indicated in order to accommodate individual needs and preferences, adaptations may be made to the physical environment, including the resident's bedroom and bathroom, as well as the common areas in the facility.<br>b. A review of Resident 19's Admission Record indicated the resident was admitted to the facility on [DATE] and was readmitted on [DATE]. Resident 19's [DIAGNOSES REDACTED].<br>A review of the MDS dated [DATE], indicated the Resident 19 had mild memory and cognitive impairment and required extensive assistance with one-person assistance for bed mobility, dressing, and eating. The MDS indicated Resident 19 was total dependent on the staff with one-person assistance with transfers, locomotion on the unit- how the resident moves to and returns from off unit locations, toilet use, and personal hygiene.<br>A review of Resident 19's Care Plan, dated 10/23/18, indicated the resident was at high risk for falls. Proposed interventions included to be sure the resident's call light was within reach and to encourage the resident to use it for assistance as needed.<br>On 2/19/19, at 3:20 p.m., during an observation and concurrent interview, Resident 19 was heard yelling help, help me, from his room. There was no staff present in the area at the time. Upon entering the resident's room, Resident 19 was observed lying in bed with bilateral side rails up. Resident 19's call light cord was observed wrap around the right side rail. Resident 19 was unable to reach the call light. Resident 19 stated, he was unable to reach the call light control.<br>On 2/19/19, at 3:25 p.m., during an observation and concurrent interview, Registered Nurse 3 (RN 3) stated, the call light was too far away from the resident and the resident could not reach it. RN 3 stated, the call light should be within the resident's reach. It was important that the resident could reach it in case of an emergency or when the resident needed help.<br>A review of the facility policy and procedures titled, Answering the Call Light, revised 10/2010, indicated that when a resident is in bed or confined to a chair, to be sure the call light was within easy reach of the resident. |
| F 0604<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | Ensure that each resident is free from the use of physical restraints, unless needed for medical treatment.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and record review, for one of three sampled residents (Resident 61) with physical restraint (any manual method, physical or mechanical device, equipment, or material that is attached or adjacent to the resident's body, cannot be removed easily by the resident and restricts the resident's freedom of movement or normal access to his/her body) in a total resident sample of 18, the facility failed to ensure the resident attained and maintained his highest practicable well-being in an environment that prohibits the use of physical restraints to unnecessarily inhibit a resident's freedom of movement or activity.<br>This deficient practice has the potential for the resident declining in physical functioning, injury from attempts to free himself from the restrain and accidents such as falls, strangulation or entrapment.<br>Findings:<br>A review of Resident 61's Admission Record indicated Resident 61 was admitted on [DATE]. Resident 61's [DIAGNOSES REDACTED]. to perform everyday activities) without behavioral disturbance.<br>A review of Resident 61's Minimum Data Set (a standardized, primary screening and assessment tool of health status which forms the foundation of the comprehensive assessment for all residents of long term care facilities) dated 1/31/19, indicated Resident 61 was moderately cognitively impaired (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses) and used a trunk restraint daily.<br>A review of Resident 61's physician's orders [REDACTED].<br>A review of Resident 61's care plan dated did not include any care plan regarding the alternative methods used before put |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE |
|---|---|---|

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

FORM CMS-2567(02-99)
Previous Versions Obsolete

Event ID: YL1O11

Facility ID: 056489

If continuation sheet
Page 1 of 5

PRINTED: 05/15/2020
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0604<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | (continued... from page 1)<br>the resident on physical restraint.<br>On 2/25/19, at 1:02 p.m., during an observation and concurrent interview, Resident 61 was sitting in a wheelchair with a family member (FAM 1) next to him. FAM 1 stated, Resident 61 used the Posey belt restraint whenever up in a chair, when FAM 1 was not present. FAM 1 stated, the resident sometimes slipped to ground even with the Posey belt was on him.<br>A review of Resident 61's progress notes dated from 7/13/18 to 8/17/18, no documentation was found that indicated the facility tried to use less restrictive methods before using the Posey belt restraint.<br>During an interview on 2/25/18, at 1:02 p.m., Registered Nurse 1 (RN 1) stated, the Posey belt restraint was applied to Resident 61 when he was up in the chair out of bed. RN 1 confirmed, there was no documentation in progress notes that less restrictive alternative methods were attempted before the Posey belt restraint was ordered. |
| F 0641<br><br>Level of harm - Potential for minimal harm<br><br>Residents Affected - Some | Ensure each resident receives an accurate assessment.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and record review, the facility failed to ensure the accuracy of the Minimum Data Set (MDS), a comprehensive health status assessment tool, for one of 18 sampled residents (Resident 73).<br>This deficient practice had the potential to result in inappropriate billing and quality of care deficiencies.<br>Findings:<br>A review of Resident 73's Admission Record indicated the resident was admitted on [DATE], with [DIAGNOSES REDACTED].<br>A review of Resident 73's physician's orders [REDACTED].<br>On 2/21/19, at 9:46 a.m., during an observation and concurrent interview, Resident 73 was in bed and had an open hole at the front of the neck covered with a loose gauze. Resident 73 stated, it was a [MEDICAL CONDITION].<br>A review of Resident 73's MDS dated [DATE], did not indicate that the resident had a [MEDICAL CONDITION].<br>During an interview, on 2/25/19, at 1:38 p.m., Registered Nurse 2/MDS Nurse stated, she did not accurately code Resident 73's [MEDICAL CONDITION] status on the MDS. |
| F 0656<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | Develop and implement a complete care plan that meets all the resident's needs, with timetables and actions that can be measured.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and record review, the facility failed to ensure a specific care plan was developed and implemented for two (Resident 34 and 67) of 18 sampled residents.<br>a. For Resident 34, facility failed to develop a care plan specific for the risk of entrapment related to the use of bed side rails. This deficient practice had the potential risk for the resident to get caught between the mattress and side rails or in the side rail itself.<br>b. For Resident 67, facility failed to develop a care plan for the resident's behavior of constantly worrying about his personal items being taken away from him and getting lost. This deficient practice had the potential risk for resident's health and well being to decline.<br>Findings:<br>a. A review of Resident 34's Admission Record indicated the resident was originally admitted to the facility on [DATE] and readmitted on [DATE], with [DIAGNOSES REDACTED]. enough blood) affecting the right dominant side.<br>A review of Resident 34's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 1/1/18, indicated Resident 34 had the ability to make self understood and understand others. The MDS further indicated, Resident 34 was totally dependent on staff for transfer to and from bed, eating, toilet use, personal hygiene, and bathing, and required extensive assistance from staff for dressing and bed mobility.<br>A review of the summary of Resident 34's physician's orders indicated an order, dated 2/24/18, to apply on the right side full side rail and the left side 1/2 side rail on resident's bed the for mobility and poor safety awareness.<br>During an observation, on 2/25/19, at 11:35 a.m., Resident 34 was observed laying in bed with 1/2 side rail up on the left side of his bed.<br>A review of a care plan for Resident 34, dated 6/30/17, for complications related to the use of the side rails, indicated goal was for resident to remain free of injury, falls, or accidents, and for resident to remain free of complications related to the use of the side rails. The list of interventions, however, did not include assessment of the resident for the risk of entrapment related to the use of the side rails.<br>A review of another care plan for the use of side rails for Resident 34, dated 2/24/18, indicated goal was to prevent decrease functioning and immobility, and reduce risk for development of skin alteration. The interventions listed, however, did not include assessment of the resident for the risk of entrapment.<br>During an interview and concurrent record review, on 2/25/19, at 2:09 p.m., the Director of Nurses (DON) confirmed, the side rail assessment does not include assessment for the risk of entrapment and that the care plans does not address the risk for entrapment. The DON stated, the facility does not have an assessment specifically for the risk of entrapment for the use of the side rail.<br>A review of the facility policy and procedure, revised 10/2010, titled, Proper Use of Side Rails, indicated: The purpose of the guideline was to ensure the safe use of side rails. The policy indicated that an assessment will be made to determine the resident's symptoms and reason for using the side rails. The policy, however, did not indicate that the risk for entrapment will be include in the assessment and a care plan will be developed as a result of this assessment.<br>b. A review of the Admission Record indicated Resident 67 was admitted to the facility on [DATE], with [DIAGNOSES REDACTED].<br>A review of Resident 67's MDS dated [DATE], indicated resident had the ability to make self understood and understand others. The MDS further indicated that Resident 67 required limited assistance from staff for most of his activities for daily living (bed mobility; transfer to and from bed; locomotion on and off the unit; and personal hygiene), and extensive staff assistance for dressing, toilet use, and bathing.<br>During an interview, on 2/21/19, at 1:24 p.m., Resident 67 stated, he felt the staff are taking his stuff, his paperwork, and sometimes clothing. He stated, sometimes he does not want to leave the room and keeps telling the staff that he is missing items. But no one pays attention to him. He further stated, he does not like it because his things are important to him.<br>During an interview, on 2/21/19, at 2:11 p.m., the Social Services Designee (SSD) stated, Resident 67 was afraid about someone taking his belongings. She stated Resident 67 does not want to leave his room and sometimes refuses to be washed due to his fear. She stated he claimed he was missing items but nothing specific, he just said that someone took his things. The SSD further stated, she issue with missing items was not care planned. The SSD stated, it should have been care planned that he was fabricating that he was missing clothes. The SSD stated, it was important so staff will know what to do, just in case something like this happens again.<br>During an interview, on 2/21/19, at 2:55 p.m., the Registered Nursing Supervisor (RN 1) stated, Resident 67 was paranoid of them touching his clothes. RN 1 stated, the resident does not want them to touch anything because he was paranoid of his belongings being lost. RN 1 stated, Resident 67 gets upset and thinks everyone was taking his items/things from him. RN 1 further stated, the paranoid behavior should have been addressed and care planned in order for the staff to address the issue with possible interventions and monitor him and other interventions to address his issues, like no-one will touch his belongings.<br>A review of the documented care plans for Resident 67, no care plan had been developed for the resident's behavior of constantly worrying about his personal items being taken away from him and getting lost. |
| F 0675<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | Honor each resident's preferences, choices, values and beliefs.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and record review, the facility failed to provide the necessary care and services for one of 18 sampled resident (Resident 67). Resident 67 was wearing a pair of eyeglasses that was broken and not in good repair.<br>This had the potential for resident's physical and psychosocial well being to decline.<br>Findings: |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0675 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | (continued... from page 2) A review of the Admission Record indicated Resident 67 was admitted to the facility on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 67's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 1/24/19, indicated resident had the ability to make self understood and understand others. The MDS further indicated that Resident 67 required limited assistance from staff for most of his activities for daily living (bed mobility; transfer to and from bed; locomotion on and off the unit; and personal hygiene), and extensive staff assistance for dressing, toilet use, and bathing. During an observation and concurrent interview, on 2/21/19, at 1:24 p.m., Resident 67 was observed wearing eyeglasses that were broken. The frame of the eyeglasses had a transparent tape on the right side and a duct tape (gray industrial tape) on the left side. The eyeglass lenses were angled towards the resident's eyes. Resident 67 stated, My eyeglasses had been like this for a while. They gave me some eyeglasses, but they are not mine. I have to walk around with tape on my broken eyeglasses. I don't like it and makes me feel shy, you know. During an interview, on 2/21/19, at 2:11 p.m., the Social Services Designee (SSD) stated, the resident has an appointment with an optometrist but did not document it. A review of the facility policy and procedure, revised 8/2009, titled, Quality of Life-Accommodation of Needs, indicated, the staff shall help to keep hearing aids, glasses and other adaptive devices clean and in working order for the resident. |
| F 0692 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Provide enough food/fluids to maintain a resident's health. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to follow the resident's food preference and did not follow the facility policy to place a diet card on each tray for one of 18 sampled residents (Resident 71). This deficient practice had the potential for the resident not to maintain sufficient intake for proper hydration. Findings: A review of Resident 71's Admission Record indicated the resident was admitted on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 71's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 12/14/18, indicated the resident had clear speech, can make herself understood and understood others, and was cognitively intact (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses). During an observation and concurrent interview, on 2/20/19, at 10:03 a.m., a breakfast tray was observed in Resident 71's room. The tray had no diet card and the tray had scrambled eggs, two pieces of bread, a glass of juice and a glass of milk. The food on the tray was untouched. Resident 71 stated, she does not like the breakfast food, especially eggs. She had asked for a fruit plate for breakfast but never received it. Resident 71 stated, she had talked to the nurse a few times but nobody took care of it. Licensed Vocational Nurse 2 (LVN 2) stated, normally the certified nurse assistants (CNAs) passes the trays and collects the trays after meals. LVN 2 confirmed, that there was no diet card on Resident 71's breakfast tray. LVN 2 stated, there should be a diet card on every tray. During an observation and a concurrent interview on 2/20/19, at 12:45 p.m., Resident 71's lunch tray included a chicken sandwich with cheese, cottage cheese, and a green salad. Resident 71 stated, she does not like cheese. Resident 71's diet card on the tray indicated, no pork, beef, rice, potatoes and cheese. LVN 1 confirmed Resident 71's lunch tray had cottage cheese and slices of cheese inside the sandwich. During an interview, on 2/25/19, at 12:16 p.m., the Dietary Supervisor (DS) stated, the facility uses a diet communicate form. When the resident requested a diet preference change, then we prepared the meal according to the request form and reflect the preference on the diet card. The DS stated, every tray should have a diet card. A review of the facility policy and procedure titled, Tray Identification. dated 1/10/19, indicated, use the diet card to assist in setting up and serving correct food trays/diets to residents, the food service manager or supervisor will check trays for correct diets before the food carts are transported to their designated area and nursing staff shall check each tray for the correct diet before serving the residents. |
| F 0693 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Ensure that feeding tubes are not used unless there is a medical reason and the resident agrees; and provide appropriate care for a resident with a feeding tube. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure one of two sampled residents (Resident 50) with a gastrostomy tube (G tube-tube surgically inserted into the stomach for administration of nutrients and medications) in a total resident sample of 18, received appropriate treatment and services to ensure adequate intake and aspiration pneumonia (a condition in which food, liquids, saliva, or vomit is breathed into the airway causing an infection in the lungs). Resident 50 head of the bed was not properly elevated to prevent the development of aspiration pneumonia. The staff was unable to determine how long the tube feeding had been running the amount of tube feeding the resident had. These deficient practices had the potential for the Resident 50 not receiving the ordered amount of nutrients and the potential for developing aspiration pneumonia. Findings: A review of Resident 50's Admission Record indicated that the resident was readmitted on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 50's physician order dated 5/16/18, indicated: a. Enteral (refers to any method of feeding that uses the gastrointestinal (GI) tract to deliver part or all of a person's caloric requirements) feed order: Fibersource HN (type of feeding formula) at 65 milliliters (ml)/hour (hr) for 20 hrs to provide 1300 ml/1560 kilocalories via feeding pump. b. Enteral feed order: Every shift elevate head of the bed (HOB) 30-45 degrees at all times. A review of Resident 50's care plan dated 5/16/18, indicated: elevate head of bed 30-45 degrees. During an observation and a concurrent interview on 2/22/19, at 9:02 a.m., Resident 50 was observed lying flat in bed. The enteral feeding pump was running at 65 ml/hr with Fibersource HN, which was dated 2/22/19, at 5 a.m. Licensed Vocational Nurse 3 (LVN 3) stated, the pump showed total volume administered was 519 ml. LVN 3 stated, she did not know what that number meant and did not know when the feeding started. LVN 3 stated, whoever set up the pump will set the total amount of feeding according to physician order and when the pump hits the set up limit, it will stop. LVN 3 stated there was no documentation of the start time for the 519 ml began to infuse or how much was administered during each shift. LVN 3 elevated the head of bed for Resident 50. LVN 3 stated, the head of bed should be elevated all the time when tube feeding was on for aspiration precaution. RN 1 stated that the person changing feeding bag should be the one document the amount of enteral feeding given to the resident. During an interview on 2/22/19, at 2:07 p.m., Registered Nurse 1 (RN 1) confirmed nothing was documented in Resident 50's progress notes or Medication Administration Record [REDACTED]. RN 1 stated, the person changing feeding bag should document the amount of enteral feeding given to the resident. RN 1 stated, the head of bed should always be elevated when the resident feeding is on. A review of the facility policy and procedure titled, Enteral Tube Feeding via Continuous Pump, dated 1/10/19, indicated: Position the head of the bed at 30-45 degrees for feeding and the person performing the tube feeding record information in the resident's medical record amount and types of enteral feeding. |
| F 0700 Level of harm - Minimal harm or potential for actual harm Residents Affected - Few | Try different approaches before using a bed rail. If a bed rail is needed, the facility must (1) assess a resident for safety risk; (2) review these risks and benefits with the resident/representative; (3) get informed consent; and (4) Correctly install and maintain the bed rail. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure one of two sampled residents (Resident 34) |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0700 **Level of harm - Minimal harm or potential for actual harm** **Residents Affected - Few** | (continued... from page 3) reviewed for the use of bed rails (side rails) in a total resident sample of 18, were assessed for the risk of entrapment. Residents 34 was not assessed for the risk of entrapment before using the side rails. This deficient practice had the potential risk for these residents to get caught between the mattress and side rails or in the side rail itself. Findings: A review of Resident 34's Admission Record indicated the resident was originally admitted to the facility on [DATE] and readmitted on [DATE], with [DIAGNOSES REDACTED]. enough blood] affecting the right dominant side. A review of Resident 34's Minimum Data Set (MDS, a standardized assessment and care screening tool), dated 1/11/18, indicated resident had the ability to make self understood and understand others. The MDS further indicated that Resident 34 was totally dependent on staff for transfer to and from bed, eating, toilet use, personal hygiene, and bathing, and required extensive assistance form staff for dressing and bed mobility. A review of the summary of Resident 34's physician's orders indicated an order, dated 2/24/18, to apply on the right side full side rail and the left side 1/2 side rail on resident's bed the for mobility and poor safety awareness. During an observation, on 2/25/19, at 11:35 a.m., Resident 34 was observed laying in bed with 1/2 side rail up on the the left side of his bed. A review of a care plan for Resident 34, dated 6/30/17, for complications related to the use of the side rails, indicated goal was for resident to remain free of injury, falls, or accidents, and for resident to remain free of complications related to the use of the side rails. The list of interventions, however, did not include assessment of the resident for the risk of entrapment related to the use of the side rails. A review of another care plan for the use of side rails for Resident 34, dated 2/24/18, indicated goal was to prevent decrease functioning and immobility, and reduce risk for development of skin alteration. The interventions listed, however, did not include assessment of the resident for the risk of entrapment. A review of Resident 34's initial assessment for the use of the side rails, dated 2/24/18, does not indicate that the resident was assessed for the risk of entrapment. During an interview and concurrent record review, on 2/25/19, at 2:09 p.m., the Director of Nurses (DON) confirmed, the side rail assessment does not include assessment for the risk of entrapment and that the care plans does not address the risk for entrapment. The DON stated, that they don't have an assessment specifically for the risk of entrapment for the use of the side rail. A review of the facility policy and procedure, revised on 10/2010, for the use of side rails indicated that the purpose of the guideline was to ensure the safe use of side rails. The policy indicated that an assessment will be made to determine the resident's symptoms and reason for using the side rails. The policy, however, did not indicate that the risk for entrapment will be included in the assessment. |
| F 0732 **Level of harm - Potential for minimal harm** **Residents Affected - Some** | Post nurse staffing information every day. Based on observation, interview, and record review, the facility failed to ensure the Daily Staffing was posted and readily available to residents and visitors at any given time. This deficient practice failed to make the Daily Staffing readily available to residents and visitors. Findings: On 2/25/19, at 10:02 a.m., during an observation and concurrent interview, the Daily Staffing Posting could not be located in a prominent place, such as the main entrance to the facility or the hallways by Nurses Station 1 and 2, Registered Nurse 1 (RN 1) stated, the Daily Staffing Posting was located in a three ring binder among other folders on the counter of Nursing Station 1. According to RN 1, the Daily Staffing binder used to be posted by the wall on the hallway by Nursing Station 1 but the place/stand where it was located broke and now it is kept by the counter on Nurses Station 1. On 2/25/18, at 11 a.m., during an interview, the Director of Nursing (DON) stated, the Daily Staffing should be posted on the wall of the main hallway to be seen by everyone, residents and visitors. |
| F 0865 **Level of harm - Minimal harm or potential for actual harm** **Residents Affected - Few** | Have a plan that describes the process for conducting QAPI and QAA activities. Based on interview and record review, the facility failed to evaluate the effectiveness of its quality assurance and performance improvement (QAPI) program per the facility policy and procedures. This deficient practice prevents quality care improvement based on QAPI Program performance evaluation. Findings: On 2/25/19, at 3:04 p.m., during a review of the facility QAPI plan and concurrent interview, the Administrator (ADM) stated, the performance of the QAPI plan was not evaluated yet. According to ADM, it was important to do it because it will aid in quality care improvements based on QAPI performance. According to the ADM if evaluated, the quality of care at the facility will improve. A review of the facility policy and procedures titled, Quality Assurance and Performance Improvement (QAPI) Plan, revised 4/2014, indicated that the facility shall evaluate the effectiveness of its QAPI Program at least annually and shall present their conclusions to the owner/governing board for review. |
| F 0880 **Level of harm - Minimal harm or potential for actual harm** **Residents Affected - Few** | Provide and implement an infection prevention and control program. **NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY** Based on observation, interview, and record review, the facility failed to ensure the infection control protocol was followed for two of 18 sampled residents (Residents 79 and 55). a. For Resident 79, the facility failed to ensure used resident equipment was removed and cleaned. This deficient practice had the potential to spread infection and transmission of communicable diseases. b. For Resident 55, the facility failed to label the oxygen tubing (a plastic flexible tubing that delivers oxygen) with the resident's name and date. This deficient practice had the potential to result in an infection to the resident. Findings: a. A review of Resident 79's Admission Record indicated the resident was re-admitted on [DATE], with [DIAGNOSES REDACTED]. A review of Resident 79's physician's orders dated 2/17/19, indicated contact isolation (used for infections, diseases, or germs that are spread by touching the resident or items in the room, wear a gown and gloves while in the resident's room) for seven days to positive result of extended spectrum beta-lactamase (ESBL a type of enzyme or chemical produced by some bacteria, which cause some antibiotics not to work) in urine. During an observation, on 2/22/19, at 3:09 p.m., Resident 79 was on contact isolation and shared the room with other three non isolation residents, and shared the privacy curtain with one resident. During an interview, on 2/25/19, at 10:35 a.m., the Maintenance Supervisor (MS) stated, if a resident was on isolation, the curtain will be washed every day. The MS stated, the facility did not have written documentation that the isolation curtain was washed daily. A review of the facility log for cleaning of the privacy curtains for 2/2019 did not indicate Resident 79's privacy curtain was removed and washed every day or right after isolation status discontinued on 2/23/19. A review of the facility maintenance log did not indicate Resident 79's privacy curtain was removed and washed during the time period that the resident was on isolation. A review of the facility policy and procedure titled, Laundry, revised 1/10/19, indicated resident privacy curtains are laundered every six months or more frequently as necessary. A review of the facility policy and procedure titled, Isolation-Categories of Transmission-Based Precautions, revised 1/10/19, indicated: if the use of common items was unavoidable, then adequately clean and disinfect them before use for another resident. b. A review of Resident 55's Admission Record indicated the resident was admitted to the facility on [DATE] and was readmitted on [DATE] [DIAGNOSES REDACTED]. A review of Resident 55's Minimum Data Set (MDS-a standardized assessment and care planning tool) dated 2/14/19, indicated that Resident 55 was cognitively intact (the mental action or process of acquiring knowledge and understanding through thought, experience, and the senses) and required extensive staff assistance with one-person assist from staff for bed |

FORM CMS-2567(02-99)
Previous Versions Obsolete

Event ID: YL1O11

Facility ID: 056489

If continuation sheet
Page 4 of 5

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER / SUPPLIER / CLIA IDENNTIFICATION NUMBER 056489 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 02/25/2019 |
|---|---|---|---|

| NAME OF PROVIDER OF SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP |
|---|---|
| HOLLYWOOD PREMIER HEALTHCARE CENTER | 5401 FOUNTAIN AVE. LOS ANGELES, CA 90029 |

For information on the nursing home's plan to correct this deficiency, please contact the nursing home or the state survey agency.

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) |
|---|---|
| F 0880<br><br>Level of harm - Minimal harm or potential for actual harm<br><br>Residents Affected - Few | (continued... from page 4)<br>mobility, toilet use, personal hygiene and dressing.<br>A review of Resident 55's Care Plan, dated 10/12/18, indicated the resident had [MEDICAL CONDITION]. Proposed interventions included to administer oxygen via a nasal cannula (NC-tubing which delivers oxygen into the nostrils) at three liters per minute as needed for shortness of breath.<br>On 2/19/19, at 3:35 p.m., during an observation and concurrent interview, Resident 55 was in resting in bed. Resident 55 stated, she wanted to use her oxygen. Licensed Vocational Nurse 3 (LVN 3) assisted the resident. Resident 55's oxygen tubing was observed with no label indicated who the tubing belonged to or when it was applied. LVN 3 verified that the oxygen tubing/NC were not labeled with the resident's name or date. According to LVN 3, the N/C tubing should be labeled with the date it was first used to ensure infection prevention.<br>On 2/25/19, at 9:30 a.m., during an interview, the Director of Nursing (DON) stated, the oxygen administration tubing, mask or nasal cannula, and plastic bag was changed every week, every seven days on Sunday. When they get changed, the staff should labeled the oxygen tubing, NC, and the bag containing the tubing, with the resident's name, room number and date. |
| F 0911<br><br>Level of harm - Potential for minimal harm<br><br>Residents Affected - Some | Ensure resident rooms hold no more than 4 residents; for new construction after November 28, 2016, rooms hold no more than 2 residents.<br>**NOTE- TERMS IN BRACKETS HAVE BEEN EDITED TO PROTECT CONFIDENTIALITY**<br>Based on observation, interview, and facility record review, the facility failed to ensure that one of 35 resident rooms did not accommodate more than four residents.<br>Findings:<br>During a tour of the facility on 2/19/19, at 2:40 p.m., it was observed that room [ROOM NUMBER] had five residents bed.<br>A review of the facility client accommodation analysis form (a form that contains information about the residents' rooms in the facility) indicated that room [ROOM NUMBER] had five beds with one unoccupied bed, three beds occupied by three non-ambulatory residents, and one bed occupied by an ambulatory resident.<br>The form also indicated that room [ROOM NUMBER] measures 420 square feet (sq ft) equivalent to a space of 84 sq ft for each bed.<br>On 2/21/19, at 11:30 a.m., during an interview and concurrent record review, the Administrator stated, he was submitting a room waiver request for resident room [ROOM NUMBER], which had five resident beds. The room waiver request indicated that the residents needs are accommodated and that there was no adverse effect to the health and safety and welfare of the residents occupying these rooms.<br>During the course of the survey from 2/19/19 to 2/25/19, it was observed that the residents in the facility had no difficulty getting in and out of their rooms. The nursing staff had full access to provide treatment, administer medications, and assist residents to perform their individual routine activities of daily living.<br>The Department was recommend the granting of the room waiver. |

Event ID: YL1O11     Facility ID: 056489

# Exhibit 4

5/18/2020        Court: LI nursing home firm violated anti-human trafficking laws | Newsday

## LONG ISLAND / SUFFOLK
# Court: LI nursing home firm violated anti-human trafficking laws



Bent Philipson, a co-owner of SentosaCare, on March 23, 2007. Credit: Photo by Howard Schnapp

**By Yancey Roy**
yancey.roy@newsday.com 🐦 @yanceyroy
*Updated October 2, 2019 7:55 PM*

A federal judge has ruled that the owners of a Long Island-based nursing home company violated human trafficking laws by using financial threats to coerce more than 200 overworked and underpaid Filipino nurses to stay on the job.

The nurses said they all were recruited to the United States to take jobs with or through SentosaCare, a nursing home company based in Woodmere, but weren't paid what they were promised and were threatened with substantial financial penalties if they quit.

Such conditions amounted to a "threat of serious financial harm" designed to keep anyone from quitting and, therefore, violated anti-trafficking laws, Judge Nina Gershon of the federal Eastern District of New York ruled on Sept. 24. She determined the owners of Sentosa, Benjamin Landa and Bent Philipson, can be held personally liable for violations of anti-trafficking laws.

An attorney for the defendants said no nurses were threatened or compelled to work and said the ruling will be appealed.

For now, Gershon's decision sets the groundwork for the nurses to pursue a class-action lawsuit. It also marks the latest milestone in a story running more than a decade and including an attempt by then-Suffolk County District Attorney Thomas Spota to charge the nurses with endangering the welfare of children when they quit at two Smithtown facilities.

Eventually, a state court ruled the charges brought by Spota were unconstitutional because they violated the nurses' right to be free from slavery.

The case centers on SentosaCare as well as two other nursing and rehabilitation care companies, and two nurse-recruitment companies. The facilities and firms were involved in recruiting nurses from the Philippines to the United States.

The lawsuit at hand was filed in 2017 by nurse Rose Ann Paguirigan and on behalf of some 200 other nurses. But the tale of legal fights between the nurses and companies goes back even further, as Gershon noted.

### Get the Breaking News newsletter!

Get the latest breaking news as it happens.

Email address      Sign up

By clicking Sign up, you agree to our privacy policy.

From 2006 to 2008, Sentosa and the other companies filed lawsuits against more than 30 Filipino nurses in attempt to force them to pay a $25,000 damages penalty inserted in their contracts for quitting, according to Gershon.

In the current legal action, it's the nurses who are suing. They alleged the companies didn't pay them the correct prevailing wage. They also asked the court to declare the damages penalty-unenforceable and, effectively, an illegal tool to keep the nurses bound to their jobs.

Besides SentosaCare, other defendants are Sentosa Nursing Recruitment Agency, Prompt Nursing Employment Agency, Golden Gate Rehabilitation and Health Center in Staten Island and Spring Creek Nursing and Rehabilitation Center in Brooklyn.

Paguirigan, according to court records, said in a deposition the penalty is the "reason we were not able to leave or were scared" while working in what she called unsafe and understaffed conditions.

Gershon agreed with the nurses.

"Having viewed the records and considered the parties' arguments, I find on the undisputed facts that defendant Prompt Nursing violated the TVPA," Gershon wrote, referring to the federal Trafficking Victims Protection Act.

"The nurses in this lawsuit were all recent arrivals from the Philippines," Gershon continued. "They were not paid the prevailing wage and a base salary, despite terms of their contracts ... Critically, if (Paguirigan) or any nurse wanted to stop working for the defendants during the first year of the contract, he or she would have to pay $25,000" as a penalty called "liquidated damages provision."

The judge concluded: "On these undisputed facts, it is apparent Prompt Nursing acted with knowledge and intent that the liquidated damages provision would effectively coerce nurses into continuing work."

Going further, Gershon ruled Landa and Philipson and others violated "conspiracy provisions" of the anti-trafficking act and, therefore, are personally liable.

The judges slated a Nov. 4 conference to address damages.

Elliot Hahn, one of the lawyers for the defendants, called the ruling disappointing. In an email, he said no nurses were threatened or "compelled to work." And he said Gershon looked past "well settled law" in determining the nurses' prevailing wage claims.

"The court's decision may have far reaching unintended consequences throughout the industry, and affecting contracts of all sorts, and would unduly burden both the employers and immigrant employees," Hahn wrote, in part. "Given this uncertainty, we anticipate that some employers may rescind the job offers and decline to execute contracts with the immigrant employees even if the United States government would otherwise grant a visa to the immigrant employees after they waited several years for the visa."

His clients will appeal, Hahn said.

An attorney for the nurses didn't immediately return messages to comment.

**By Yancey Roy**
yancey.roy@newsday.com 🐦 @yanceyroy



SPONSORED CONTENT

## COVID-19 and Healthcare Risks: Urgent Resources for Urgent Times

BY COVERYS

Get access to information and resources to help mitigate the risks in a COVID-19 environment.

## Didn't find what you were looking for?

Try our new Search

| search newsday.com | 🔍 |
|---|---|

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ROSE ANN PAGUIRIGAN, individually and
on behalf of all others similarly situated,                  :

                        Plaintiff,                  :  **CLASS ACTION
                                            COMPLAINT**

        -vs-                  :

                                Plaintiff Demands
PROMPT NURSING EMPLOYMENT AGENCY   :  A Jury Trial
LLC d/b/a SENTOSA SERVICES,
SENTOSACARE LLC, SENTOSA NURSING          :
RECRUITMENT AGENCY, BENJAMIN LANDA,
BENT PHILIPSON, BERISH RUBENSTEIN a/k/a  :
BARRY RUBENSTEIN, FRANCIS LUYUN,
GOLDEN GATE REHABILITATION & HEALTH  :
CARE CENTER LLC, and SPRING CREEK
REHABILITATION AND NURSING CENTER,      :

                        Defendants.                  :

---------------------------------------------------------------X

      Plaintiff ROSE ANN PAGUIRIGAN, by her undersigned attorneys, on behalf of

herself and all others similarly situated, as and for her complaint against the defendants,

alleges as follows:

      1.     This is an action for damages, injunctive relief, declaratory relief, and

other remedies for violations of the Trafficking Victims Protection Act (TVPA), 18

U.S.C. § 1589 *et seq.*, and for breach of contract under New York law.

      2.     Defendants are foreign labor recruiters and nursing home owners who

have recruited more than 350 nurses in the Philippines to work for the defendants in this

District under contracts of indentured servitude.  Once the foreign nurses arrived in the

United States, the defendants refused to pay the wages required by their employment

contracts.  To keep the foreign nurses from leaving, the defendants commenced and

threatened to commence baseless civil litigation, professional disciplinary proceedings,

1

⚠ Caution
As of: May 11, 2020 5:06 PM Z

# *Paguirigan v. Prompt Nursing Empl. Agency LLC*

United States District Court for the Eastern District of New York

September 23, 2019, Decided; September 24, 2019, Filed

17-cv-1302 (NG) (JO)

**Reporter**
2019 U.S. Dist. LEXIS 165587 *; 2019 WL 4647648

ROSE ANN PAGUIRIGAN, individually and on behalf of all others similarly situated, Plaintiff, - against- PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ SENTOSA SERVICES, SENTOSACARE LLC, SENTOSA NURSING RECRUITMENT AGENCY, BENJAMIN LANDA, BENT PHILIPSON, BERISH RUBENSTEIN a/k/a BARRY RUBENSTEIN, FRANCIS LUYUN, GOLDEN GATE REHABILITATION & HEALTH CARE CENTER LLC, and SPRING CREEK REHABILITATION AND NURSING CENTER, Defendants.

**Subsequent History:** Appeal filed, 10/23/2019

Reconsideration denied by *Paguirigan v. Prompt Nursing Empl. Agency LLC, 2020 U.S. Dist. LEXIS 4837 (E.D.N.Y., Jan. 9, 2020)*

Certificate of appealability denied *Paguirigan v. Prompt Nursing Empl. Agency LLC, 2020 U.S. Dist. LEXIS 4838 (E.D.N.Y., Jan. 9, 2020)*

**Prior History:** *Paguirigan v. Prompt Nursing Empl. Agency LLC, 286 F. Supp. 3d 430, 2017 U.S. Dist. LEXIS 218523 (E.D.N.Y., Dec. 20, 2017)*

## Case Summary

### Overview

HOLDINGS: [1]-Plaintiff nurse met the elements for her breach of contract claim because she proved that a contract existed between her and defendant nursing agency, that she performed under the contract, that the nursing agency breached the contract by failing to pay her the prevailing wage as of her Commencement Date and by failing to pay her a base salary, and that she was damaged; [2]-The liquidated damages provision in the contract was a penalty because it required plaintiff to submit a confession of judgment, for an amount of $25,000 if she quit in her first year, that would be held by defendants during her employment term, and could be filed in the event that the nurse terminated her contract early, thereby intending to operate as a means to compel performance, ensuring that the nurse and other nurses did not resign prior to the end of their contract terms.

### Outcome

Summary judgment granted in part. Plaintiffs' requested declaratory and injunctive relief granted.

**A** Neutral

As of: May 11, 2020 5:05 PM Z

## *Paguirigan v. Prompt Nursing Empl. Agency LLC*

United States District Court for the Eastern District of New York

January 9, 2020, Decided; January 9, 2020, Filed

17-cv-1302 (NG) (JO)

**Reporter**

2020 U.S. Dist. LEXIS 4837 *; 2020 WL 122704

ROSE ANN PAGUIRIGAN, individually and on behalf of all others similarly situated, Plaintiff, - against - PROMPT NURSING EMPLOYMENT AGENCY LLC d/b/a/ SENTOSA SERVICES, SENTOSACARE LLC, SENTOSA NURSING RECRUITMENT AGENCY, BENJAMIN LANDA, BENT PHILIPSON, BERISH RUBENSTEIN a/k/a BARRY RUBENSTEIN, FRANCIS LUYUN, GOLDEN GATE REHABILITATION & HEALTH CARE CENTER LLC, and SPRING CREEK REHABILITATION AND NURSING CENTER, Defendants.

**Prior History:** *Paguirigan v. Prompt Nursing Empl. Agency LLC, 2019 U.S. Dist. LEXIS 165587 (E.D.N.Y., Sept. 23, 2019)*

**Counsel:** **[\*1]** For Rose Paguirigan, individually and on behalf of all others similarly situated, Plaintiff: Leandro Bolesa Lachica, Howley Law Firm, New York, NY; John J.P. Howley, Law Offices of John Howley, New York, NY.

For Prompt Nursing Employment Agency LLC, doing business as, Sentosa Services, Sentosacare, LLC, Sentosa Nursing Recruitment Agency, Mr. Benjamin Landa, Bent Philipson, Berish Rubenstein, also known as, Barry Rubenstein, Francis Luyun, Golden Gate Rehabilitation and Health Care Center, LLC, Spring Creek Rehabilitation and Nursing Center, Defendants: Elliot Hahn, LEAD ATTORNEY, Hahn Eisenberger PLLC, Brooklyn, NY; Sheldon Eisenberger, LEAD ATTORNEY, Alan M. Pollack, Robinson Brog Leinwand Greene Genovese & Gluck PC, New York, NY; Seth Eisenberger, Law Office of Seth Eisenberger, Brooklyn, NY.

For Mr. Benjamin Landa, Golden Gate Rehabilitation and Health Care Center, LLC, Bent Philipson, Spring Creek Rehabilitation and Nursing Center, Prompt Nursing Employment Agency LLC, Berish Rubenstein, Sentosacare, LLC, Francis Luyun, Sentosa Nursing Recruitment Agency, Counter Claimants: Elliot Hahn, LEAD ATTORNEY, Hahn Eisenberger PLLC, Brooklyn, NY; Sheldon Eisenberger, LEAD ATTORNEY, Alan M. **[\*2]** Pollack, Robinson Brog Leinwand Greene Genovese & Gluck PC, New York, NY; Seth Eisenberger, Law Office of Seth Eisenberger, Brooklyn, NY.

For Rose Paguirigan, individually and on behalf of all others similarly situated, Counter Defendant: Leandro Bolesa Lachica, Howley Law Firm, New York, NY; John J.P. Howley, Law Offices of John Howley, New York, NY.

# Exhibit 5

**United States Department of Justice**

THE UNITED STATES ATTORNEY'S OFFICE

# CENTRAL DISTRICT *of* CALIFORNIA

<u>U.S. Attorneys</u> » <u>Central District of California</u> » <u>News</u>

### Department of Justice

U.S. Attorney's Office

Central District of California

FOR IMMEDIATE RELEASE                    Wednesday, June 28, 2017

## Los Angeles Hospital Agrees To Pay $42 Million to Settle Allegations Arising From Improper Financial Arrangements with Physicians

*LOS ANGELES* – The owners of Pacific Alliance Medical Center, an acute care hospital located in the Chinatown District of Los Angeles, have agreed to pay $42 million to settle allegations that they were involved in improper financial relationships with referring physicians, the Justice Department announced today.

PAMC, Ltd. and Pacific Alliance Medical Center Inc., the owners of the hospital, agreed to pay the settlement to resolve a lawsuit that alleged they had violated the False Claims Act by submitting false claims to the Medicare and MediCal programs.

The settlement, which was finalized this week, calls for PAMC Ltd. and Pacific Alliance Medical Center Inc. to pay $31.9 million to the United States and $10 million to the State of California.

The settlement resolves allegations brought in a "whistleblower" lawsuit that the defendants submitted or caused to be submitted false claims to Medicare and MediCal for services rendered to patients who had been referred by physicians with whom the defendants had improper financial relationships.

These improper relationships took the form of (1) arrangements under which the defendants allegedly paid above-market rates to rent office space in physicians' offices, and (2) marketing arrangements that allegedly provided undue benefit to physicians' practices.

The lawsuit alleged that these relationships violated the Anti-Kickback Statute and the Stark Law, both of which restrict the financial relationships that hospitals may have with doctors who refer patients to them.

"Federal law prohibits improper financial relationships between hospitals that receive federal health care funds and medical professionals – this is to protect the doctor-patient relationship and to ensure the quality of care provided," said Acting United States Attorney Sandra R. Brown. "Patients deserve to know their doctors are making health care decisions based solely on medical need and not for any potential financial benefit."

The whistleblower lawsuit was filed by Paul Chan, who was employed as a manager by one of the defendants, under the *qui tam* provisions of the False Claims Act. Under the False Claims Act, private citizens can bring suit on behalf of the United States and share in any recovery. The United States may intervene in the lawsuit, or, as in this case, the whistleblower may pursue the action. Mr. Chan will receive over $9.2 million as his share of the federal recovery.

"This is another example of how the False Claims Act whistleblower provisions can help protect the public fisc," said Acting Assistant Attorney General Chad A. Readler of the Justice Department's Civil Division. "This recovery should help to deter other health care providers from entering into improper financial relationships with physicians that can taint the physicians' medical judgment, to the detriment of patients and taxpayers."

"This settlement is a warning to health care companies that think they can boost their profits by entering into improper financial arrangements with referring physicians," said Special Agent in Charge Christian J. Schrank of the Department of Health and Human Services, Office of Inspector General (HHS-OIG). "Working with our law enforcement partners, we will continue to crack down on such deals, which work to undermine impartial medical judgement, drive up health care costs, and corrode the public's trust in the health care system."

The case, *United States ex rel. Chan v. PAMC, Ltd., et al.*, CV13-4273 (C.D. Cal.), was monitored by the United States Attorney's Office, the Civil Division's Commercial Litigation Branch, and HHS-OIG.

The defendants have until July 7 to make the settlement payments.

The claims settled by this agreement are allegations only, and the defendants did not admit liability in settling the action.

---

**Component(s):**
USAO - California, Central

**Contact:**
Thom Mrozek
Spokesperson/Public Affairs Officer
United States Attorney's Office
Central District of California (Los Angeles)
213-894-6947

**Press Release Number:**
17-130

Donald R. Warren (CA 138933)
Phillip E. Benson (CA 97420)
Warren - Benson Law Group
7825 Fay Ave., Ste. 200
La Jolla, CA 92037
Tel: 858-454-2877
Fax: 858-454-5878
donwarren@warrenbensonlaw.com
philbenson@warrenbensonlaw.com

Attorneys for *Qui Tam* Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA AND STATE OF CALIFORNIA, ex rel Paul Chan,<br><br>   Plaintiffs,<br><br>v.<br><br>PAMC, LTD.; and PACIFIC ALLIANCE MEDICAL CENTER, INC.,<br><br>   Defendants | CASE NO.  13 cv 04273 - RGK (MRWx)<br><br><br>QUI TAM PLAINTIFF'S CORRECTED THIRD AMENDED COMPLAINT |

1    *Qui Tam* Plaintiff Paul Chan suing for himself and for the United States and

2    the State of California, alleges as follows[1]:

## I. INTRODUCTION

4    1.    For years, Defendant PAMC, Ltd. has brazenly violated the Stark

5    Statute and the Anti-Kickback Statute by paying doctors as an inducement to refer

6    patients to PAMC hospital.  One referring doctor, who initially balked at a

7    kickback offer which required that he admit 15 - 20 patients per month, stated:

8    "There are Stark laws."  Shortly after the doctor also asked the PAMC's Interim

9    Vice President of Business Development if she would put the offer in writing, the

10   Interim V.P. of Business Development retorted, "*Fuck that.  I'm not putting that*

11   *in writing.*"

12   2.    PAMC, Ltd. is a fully integrated healthcare company with different

13   lines of business including not only 1) PAMC hospital, but also 2) a managed care

14   organization, 3) two Independent Practice Associations which contract with

15   independent physicians to provide services to managed care, and 4) a 50%

16   ownership in a health plan specifically for Medi-Cal (California's Medicaid)

17   patients.  In the operation of its PAMC hospital business segment, PAMC, Ltd.

18   has knowingly engaged in a pervasive scheme to pay illegal

19   compensation/remuneration to referring physicians in violation of the Stark

20   Statute and the Anti-Kickback Statute, resulting in PAMC's submission of false

21   claims to Medicare and Medi-Cal totaling more than $15 million per year for at

22   least the past nine years, all of which is within the applicable statute of

23

24        [1]Pursuant to the decision of the Ninth Circuit Court of Appeals in *Lacey v.*

25   *Maricopa County*, 693 F.3d 896, 925-928 (2012), claims alleged in the First

26   Amended Complaint that have been dismissed with prejudice and that are not
     realleged herein are not waived and are preserved for appeal.  Those claims

27   involve allegations as to the liability of Dr. Shin-Yin Wong; Dr. George Ma; Dr.
     Tit Li; Dr. Carl Moy; Dr. Thick Gong Chow and Dr. Stephen Kwan.

28

**is determined in a manner that takes into account the volume or value of referrals** from the referring physician/clinic each month (violating the Stark Statute), and is made with a purpose of inducing referrals (violating the Anti-Kickback Statute).

112.   One example of a Vendor Marketing Agreement involved a PAMC payment of $5,000 per month for one of its top referring Medicare doctors: Dr. Marcel Filart.  In return, Dr. Filart was supposed to admit 17 patients per month to PAMC.  In Dr. Filart's situation, PAMC paid the monthly $5,000 to a person named Samvel Kostandyna who, on information and belief, is Dr. Filart's father in law.  From Relator Paul Chan's discussions with Mr. Kostandyna and his daughter, in which they explained to Mr. Chan that they did not know how to prepare an invoice, it its believed that Mr. Kostandyna does not have any sort of marketing business and has never done any marketing for Dr. Filart.  On information and belief, the supposed Vendor Marketing Agreement for Dr. Filart is a complete sham and simply a way to funnel money to Dr. Filart in exchange for his admissions to PAMC.

113.   PAMC received many Medi-Cal and Medicare patient referrals/admissions from physicians with prohibited compensation arrangements via the above described Vendor Marketing Agreement programs.  PAMC wrongfully billed government healthcare programs for its hospital services for these referred patients and received reimbursements.  Qui Tam Relator Paul Chan does not have access to these billings, but he knows that PAMC diligently tracks these referrals/admissions, the related billings, and the resulting reimbursements.

114.   **5.) <u>"Medical Directorships" to Induce the Recommendation and Referral of Medi-Cal and Medicare Patients.</u>**   A fifth way in which PAMC compensates physicians based upon referrals to the hospital is by awarding medical directorships to its top referring physicians, based on a target number of

referrals/admissions to be made by the physicians.  Two examples of this situation involve top referring physicians Dr. John Liu and  Dr. Marcel Filart.

115.   In addition to PAMC paying Dr. Liu $1,834 per month in a Sublease Agreement and paying an additional $4,000 per month for a Shared Marketing Agreement, PAMC compensated Dr. Liu by naming him, at various points in time, Medical Director of Acute Rehab, Medical Director of Continuity of Care, and Medical Director of PAMC's mental health wing "1 West" because of his high volume of referrals/admissions.  Qui Tam Relator Paul Chan does not know the dollar amount paid to Dr. Liu in these directorship positions.

116.   As to Dr. Filart, Qui Tam Relator Paul Chan was told by Business Development Department management that he had "$10,000 to play with" so that he could offer Dr. Filart $10,000 per month in various payment arrangements.  Mr. Chan never made any compensation offer to Dr. Filart.  Mr. Chan did, however, witness PAMC Interim Vice President of Business Development Patricia Suarez tell Dr. Filart on June 5, 2013 that PAMC would name him Medical Director of Continuity of Care, but that the directorship position would require him to provide 15 - 20 referrals/admissions to PAMC each month.  Dr. Filart responded by saying "There are Stark laws." Dr. Filart also asked if Ms. Suarez would put the offer in writing.  When Ms. Suarez and Mr. Chan returned to the PAMC offices, Ms. Suarez said "*Fuck that.  I'm not putting that in writing.*"  Dr. Filart later accepted the Medical Directorship position which, on information and belief, paid him $6,000 per month.

117.   PAMC received many Medicare and Medi-Cal patient referrals/admissions from physicians with prohibited compensation arrangements and illegal remuneration arrangments via medical directorships whose compensation was made with a purpose to induce referrals, and was **determined in a manner that takes into account the volume or value of referrals**.   PAMC

6/9/2010 "Delv sublease ck to Faragalla. He said he is having health fair in two wkds wants Martha R to call him re details. Also talked to him about admissions… told him he only had couple in May and really need his support right now."

7/13/2010 "Met with MD to discuss sublease, and volume @ Aghapy. Told him we are terminating Sublease. And that numbers at Aghapy need improvement or else we may have to terminate that contract too. He suggested we meet Mon morning at his office. Will run it by M. Rivera and invite M Roman to attend."

7/27/2010 "Dropped off sublease… he had another pt this week for Med Surge… he wants to re-instate sublease… he says he will send us pts. He has send 3 pts since the letter. Also, spoke to him about OB volume. He asked about the retention person… he is open to any changes."
8/8/2010 "He sent another admission to us this week… per M. Rivera if he continued the trend of sending us pts weekly (which he has… I will track number and submit to RZ) we would cancel the cancellation letter. I need an update on this strategy."

8/25/2010 "Dr. Faragalla sent another admission this week… any chance we will be able to reinstate the sublease? Even if it is at a reduced rate?"

10/28/2010 "Met with Faragalla re admissions… he said he will try to send more patients but wants to know if we will restart the sublease? I told him (per BEF last msg) if he admits 5+ consistently for 2-3 months we would do new sublease. He also mentioned some concerns re Sylvia in HP."

Dr. Marcel Filart
5/3/2010 "Visited and met with Dr. He knows my goal for him is 20… Also discussed with him the two candidates for Phys Guarantee. Presented him with the Cvs. MY helping me set up interview."

5/6/2010 "Spk w Md re interview next week with new provider and admissions."

7/27/2010 "Met with MD Fri, took KP and JM to his office. All is ok.. He mentioned some frustation with EHS… but he is handling it himself. All is ok… text him this morning re admissions. His mtg is about 12… we need 5 from him this week."

11/5/2010 "Meeting with BEF and Filart went well. He recommitted to 20 admits per month. We will ride the wave until Yan and Filart settle their agreement."

5/20/2010 "RTHL classes in questions for month of June. Await Martha and PS assessment."

5/26/2010 "Spoke with Dr. Sevilla… he wants to do an event… I will press for 5 admissions… see what I can do. Not promising anything to him though."

7/7/2010 "Sevilla called. Spk to him briefly about admits/RTHL events. Same as last month.  We need to see at least 5 admits per month to do RTHL events moving forward."

Dr. Cesar Velez
5/6/2010 "Delv contract, thank them for the admissions mtd"

5/19/2010 "Per M. Rivera leave Med Staff issues alone… continue to encourage Admissions… will let the dust settle for now…. I will remind Velez that we have sublease and need his support."

6/1/2010 "Dropped off sublease check. Velez said all is fine. He reached his goal for the month of May."

12/7/2010 "Delivered sublease check. Second sublease is pending, he asked me about it. Velez continues to support us with admits."

Dr. Yan
11/11/2010 "GR stopped by to drop off phys order forms, transportation and important numbers for the hospital. Briefly inserviced his staff. Met with Freddie and told him black and white that we need to double our efforts since we are doubling resources. He knows Filart was only sending us about 15 pts… so I told him we need 30… I think we will see for sure 25 pts per month. The rest of the month we may see a peek since Filart will be out of town and Yan will be handling everything. Freddie said they will send everything to us. Freddie also said that the deal is going through and that it benefits Filart to do this."

2/15/2011 "Dropped off Jan check.  Also we discussed the deal w Filart, SNF assignments, and admisisons volume. Also set the meeting with JE, BEF and Yan."

**Piper Allen (Physician Integration Manager) Access call notes.**
Dr. Jeremiah Aguolu
4/28/2010 "Dropped off flyers, Dr. happy with production, will have staff start using and also passing out to patients. Discussed patient admissions

the full details of these arrangements, referrals/admissions, patient information and each related Medicare and Medi-Cal claim submitted and the corresponding Medicare, Medi-Cal and DSH reimbursements. The list and information to which Mr. Chan had access in his normal job function is as follows:

| Physician/Clinic | Compensation Arrangement | PAMC's Payment |
|---|---|---|
| Dr. Ali Abaian | Marketing Agreement | $4,000/month |
| Dr. Peyman Banooni | Sublease Agreement | $2,253/month (PAMC cut Dr. Banooni's sublease amount because of his low admissions) |
| Dr. Rufino Cadano | Sublease Agreement | $2,610/month (even though Dr. Cadano never hosted any event) |
| Dr. Lulu Chen | Sublease Agreement Marketing Agreement | $1,913/month $3,000/month |
| Dr. Paul Chu | Sublease Agreement | $2,501/month |
| Dr. S. Paul Daniels (Health & Wellness MedicalClinic) | Sublease Agreement | $2,240/month |
| Dr. Maged Faragalla | Marketing Agreement | $5,000/month |
| Dr. Marcel Filart | Marketing Agreement Medical Directorship | $5,000/month $6,000/month |
| Dr. Byron Flores | Sublease Agreement | $2,225/month |
| Dr. Cadrin Gill | Sublease Agreement | $3,401/month (after more than five years, PAMC cancelled the sublease because of Dr. Gill's low admissions) |
| Dr. Enriqui Gonzalez | Marketing Agreement | $2,500/month (PAMC cut Dr. Gonzalez's Marketing Agreement amount in April 2013 because of his low admissions) |

134. Excerpt of Preliminary Provider Report, Year 2007:

## PRELIMINARY PROVIDER REPORT

| | Monthly $ | Yearly $ | Annual Activity | | Monthly Activity Avg. | | Rank | $ / Admit | Rank - ROI |
| | | | 2006 | 2007 Annualized | 2006 | 2007 | | | |
|---|---|---|---|---|---|---|---|---|---|
| Liu SM $4K & sublease $1834 (incl. wound & med/surg) | $5,834 | $70,008 | 247 | 80 | 21 | 7 | * Combined below | $875 | |
| Chen | $1,956 | $23,472 | 69 | 195 | 6 | 16 | | $120 | |
| Axis Medical Group (incl. wound & med/surg) | | | 141 | 92 | 12 | 8 | Slug | $0 | |
| Daniels (incl. wound & med/surg) | $2,240 | $26,880 | 101 | 148 | 8 | 12 | Winner | $182 | Winner |
| Ngo | $1,580 | $18,964 | 64 | 88 | 5 | 7 | Slug | $216 | Winner |
| Velez 2 clinics | $2,814 | $33,768 | 134 | 132 | 11 | 11 | Grinner | $256 | Winner |
| Liu / Chen | $7,790 | $93,480 | 316 | 275 | 27 | 23 | Winner | $340 | Grinner |
| Flores | $2,225 | $26,700 | 68 | 78 | 6 | 7 | Slug | $342 | Grinner |
| Filart (using 10 months for avg) | $5,000 | $60,000 | 0 | 140 | 0 | 14 | Winner | $429 | Slug |
| Gill (incl. wound & med/surg) | $3,481 | $41,772 | 45 | 97 | 4 | 8 | Slug | $431 | Slug |
| Sevilla (SM & sublease) (incl. wound & med/surg) | $2,946 | $35,352 | 67 | 57 | 6 | 5 | Slug | $620 | Sinner |

**Rank / Activity**

Winners: $\geq 12$

Grinners: 9-11

Slugs: 6-8

Sinners: $\leq 5$

**Rank / $ per Admit**

Winners: $\leq 300$

Grinners: $301 - $400

Slugs: $401 - $450

Sinners: $\geq $451

///

///

135. "**Medical Surgical Accounts**" report, copied below, and plainly showing how it is PAMC's obvious wide-spread business model to pay referring physicians for referrals as follows:

## MEDICAL SURGICAL ACCOUNTS

### Winners

| | |
|---|---|
| Dr. Daniels: 12/182* | A Winner all the way around. Cooperative and loyal to PAMC. **Terrific volume and ROI.** |
| Dr. Filart: 14/429* | Volume is terrific, but current **ROI is at Slug level**. However, volume is expected to increase significantly, ranking him as a Winner. |
| Drs. Liu & Chen 23/340* | Using only direct admit numbers for evaluation. Winners with respect to volume, but **ROI places them at Grinner level**; however UR issues impact negatively on overall performance. Nevertheless, consider them Winners when loyalty to PAMC is included in the equation. |

### Grinners

| | |
|---|---|
| Dr. Flores: 7/342* | His volume is at Slug level, but his **ROI is at Grinner level**. He maintains consistent performance in spite of severe practice challenges. Consider him a Grinner when all is considered. |
| Dr. Ngo: 7/342* | Using only direct admit numbers for evaluation. Volume is at Slug level, but **ROI is at Winner level**. Annualized 2007 volume shows an increase from 2006 and April was a great month for him with 10 direct admits. Consider him a Grinner. |
| Dr. Velez: 11/256* | At present, volume is at Grinner level, but his **ROI is at Winner level**. A Grinner heading for Winner. |

### Slugs

| | |
|---|---|
| Axis Medical Group: 8* | Volume has decreased relative to 2006 in spite of HBO activity. |
| Dr. Gill: 8/431* | A **Slug at present both in volume and ROI**. Although volume has been erratic, his 2007 projections are double 2006 activity. However, March was a terrific month, at 15 admits, with Dr. Liu diligently following convalescent home patients. Sustained support of Dr. Liu following Dr. Gill's convalescent home patients should see volumes sustained at March levels (15). **Recommend two months to determine if contract amendment is indicated.** |

### Sinners

| | |
|---|---|
| Dr. Sevilla | Volume is low. Relationship needs strengthening if account is to thrive. **Inclined amend the contract,** but before taking that step will discuss situation with physician. Splitting with White? Practice issues? |

\* Average Admit per Month / Business Development Cost per Admit (See attached for detail)

**(emphasis** added )

# Exhibit 6

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF LOS ANGELES
## DEPARTMENT OF PUBLIC HEALTH

**CERTIFICATE OF DEATH**

State File Number: 3052020075725
Local Registration Number: 3202019017225

| Field | Value |
|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) | VINCENT |
| 2. MIDDLE | PAUL |
| 3. LAST (Family) | MARTIN |
| AKA, ALSO KNOWN AS | — |
| 4. DATE OF BIRTH | 08/31/1935 |
| 5. AGE Yrs. | 84 |
| 6. SEX | M |
| 7. DATE OF DEATH | 04/04/2020 |
| 8. HOUR (24 Hours) | 0151 |
| 9. BIRTH STATE/FOREIGN COUNTRY | NY |
| 11. EVER IN U.S. ARMED FORCES? | X YES |
| 12. MARITAL STATUS/SRDP (at Time of Death) | MARRIED |
| 15. EDUCATION | ASSOCIATE |
| 14. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? | X NO |
| 16. DECEDENT'S RACE | CAUCASIAN |
| 17. USUAL OCCUPATION | GRAPHIC ARTIST |
| 18. KIND OF BUSINESS OR INDUSTRY | ART |
| 19. YEARS IN OCCUPATION | 31 |

**USUAL RESIDENCE**

| Field | Value |
|---|---|
| 20. DECEDENT'S RESIDENCE | 4955 ARCOLA AVENUE |
| 21. CITY | NORTH HOLLYWOOD |
| 22. COUNTY/PROVINCE | LOS ANGELES |
| 23. ZIP CODE | 91601 |
| 24. YEARS IN COUNTY | 59 |
| 25. STATE/FOREIGN COUNTRY | CA |

**INFORMANT**

| Field | Value |
|---|---|
| 26. INFORMANT'S NAME, RELATIONSHIP | KATHRYN SESSINGHAUS, DAUGHTER |
| 27. INFORMANT'S MAILING ADDRESS | 1425 N. CATALINA STREET, BURBANK, CA 91505 |

**SPOUSE AND PARENT INFORMATION**

| Field | Value |
|---|---|
| 28. NAME OF SURVIVING SPOUSE/SRDP—FIRST | EMMA |
| 29. MIDDLE | FLORENTINA |
| 30. LAST (Birth Name) | RODRIGUEZ |
| 31. NAME OF FATHER/PARENT—FIRST | JOHN |
| 32. MIDDLE | — |
| 33. LAST | OLSZEWSKI |
| 34. BIRTH STATE | NJ |
| 35. NAME OF MOTHER/PARENT—FIRST | ANNA |
| 36. MIDDLE | E. |
| 37. LAST (Birth Name) | BOTCHER |
| 38. BIRTH STATE | NY |

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| Field | Value |
|---|---|
| 39. DISPOSITION DATE | 04/16/2020 |
| 40. PLACE OF FINAL DISPOSITION | SCATTER AT SEA OFF THE COAST OF VENTURA COUNTY |
| 41. TYPE OF DISPOSITION | CR/SEA |
| 42. SIGNATURE OF EMBALMER | NOT EMBALMED |
| 44. NAME OF FUNERAL ESTABLISHMENT | VALLEY FUNERAL HOME |
| 45. LICENSE NUMBER | FD976 |
| 46. SIGNATURE OF LOCAL REGISTRAR | MUNTU DAVIS, M.D. |
| 47. DATE | 04/10/2020 |

**PLACE OF DEATH**

| Field | Value |
|---|---|
| 101. PLACE OF DEATH | SERRANO N. CONVALESCENT HOSPITAL |
| 102. IF HOSPITAL, SPECIFY ONE | X Other |
| 103. IF OTHER THAN HOSPITAL | — |
| 103A. FACILITY ADDRESS OR LOCATION | 5401 FOUNTAIN AVENUE |
| 104. COUNTY | LOS ANGELES |
| 106. CITY | LOS ANGELES |

**CAUSE OF DEATH**

| Field | Value |
|---|---|
| 107. CAUSE OF DEATH — IMMEDIATE CAUSE (A) | CARDIORESPIRATORY ARREST |
| (B) | ESSENTIAL HYPERTENSION |
| (C) | CORONARY ARTERY DISEASE |
| (D) | — |
| 108. Time Interval Onset to Death (A) | MINS |
| (B) | YRS |
| (C) | YRS |
| 111. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH | NONE |
| 113. WAS OPERATION PERFORMED | NO |

**PHYSICIAN'S CERTIFICATION**

| Field | Value |
|---|---|
| 114. I CERTIFY... | MARCEL FILART M.D. |
| 116. DECEDENT ATTENDED SINCE | 11/21/2018 |
| 116A. DECEDENT LAST SEEN ALIVE | 04/01/2020 |
| 115. SIGNATURE AND TITLE OF CERTIFIER | MARCEL FILART M.D. |
| 116. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | MARCEL FILART M.D. 1711 W TEMPLE ST SUITE 1070, LOS ANGELES, CA 90026 |
| 118. LICENSE NUMBER | A76022 |
| 117. DATE | 04/09/2020 |
| 119. I CERTIFY... MANNER OF DEATH | Natural |

**CORONER'S USE ONLY** — 120–128 (blank)

STATE REGISTRAR

*01500100450000339*

**CERTIFIED COPY OF VITAL RECORD**
STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

This is a true certified copy of the record filed in the County of Los Angeles Department of Public Health if it bears the Registrar's signature in purple ink.



MD — DATE ISSUED    APR 14 2020

Health Officer and Registrar   DO 11

002399459

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the Registrar.

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

CALOSANGO1

EXHIBIT 2

Electronically FILED by Superior Court of California, County of Los Angeles on 06/08/2020 01:49 PM Sherri R. Carter, Executive Officer/Clerk of Court, by W. Moore, Deputy Clerk

| Attorney or Party without Attorney:<br>ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA 94010<br>Telephone No: 650-697-6000     FAX No: 650-697-0577 | For Court Use Only |
|---|---|

| Attorney for: Plaintiff | Ref. No. or File No.:<br>HPHC #2961 |

*Insert name of Court, and Judicial District and Branch Court:*
**LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK**

*Plaintiff:* EMMA MARTIN, ELIZABETH GAGLIANO; ET AL

*Defendant:* SERRANO POST ACUTE LLC; ET AL

| **PROOF OF SERVICE**<br>**SUMMONS** | Hearing Date: | Time: | Dept/Div: | Case Number:<br>20STCV19545 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2.  I served copies of the SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE

3.  a. *Party served:*  SERRANO POST ACUTE LLC D/B/A HOLLYWOOD PREMIER HEALTHCARE CENTER, A/K/A SERRANO HEALTHCARE, A/K/A SERRANO NORTH CONVALESCENT HOSPITAL BY SERVING: ANTHONY DIMONT, AGENT FOR SERVICE

     b. *Person served:*  party in item 5.b

4.  *Address where the party was served:*  5401 FOUNTAIN AVENUE
     LOS ANGELES, CA 90029

5.  I served the party:
     b. **by substituted service.** On: Wed., May. 27, 2020 at: 1:59PM I left the documents listed in item 2 with or in the presence of:
     JUHN CAYABYAH, ADMINISTRATOR
     (1) **(Business)** Person in charge over 18. I informed him or her of the general nature of the papers.
     (4) A declaration of mailing is attached.
     (5) I attach a declaration of diligence stating actions taken first to attempt personal service.

6.  The *"Notice to the Person Served"* (on the Summons) was completed as follows:
     *as the person sued under the fictitious name of:*  Hollywood Premier Healthcare Center, A/k/a Serrano Healthcare,
     *on behalf of:*  A/k/a Serrano North Convalescent Hospital
     *Other:*  SERRANO POST ACUTE LLC
          CAL. CORP. CODE 17061

7.  *Person Who Served Papers:*                                     Recoverable Cost Per CCP 1033.5(a)(4)(B)
     a. BUD A KOOGLE
     b. **A & A LEGAL SERVICE, Inc.**          d. *The Fee for Service was:*
       880 MITTEN ROAD, SUITE 102          e. I am: (3) registered California process server
       BURLINGAME, CA 94010
     c. (650) 697-9431, FAX (650) 697-4640          *(ii) Registration No.:*     2018298656
                                             *(iii) County:*          Los Angeles

8.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

     *Date:* Mon, Jun. 01, 2020

| Judicial Council Form POS-010<br>Rule 2.150.(a)&(b) Rev January 1, 2007 | **PROOF OF SERVICE**<br>**SUMMONS** | (BUD A KOOGLE) | *ammur.123613* |
|---|---|---|---|

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA  94010<br><br>Telephone No: 650-697-6000      *FAX: No:* 650-697-0577 | *For Court Use Only* |

| | |
|---|---|
| *Attorney for:* Plaintiff | *Ref. No or File No.:*<br>HPHC #2961 |

*Insert name of Court, and Judicial District and Branch Court:*
LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK

*Plaintiff:* EMMA MARTIN, ELIZABETH GAGLIANO; ET AL

*Defendant:* SERRANO POST ACUTE LLC; ET AL

| **DECLARATION OF**<br>**REASONABLE DILIGENCE** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>20STCV19545 |
|---|---|---|---|---|

1.  I, BUD A KOOGLE, and any employee or independent contractors retained by A & A LEGAL SERVICE, Inc.  are and were on the dates mentioned herein over the age of eighteen years and not a party to this action.  Personal service was attempted on Defendant SERRANO POST ACUTE LLC D/B/A HOLLYWOOD PREMIER HEALTHCARE CENTER, A/K/A SERRANO HEALTHCARE, A/K/A SERRANO NORTH CONVALESCENT HOSPITAL BY SERVING: ANTHONY DIMONT, AGENT FOR SERVICE as follows:

2.  *Documents:*     SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE.

| Day | Date | Time | Location | R e s u l t s |
|---|---|---|---|---|
| Wed | 05/27/20 | 1:00pm | Business | SPOKE TO THE MAILROOM CLERK AST CLARK HILL WHO TOLD ME THAT THEY CANNOT ACCEPT SERVICE BECAUSE THE ATTORNEYS AND ACCOUNTANTS ARE NOT HERE TO CONFIRM THAT THEY REPRESENT. Attempt made by: BUD A KOOGLE. Attempt at: 1055 WEST SEVENTH STREET, STE. 2400  LOS ANGELES, CA 90017. |
| Wed | 05/27/20 | 1:45pm | Business | SPOKE TO AN EMPLOYEE AT POLAZZO POST ACUTE NURSING HOME WHO TOLD ME THAT THE COMPANY I AM LOOKING FOR IS ACROSS THE STREET. THEY HAVE NO AFFILIATION. Attempt made by: BUD A KOOGLE. Attempt at: 5400 FOUNTAIN AVENUE  LOS ANGELES, CA 90029. |

3.  *Person Executing*
    a. BUD A KOOGLE
    **b. A & A LEGAL SERVICE, Inc.**
       880 MITTEN ROAD, SUITE 102
       BURLINGAME, CA  94010
    c. (650) 697-9431, FAX (650) 697-4640

Recoverable Costs Per CCP 1033.5(a)(4)(B)
d. *The Fee  for service was:*
e. *I am:*   (3)  registered California process server

    (ii)  Registration No.:        2018298656
    (iii)  County:                 Los Angeles

4.  *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*
    Date: Mon, Jun. 01, 2020

    (BUD A KOOGLE)

DECLARATION OF REASONABLE DILIGENCE

6976000.123613

| *Attorney or Party without Attorney:* | For Court Use Only |
|---|---|
| ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA  94010<br>*Telephone No:* 650-697-6000       *FAX No:* 650-697-0577 | |

| | |
|---|---|
| *Attorney for:* Plaintiff | *Ref. No or File No.:*<br>HPHC #2961 |

*Insert name of Court, and Judicial District and Branch Court:*
LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK

*Plaintiff:* EMMA MARTIN, ELIZABETH GAGLIANO; ET AL

*Defendant:* SERRANO POST ACUTE LLC; ET AL

| **PROOF OF SERVICE**<br>**By Mail** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>20STCV19545 |
|---|---|---|---|---|

1. I am over the age of 18 and not a party to this action.  I am employed in the county where the mailing occurred.

2. I served copies of the SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE

3. By placing a true copy of each document in the United States mail, in a sealed envelope by **First Class** mail with postage prepaid as follows:

   a. Date of Mailing:                                 Fri., May. 29, 2020
   b. Place of Mailing:                             BURLINGAME, CA  94010
   c. Addressed as follows:                    SERRANO POST ACUTE LLC D/B/A HOLLYWOOD PREMIER
                                                   HEALTHCARE CENTER, A/K/A SERRANO HEALTHCARE, A/K/A SERRANO
                                                   NORTH CONVALESCENT HOSPITAL BY SERVING: ANTHONY DIMONT,
                                                   AGENT FOR SERVICE
                                                   5401 FOUNTAIN AVENUE
                                                   LOS ANGELES, CA  90029

4. I am readily familiar with the business practice for collection and processing of correspondence as deposited with the U.S. Postal Service on Fri., May. 29, 2020 in the ordinary course of business.

5. *Person Serving:*                                 Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. LIANA M. SOLOMON                      d. ***The Fee*** *for Service was:*
   b. A & A LEGAL SERVICE, Inc.              e. I am: Exempt from registration under B&P 22350(b)
      880 MITTEN ROAD, SUITE 102
      BURLINGAME, CA  94010
   c. (650) 697-9431, FAX (650) 697-4640

8. ***I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.***

   *Date:*  **Mon, Jun. 01, 2020**

Electronically FILED by Superior Court of California, County of Los Angeles on 06/08/2020 01:49 PM Sherri R. Carter, Executive Officer/Clerk of Court, by W. Moore,Deputy Clerk

| | |
|---|---|
| *Attorney or Party without Attorney:*<br>ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA 94010<br>*Telephone No:* 650-697-6000     *FAX No:* 650-697-0577 | *For Court Use Only* |
| *Attorney for:* Plaintiff | *Ref. No. or File No.:*<br>HPHC #2961 |

*Insert name of Court, and Judicial District and Branch Court:*
  LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK

*Plaintiff:* EMMA MARTIN, ELIZABETH GAGLIANO; ET AL

*Defendant:* SERRANO POST ACUTE LLC; ET AL

| PROOF OF SERVICE<br>SUMMONS | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>20STCV19545 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE

3. *a. Party served:*          MARCEL ADRIAN SOLERO FILART, M.D., AN INDIVIDUAL
   *b. Person served:*        party in item 5.b

4. *Address where the party was served:*     1711 W. TEMPLE STREET, STE. 1070
                                             LOS ANGELES, CA 90026

5. *I served the party:*
   b. **by substituted service.** On: Fri., May. 29, 2020 at: 11:39AM I left the documents listed in item 2 with or in the presence of:
      ALEX PECZON, SUPPORT STAFF, Hispanic, Male, 45 Years Old, Black Hair, 5 Feet 5 Inches, 190 Pounds
   (1) **(Business)** Person in charge over 18. I informed him or her of the general nature of the papers.
   (4) A declaration of mailing is attached.
   (5) I attach a declaration of diligence stating actions taken first to attempt personal service.

6. *The "Notice to the Person Served" (on the Summons) was completed as follows:*
   a. as an individual defendant

7. *Person Who Served Papers:*                          Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. BUD A KOOGLE                          d. *The Fee for Service was:*
   b. **A & A LEGAL SERVICE, Inc.**         e. I am: (3) registered California process server
      880 MITTEN ROAD, SUITE 102              *(i)* Owner
      BURLINGAME, CA 94010                    *(ii) Registration No.:*     2018298656
   c. (650) 697-9431, FAX (650) 697-4640      *(iii) County:*             Los Angeles

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

   Date: *Wed, Jun. 03, 2020*

Judicial Council Form POS-010          PROOF OF SERVICE          (BUD A KOOGLE)
Rule 2.150.(a)&(b) Rev January 1, 2007      SUMMONS                                    *amnur.123615*

| | | | | For Court Use Only |
|---|---|---|---|---|
| *Attorney or Party without Attorney:*<br>ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA 94010 | | | | |

*Telephone No:* 650-697-6000    *FAX No:* 650-697-0577

| *Attorney for:* Plaintiff | *Ref. No or File No.:*<br>HPHC #2961 |
|---|---|

*Insert name of Court, and Judicial District and Branch Court:*
LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK

*Plaintiff:* EMMA MARTIN, ELIZABETH GAGLIANO; ET AL

*Defendant:* SERRANO POST ACUTE LLC; ET AL

| **DECLARATION OF**<br>**REASONABLE DILIGENCE** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>20STCV19545 |
|---|---|---|---|---|

1. I, PAUL R. GARCIA, and any employee or independent contractors retained by A & A LEGAL SERVICE, Inc. are and were on the dates mentioned herein over the age of eighteen years and not a party to this action.  Personal service was attempted on Defendant MARCEL ADRIAN SOLERO FILART, M.D., AN INDIVIDUAL as follows:

2. *Documents:*   SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE.

| Day | Date | Time | Location | R e s u l t s |
|---|---|---|---|---|
| Wed | 05/27/20 | 1:30pm | Business | PER ASSISTANT, SUBJECT NOT IN. Attempt made by: PAUL R. GARCIA.<br>Attempt at: 1711 W. TEMPLE STREET, STE. 1070  LOS ANGELES, CA 90026. |
| Wed | 05/27/20 | 2:00pm | Home | UNABLE TO GAIN ACCESS. GATED PROPERTY. Attempt made by: PAUL R.<br>GARCIA, Registration #2012070781 Los Angeles County. Attempt at: 1151 E.<br>ELMWOOD AVENUE  Burbank, CA 91501. |
| Thu | 05/28/20 | 11:00am | Business | PER ASSISTANT, SUBJECT NOT IN. Attempt made by: PAUL R. GARCIA.<br>Attempt at: 1711 W. TEMPLE STREET, STE. 1070  LOS ANGELES, CA 90026. |

3. *Person Executing*
   a. PAUL R. GARCIA
   b. **A & A LEGAL SERVICE, Inc.**
      880 MITTEN ROAD, SUITE 102
      BURLINGAME, CA 94010
   c. (650) 697-9431, FAX (650) 697-4640

Recoverable Costs Per CCP 1033.5(a)(4)(B)
d. *The Fee* for service was:
e. *I am:*   (3) registered California process server
   (i)   Independent Contractor
   (ii)  *Registration No.:*      2012070781
   (iii) *County:*             Los Angeles

4. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*
   Date: Wed, Jun. 03, 2020

_____
(PAUL R. GARCIA)

6976000.123615

**DECLARATION OF REASONABLE DILIGENCE**

| *Attorney or Party without Attorney:*<br>ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA  94010<br>*Telephone No:* 650-697-6000       *FAX No:* 650-697-0577 | *For Court Use Only* |
|---|---|

| *Attorney for:* Plaintiff | *Ref. No or File No.:*<br>HPHC #2961 | |
|---|---|---|
| *Insert name of Court, and Judicial District and Branch Court:*<br>LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK | | |
| *Plaintiff:* EMMA MARTIN, ELIZABETH GAGLIANO; ET AL | | |
| *Defendant:* SERRANO POST ACUTE LLC; ET AL | | |

| **PROOF OF SERVICE**<br>**By Mail** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>20STCV19545 |
|---|---|---|---|---|

1. I am over the age of 18 and not a party to this action.  I am employed in the county where the mailing occurred.

2. I served copies of the SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE

3. By placing a true copy of each document in the United States mail, in a sealed envelope by **First Class** mail with postage prepaid as follows:

    a. Date of Mailing:  Fri., May. 29, 2020
    b. Place of Mailing:  BURLINGAME, CA  94010
    c. Addressed as follows:  MARCEL ADRIAN SOLERO FILART, M.D., AN INDIVIDUAL
    1711 W. TEMPLE STREET, STE. 1070
    LOS ANGELES, CA  90026

4. I am readily familiar with the business practice for collection and processing of correspondence as deposited with the U.S. Postal Service on Fri., May. 29, 2020 in the ordinary course of business.

5. Person Serving:                                                    Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. LIANA M. SOLOMON                          d. *The Fee for Service was:*
    b. A & A LEGAL SERVICE, Inc.               e. I am: Exempt from registration under B&P 22350(b)
       880 MITTEN ROAD, SUITE 102
       BURLINGAME, CA  94010
    c. (650) 697-9431, FAX (650) 697-4640

8. *I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

   Date:  *Wed, Jun. 03, 2020*

Judicial Council Form POS-010                           PROOF OF SERVICE                    (LIANA M. SOLOMON)
Rule 2.150.(a)&(b) Rev January 1, 2007                      By Mail                                          *ammur.123615*

Electronically FILED by Superior Court of California, County of Los Angeles on 06/10/2020 02:06 PM Sherri R. Carter, Executive Officer/Clerk of Court, by S. Bolden,Deputy Clerk

Case 2:20-cv-05937-DSF-SK   Document 1   Filed 07/01/20   Page 89 of 116   Page ID #:89

| Attorney or Party without Attorney: | | | | | For Court Use Only |
|---|---|---|---|---|---|
| ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA 94010<br>Telephone No: 650-697-6000     FAX No: 650-697-0577 | | | | | |

| Attorney for: Plaintiff | Ref. No. or File No.:<br>HPHC #2961 |
|---|---|

Insert name of Court, and Judicial District and Branch Court:

**LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK**

Plaintiff: EMMA MARTIN, ELIZABETH GAGLIANO; ET AL

Defendant: SERRANO POST ACUTE LLC; ET AL

| PROOF OF SERVICE<br>SUMMONS | Hearing Date: | Time: | Dept/Div: | Case Number:<br>20STCV19545 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE

| 3. *a. Party served:*<br>   *b. Person served:* | BENJAMIN LANDA, AN INDIVIDUAL<br>party in item 3.a., White, Male, 64 Years Old, Gray Hair, 6 Feet 1 Inches, 250 Pounds |
|---|---|

| 4. *Address where the party was served:* | 182 BRIARWOOD XING<br>LAWRENCE, NY 11559 |
|---|---|

5. *I served the party:*
   a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive process for the party (1) on: Mon., Jun. 01, 2020 (2) at: 4:02PM

*6. The "Notice to the Person Served" (on the Summons) was completed as follows:*
   a. as an individual defendant

7. *Person Who Served Papers:*                                    Recoverable Cost Per CCP 1033.5(a)(4)(B)
   a. CURTIS WARREN                              d.  *The Fee for Service was:*
   **b. A & A LEGAL SERVICE, Inc.**              e.  I am:
      880 MITTEN ROAD, SUITE 102
      BURLINGAME, CA 94010                              *(i)*  Independent Contractor
   c. (650) 697-9431, FAX (650) 697-4640

8. *I declare under penalty of perjury under the laws*          *that the foregoing is true and correct.*

   Date: *Wed, Jun. 03, 2020*

                                                               *C Wan*

| Attorney or Party without Attorney: | For Court Use Only |
|---|---|
| ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA 94010<br><br>Telephone No: 650-697-6000     FAX: No: 650-697-0577<br>*Attorney for:* Plaintiff | |

| | |
|---|---|
| | *Ref. No or File No.:*<br>HPHC #2961 |

*Insert name of Court, and Judicial District and Branch Court:*
LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK

*Plaintiff:* EMMA MARTIN, ELIZABETH GAGLIANO; ET AL

*Defendant:* SERRANO POST ACUTE LLC; ET AL

| **DECLARATION OF**<br>**REASONABLE DILIGENCE** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>20STCV19545 |
|---|---|---|---|---|

1. I, CURTIS  WARREN, and any employee or independent contractors retained by A & A LEGAL SERVICE, Inc.  are and were on the dates mentioned herein over the age of eighteen years and not a party to this action.  Personal service was attempted on Defendant BENJAMIN  LANDA, AN INDIVIDUAL as follows:

2. *Documents:*     SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE.

| Day | Date | Time | Location | R e s u l t s |
|---|---|---|---|---|
| Thu | 05/28/20 | 9:42am | Home | THE PROPERTY IS BOARDED UP. PLACE IS VACANT. Attempt made by: CURTIS  WARREN. Attempt at: 235 BRIARWOOD XING  LAWRENCE, NY 11559. |

3. *Person Executing*
   a. CURTIS  WARREN
   b. **A & A LEGAL SERVICE, Inc.**
      880 MITTEN ROAD, SUITE 102
      BURLINGAME, CA 94010
   c. (650) 697-9431, FAX (650) 697-4640

Recoverable Costs Per CCP 1033.5(a)(4)(B)
d. *The Fee  for service was:*
e. *I am:*
      (i)     Independent Contractor

4. *I declare under penalty of perjury under the laws*
   Date: Wed, Jun. 03, 2020

   *that the foregoing is true and correct.*

   _____
   (CURTIS  WARREN)

   6976000.123614

**DECLARATION OF REASONABLE DILIGENCE**

| Attorney or Party without Attorney: | For Court Use Only |
|---|---|
| ANNE MARIE MURPHY ESQ., Bar #202540<br>COTCHETT, PITRE & MCCARTHY<br>840 MALCOLM ROAD, STE. 200<br>BURLINGAME, CA 94010<br><br>Telephone No: 650-697-6000      FAX: No: 650-697-0577 | |

| | |
|---|---|
| Attorney for: Plaintiff | Ref. No or File No.:<br>HPHC #2961 |
| Insert name of Court, and Judicial District and Branch Court: | |
| LOS ANGELES COUNTY SUPERIOR COURT-STANLEY MOSK | |
| Plaintiff: EMMA MARTIN, ELIZABETH GAGLIANO; ET AL | |
| Defendant: SERRANO POST ACUTE LLC; ET AL | |

| DECLARATION OF<br>REASONABLE DILIGENCE | Hearing Date: | Time: | Dept/Div: | Case Number:<br>20STCV19545 |
|---|---|---|---|---|

1.  I, WILSON PASTORIZA, and any employee or independent contractors retained by A & A LEGAL SERVICE, Inc. are and were on the dates mentioned herein over the age of eighteen years and not a party to this action. Personal service was attempted on Defendant BENJAMIN LANDA, AN INDIVIDUAL as follows:

2.  *Documents:*     SUMMONS AND COMPLAINT; CIVIL CASE COVER SHEET; NOTICE OF CASE ASSIGNMENT; ADR INFORMATION PACKAGE; FIRST AMENDED STANDING ORDER RE: PERSONAL INJURY PROCEDURES AT THE SPRING STREET COURTHOUSE.

| Day | Date | Time | Location | R e s u l t s |
|---|---|---|---|---|
| Fri | 05/29/20 | 1:50pm | Home | PER MALE TENANT, THERE IS NO SUCH PERSON AT THIS ADDRESS. SUBJECT UNKNOWN. LAST NAME ON MAILBOX IS "RUBIN". Attempt made by: WILSON PASTORIZA, Registration #1470737. Attempt at: 13535-77TH AVENUE  FLUSHING, NY 11367. |
| Mon | 06/01/20 | 5:08pm | Home | SPOKE WITH BENJAMIN LANDA, JR. SUBJECT NOT THERE. LEFT A COURTESY COPY. Attempt made by: WILSON PASTORIZA. Attempt at: 1337 E. 7TH STREET  BROOKLYN, NY 11230. |

3.  *Person Executing*
    a. WILSON PASTORIZA
    **b. A & A LEGAL SERVICE, Inc.**
       880 MITTEN ROAD, SUITE 102
       BURLINGAME, CA 94010
    c. (650) 697-9431, FAX (650) 697-4640

Recoverable Costs Per CCP 1033.5(a)(4)(B)
*d. The Fee for service was:*
*e. I am:*
      (i)    Independent Contractor
      (ii)   Registration No.:        1470737

4.  *I declare under penalty of perjury under the laws          : that the foregoing is true and correct.*
    Date: Mon, Jun. 08, 2020

                                                                 (WILSON PASTORIZA)

                                                                                              6976000.123723

DECLARATION OF REASONABLE DILIGENCE

EXHIBIT 3

2020 WL 2145350
Only the Westlaw citation is currently available.
United States District Court, W.D. Missouri, Saint
Joseph Division.

RURAL COMMUNITY WORKERS ALLIANCE
and Jane Doe,[1] Plaintiffs,
v.

SMITHFIELD FOODS, INC. and Smithfield Fresh
Meats Corp., Defendants.

No. 5:20-CV-06063-DGK
|
Signed 05/05/2020

**Attorneys and Law Firms**

David S. Muraskin, Pro Hac Vice, Stephanie K.
Glaberson, Pro Hac Vice, Karla Gilbride, Pro Hac Vice,
Public Justice, P.C., Washington, DC, David Seligman,
Pro Hac Vice, Juno Turner, Pro Hac Vice, Denver, CO,
Gina Chiala, Heartland Center for Jobs and Freedom,
Kansas City, MO, for Plaintiffs.

Alexandra B. Cunningham, Pro Hac Vice, Hunton
Andrews Kurth, Richmond, VA, Jean Paul Bradshaw, II,
Mara Halpert Cohara, Lathrop GPM LLP, Kansas City,
MO, Susan F. Wiltsie, Pro Hac Vice, Hunton Andrews
Kurth LLP, Washington, DC, for Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO
DISMISS**

GREG KAYS, JUDGE

**\*1** This lawsuit arises from Plaintiffs' allegations that
Defendant Smithfield Foods, Inc. and its wholly owned
subsidiary, Defendant Smithfield Fresh Meats
Corporation (collectively, "Smithfield") have failed to
adequately protect workers at its meat processing plant in
Milan, Missouri, ("the Plant" or "the Milan Plant") from
the virus that causes COVID-19. Now before the Court
are Plaintiffs' Motion for a Temporary Restraining Order
("TRO") and Preliminary Injunction (Doc. 3), and
Smithfield's motion to dismiss and/or stay pursuant to the

primary-jurisdiction doctrine (Doc. 28).

After carefully reviewing the motions and the existing
record, the Court holds that it should decline to hear this
matter pursuant to the primary-jurisdiction doctrine to
allow the Occupational Health and Safety Administration
("OSHA") to consider the issues raised by this case. But
even if the Court did not apply the primary-jurisdiction
doctrine, the Court would not issue a preliminary
injunction because Plaintiffs have not met their burden of
proving that the extraordinary remedy of an affirmative
injunction is justified. Smithfield's motion is GRANTED,
and the case is DISMISSED WITHOUT PREJUDICE.

**Background**

The Background section of this order is arranged in
chronological order. Although regrettably lengthy, it
details how the regulatory environment in which
meat-processing plants operate is constantly changing
during this unique national emergency.

In late 2019, a new coronavirus emerged named severe
acute respiratory syndrome coronavirus 2
(SARS-CoV-2).[2] This virus causes coronavirus disease
2019 (COVID-19), a respiratory illness that can cause
serious health problems, including death.[3] SARS-CoV-2
is highly contagious; it appears to spread from person to
person through respiratory droplets produced when an
infectious person coughs, sneezes, or talks, and the virus
can be spread by presymptomatic, or even asymptomatic,
individuals.[4]

A global pandemic ensued, and the virus and COVID-19
reached the United States in early 2020. On March 13,
2020, the President declared a national emergency
concerning COVID-19. That same day, Missouri's
governor also declared a state emergency, and on April 3,
the Missouri Department of Health and Senior Services
issued a stay-at-home order that mandated all individuals
abide by social-distancing requirements and closed all
nonessential businesses in Missouri through May 4.[5] The
stay-at-home order defines essential businesses in
accordance with guidance from the U.S. Department of
Homeland Security, Cybersecurity & Infrastructure
Security Agency ("Homeland Security"), which identified
livestock-slaughter facilities, including the Plant and its
operations, as "critical infrastructure."[6] On April 9, the
Centers for Disease Control ("CDC") published *Interim*

*Guidance for Businesses and Employers to Plan and Respond to Coronavirus Disease 2019 (COVID-19)*, which outlined several policies and procedures employers should implement to help prevent workplace exposure and community spread of the virus.

**\*2** On April 22, OSHA sent Smithfield a "Rapid Response Investigation" requesting information regarding its COVID-19 work practices and infection at the Milan Plant, giving Smithfield seven days to respond. As part of its inquiry, OSHA requested information about Smithfield's COVID-19 practices including what, if any, personal protective equipment has been given to its workers, what engineering controls have been implemented, what contact tracing methods have been employed, and what policies have been changed or implemented in light of the pandemic (Doc. 29-2). Smithfield responded on April 29 (Doc. 41).

The next day, on April 23, Plaintiffs Jane Doe and the Rural Community Workers Alliance ("RCWA") filed suit. They allege Smithfield is not taking adequate steps to prevent transmission of the virus at its Plant, thereby endangering workers and members of the surrounding community. According to her declaration, Doe is a current Smithfield employee who has worked at its Milan Plant for at least five years. She claims she currently works on the "cut floor" where animals are broken down into products and packaged.

The RCWA is a Missouri non-profit advocacy group whose members consist exclusively of workers in Northern Missouri. Several members of RCWA's current leadership council work at the Plant, and sixty to seventy workers who attend its meetings work at the Plant, including Jane Doe.

Defendant Smithfield is one of the largest meat-processing companies in the world, with meat-processing plants all over the United States, including in Milan, Missouri. Several of its meat-processing plants in the United States have closed recently due to outbreaks of COVID-19 among its workers.

The Complaint (Doc. 1) alleges that several meat-processing plants in this country owned and operated by Smithfield have become major COVID-19 "hot spots." It also alleges that in direct contravention of CDC guidelines, Smithfield has not implemented certain precautions to keep its workers and the Milan community safe from the virus. Such measures include keeping adequate distance between workers, prohibiting workers from taking a break to wash their hands or face,

preventing workers from covering their faces if they need to cough or sneeze, implementing a sick-leave policy that penalizes workers for missing work even if they are exhibiting COVID-19 symptoms, and failing to implement plans for testing and contact tracing.

The Complaint brings state-law claims for public nuisance and breach of duty to provide a safe workplace. Plaintiffs are not seeking monetary damages, only declaratory judgments stating that: (1) Smithfield's practices at the Plant constitute a public nuisance; and (2) Smithfield has breached its duty to provide a safe workplace.

The same day Plaintiffs filed suit, they also moved for a temporary restraining order and preliminary injunction (Doc. 3), seeking to force Smithfield to: provide masks; ensure social distancing; give employees an opportunity to wash their hands while on the line; provide tissues; change its leave policy to discourage individuals to show up to work when they have symptoms of the virus; give workers access to testing; develop a contact-tracing policy; and allow their expert to tour the Plant. Attached to the motion were declarations from: (1) Jane Doe, who described working conditions at the Plant and stated she was afraid for health and safety, as well as the health and safety of the Milan community, because of what she considers inadequate safety procedures at the Plant; (2) RCWA's Executive Director, Alex Fuentes; (3) a senior lobbyist with the non-profit organization Food & Water Watch ("FWW"), Anthony Corbo; (4) a lawyer, Thomas Fritzsche, who has interviewed a number of Alabama poultry-plant workers about working conditions and authored a 2013 report for the Southern Poverty Law Center about modern industrial slaughterhouse workers; and (5) an occupational-medicine specialist, Dr. Robert Harrison, who works as Clinical Professor of Medicine at the University of California, and also serves the California Department of Public Health.

**\*3** On April 26, the Court set a videoconference hearing on the preliminary injunction motion for April 30. That same day, the CDC and OSHA issued *Meat and Poultry Processing Workers and Employers – Interim Guidance* ("the Joint Guidance"), which provided supplemental guidance to meat-processing plants concerning COVID-19.[7] The Joint Guidance states that to reduce the risk of transmission among employees, employers at meat-processing facilities should, where "feasible," implement engineering controls, such as staggering shifts and breaks, requiring workers to stay six-feet apart, and/or erecting physical barriers; place handwashing or hand-sanitizing stations in multiple locations and encourage hand hygiene; give workers additional short

breaks to wash hands; provide tissues; and allow workers to take breaks in alternative areas to ensure social distancing. It also recommends employers provide personal protective equipment for workers to use during their shift and increase the frequency of sanitization in work and common spaces. It states employers should educate employees on measures they can take to decrease the risk of spreading the virus and provides a specific list of measures employers should take to promote social distancing, such as providing visual cues on floors, as reminders for social distancing. It encourages employers to screen workers for COVID-19 by implementing temperature checks prior to entering the workplace and sending home workers who appear to have symptoms (e.g., cough, fever, or shortness of breath), and monitor workers' contacts so they can alert anyone who may have been exposed to the virus. Finally, it recommends employers review leave and incentive policies so as to not penalize workers for taking sick leave if they contract COVID-19.

On April 27, Smithfield filed a motion to dismiss this case pursuant to the primary-jurisdiction doctrine, arguing this Court should defer to OSHA in this case. The next day—April 28—the President signed an executive order ("the Executive Order") under § 4511(b) of the Defense Production Act ("DPA"), 50 U.S.C. § 2061 *et seq.*, delegating authority to the Secretary of Agriculture to take all appropriate action "to ensure that meat and poultry processors continue operations consistent with the guidance for their operations jointly issued by" the CDC and OSHA.[8]

On April 29, Smithfield made several filings, including a supplemental brief to its motion to dismiss, which alleged that pursuant to the Executive Order, the United States Department of Agriculture ("USDA") now had jurisdiction over this case. It also submitted its Suggestions in Opposition (Doc. 32) to the preliminary injunction motion. Attached to its brief as exhibit A (Doc. 32-1) is a declaration from the Plant's general manager, Tim Messman, along with pictures of the Plant and copies of the Plant's policies and procedures related to COVID-19. Exhibit B (Doc. 32-2) is a declaration from John Henshaw, the head of OSHA from 2001 to 2003.

Later that same day, Plaintiffs' filed their suggestions in opposition (Doc. 35) to Smithfield's motion to dismiss. Included in it is a declaration from Dr. Melissa Perry (Doc. 35-2), a professor of environmental health at George Washington University.

On April 30, the Court held a hearing on the motion via teleconferencing. The Court offered the parties an

opportunity to introduce evidence, including witness testimony, but both parties elected to stand on the existing record. The parties then argued their respective positions.

After the hearing, the parties filed supplemental briefs. Attached to Smithfield's brief (Doc. 46) is a supplemental declaration from Smithfield's plant manager, clarifying Smithfield's leave policy and updating the Court on additional safety changes at the Plant.

Plaintiffs concede that Smithfield implemented new policies and procedures after this lawsuit was filed and have narrowed their requested injunctive relief to direct Smithfield to:

> (1) make all reasonable changes to its "production practices," including potentially lowering its line speeds, to place as many workers as possible at least six feet apart; (2) provide reasonable additional breaks to allow workers to care for their personal hygiene without penalty, including blowing their noses, using tissues, and hand washing; and (3) ensure that its policies do not require workers to come to the Plant to obtain COVID-19-related sick leave and take all reasonable steps to communicate that policy clearly to workers.

**\*4** (Doc. 48 at 10). Plaintiffs characterize their requested relief as compliance with the Joint Guidance.

### Findings of Fact

The Court gives the various declarations submitted by the parties the following evidentiary weight.[9]

The Court gives Jane Doe's declaration limited weight. While she has personal knowledge of conditions in those parts of the Plant in which she works, it is unclear exactly what part of the "cutting floor" she works in, and whether she can see all that she claims to see from this area. Further, it appears that some of the information in her

declaration is no longer accurate due to recent changes in the Plant's policies and procedures. For example, although her declaration may be correct that Smithfield initially told workers they would receive only one mask per week, this policy has been superseded. As discussed below, workers are now given masks every day. Finally, because her identify is unknown, there is no way to determine, through the adversarial process or otherwise, whether Doe has some bias against Smithfield that could lead her to misrepresent or exaggerate conditions at the Plant. The Court notes that at least one of her statements—that Smithfield has increased the line speed at the Plant during the pandemic—is contradicted by other, more persuasive evidence.

Mr. Fuentes' declaration concerning working conditions at the Plant are even less reliable than Jane Doe's, and so the Court gives them less weight. Mr. Fuentes has no personal knowledge of conditions at the Plant because he has never set foot in it. His understanding is based on hearsay from unidentified employees whose statements to him, even if accurately relayed by Mr. Fuentes, were not made under penalty of perjury. That said, the Court finds the portions of his declaration concerning RCWA's membership and activities are credible.

The Court finds the declarations of Messrs. Corbo, Fritzsche, and Harrison are based on some relevant knowledge, education, and experience concerning working conditions in American meat-processing plants generally, and so they possess some limited insight into what steps could be taken to prevent the spread of the SARS-CoV-2 virus in a generic American meat-processing facility. Because they are unfamiliar with specific working conditions at the Plant, however, their declarations provide limited help in determining whether Smithfield's policies and procedure at the Plant are sufficient to stem transmission of the virus.

Finally, the Court turns to the declaration of Dr. Melissa J. Perry, Professor and Chair of Environmental and Occupational Health at the Milken Institute School of Public Health of the George Washington University. Dr. Perry credentials are excellent: She is a past President of the American College of Epidemiology and a past chair of the Board of Scientific Counselors for the CDC. She has also served as a member of the National Institute for Occupational Safety and Health research grant-review panel. She has studied meat-processing facilities since 2004 and has published six peer-reviewed-journal articles on work health and safety at meat-processing facilities. As part of that work, she has visited four meat-processing plants and spoken with engineers regarding the organizational structure of processing plants and how they

can be redesigned to further worker health and safety.

*5 Dr. Perry opines that meat-processing plants can allow workers to stand six feet apart if they reduce production line speed, and that, if they do not space production line workers six feet apart, the plants will "inevitably" have a COVID-19 outbreak. She contends slowing the production line is the only way the plant will be able to continue meat production without an outbreak. She also endorses the other requests Plaintiffs make, such as for more rest breaks and paid leave, as "absolutely necessary" so the Plant can continue operating.

This Court has respect for Dr. Perry's opinion but finds it of limited value in this case. While this Court agrees that slowing down line speed may be beneficial for workers and allow more opportunities for social distancing, the Court found nothing in the Joint Guidance recommending a decrease in line speed. To that point, she provides no specific opinion regarding whether the Milan Plant is currently in compliance with the Joint Guidance, and there is no evidence that Dr. Perry reviewed the policies and procedures at the Milan Plant in forming her opinion. Accordingly, the Court gives little weight to her opinion that unless the production line speed is slowed and workers spread six feet apart, spread of the virus through the Plant is "inevitable" and it "will be forced to shutter." This assertion appears to be more of a good-faith speculation than an evidenced-based conclusion.

The Court gives more weight to the declarations provided by Smithfield. The statements made by Mr. Messman, the Plant's general plant manager, are almost all based on his personal knowledge. He possesses the most recent information concerning working conditions at the Plant, and he appears to be a reliable source of information about Smithfield's policies and procedures there.

The Court gives considerable weight to the declaration of John Henshaw, Smithfield's expert witness. After reviewing Smithfield's written policies and procedures at the Plant, the general manager's declaration, the pictures, and the declarations in Plaintiffs' motion, Mr. Henshaw opined that Smithfield's current policies and procedures, if followed, were consistent with the Joint Guidance as of April 29, 2020. Although the Court is aware that he is a retained expert witness whose assumptions and conclusions have not been tested by cross-examination, his opinion is measured, qualified, and grounded in the facts at the Milan Plant.

With the credibility determinations in mind, the Court makes the following findings of fact concerning current the Plant's working conditions and Smithfield's

COVID-19 policies and procedures.

Before entering the Plant, Smithfield requires all employees to undergo thermal screening. If employees exhibit one primary symptom or two secondary symptoms of COVID-19,[10] Smithfield provides them with instructions for next steps, including directions to quarantine and call their physician for guidance, and sends the employee home for fourteen days of paid leave or until the individual receives a negative COVID-19 test result. Employees with underlying health concerns—verified by a doctor—that place them at a higher risk of COVID-19 are given fourteen days of paid leave and then are shifted to short-term disability leave.

While quarantining as a result of COVID-19 symptoms, Smithfield requires employees to complete a questionnaire that in part entails naming all other employees they have closely contacted within the two days before experiencing symptoms. If the employee tests positive for COVID-19, Smithfield notifies and screens the close contacts. As of April 29, 2020, thirteen employees had been tested for COVID-19. None were positive.

**\*6** If employees miss work as a result of COVID-related symptoms, Smithfield does not penalize them. They do not receive attendance points and remain eligible for Smithfield's Responsibility Bonus ($500), regardless of whether individuals provide a doctor's or nurse's note. Moreover, Smithfield has expanded its employee benefits by eliminating co-pays for COVID-related testing and treatment.

To ensure that those inside the Plant are complying with Smithfield's COVID-19 safety procedures and policies, Smithfield has assigned both a nurse and a health-and-safety clerk to perform checks throughout the Plant. Smithfield has communicated these procedures and policies to its employees by several different media, including on televisions and signs at the Plant, through the Beekeeper communications app, and through the Textcaster mass text-messaging tool. Signs at the Plant relay the information in English, Spanish, and French, while the Beekeeper and Textcaster communications are available in the employee's language of choice. Interpreters are also available at the Plant to assist with these communications.

The Plant provides workers with an ear-looped face mask upon entry to the Plant each day, and if a mask breaks or becomes soiled, it provides a new one. Smithfield now requires all workers at the Plant to wear a mask at all times other than during meals and in certain offices where employees are spaced six feet apart. These masks prevent the spread of germs if an employee sneezes or coughs while on the line, reducing the need for tissues to reduce the spread of COVID-19. Additionally, Smithfield requires employees on the production floor to wear nitrile gloves and a plastic face shield.

As Smithfield concedes, it does not provide tissues to employees. It cannot provide tissues to individuals working on the production line because doing so would violate health standards set by the USDA. Thus, one of Plaintiff's original complaints cannot be remedied. Smithfield could, however, provide tissues for employees to wipe their nose while on breaks, but the record does not support that employees are banned from bringing their own tissues or other hygienic wipes to use while on breaks.

As for Plaintiffs' claim that Smithfield does not allow employees to wash their hands without penalty, the Court finds that Smithfield policies and procedures are reasonable under the circumstances. Due to the nature of the meat-processing business, employees must wear gloves on the production line. When workers leave the line for a break, they remove their gloves and sanitize their hands before entering common areas. They must also wash their hands and put on gloves before returning to the line. Smithfield currently administers hand sanitizer to employees every thirty minutes to use on their gloves and has added approximately 110 hand-sanitizing stations throughout the Plant. Smithfield also expects a shipment of small hand-sanitizer bottles soon, which it will make available to employees for personal use. In the meantime, the Plant has invited employees to bring in personal bottles they may refill using the company supply. Thus, the need for continued hand washing is unnecessary because any contamination that may occur on the line is contained by the required use of gloves.

Moreover, Smithfield has also enhanced cleaning and disinfection of the Plant's frequently touched surfaces in common areas using cleaning solutions identified by the CDC for use against the virus. These cleanings are performed as often as every two hours throughout the workday. Additional deep cleanings occur over the weekends, and Smithfield is working to implement use of fogging/misting disinfectants where possible.

**\*7** Finally, the Court turns to the steps Smithfield has taken steps to facilitate social distancing at the Plant. Smithfield has staggered workday start times, as well as lunch and break times, to avoid large numbers of workers congregating in break rooms or around time clocks. Smithfield is currently working to secure a wireless

Rural Community Workers Alliance v. Smithfield Foods, Inc., --- F.Supp.3d ---- (2020)

means for employees to clock in and out of their shifts to minimize crowding. In the meantime, it has expanded the number of available clocks for employees to use and will implement a grace period for workers to clock in and out of their shifts, all increasing the ability of workers to maintain social distance.

Smithfield has erected two large tents and three carport structures on the Plant lawn and placed tables and chairs underneath each so that workers have more space to eat while on breaks. The Plant has also installed plastic barriers on eating tables that separate employees from those sitting beside and across from them. Tables are sanitized after one employee leaves and before another sits down.

Smithfield has also reduced the number of hogs harvested each day and sends some employees home before lunch. This requires fewer employees to be at the Plant, helping to minimize crowding in the cafeteria and other areas. However, these policies reduce the number of hours worked by the affected employees, thereby decreasing their weekly pay. To ease the resulting financial burden on employees, Smithfield has temporarily increased pay by $5/hour, and such pay is available to any employee who takes an approved leave as a result of COVID-related symptoms. Smithfield has also installed clear plastic barriers along the Plant production line to separate employees working across from each other and employees working side by side.

**Discussion**

**I. The primary-jurisdiction doctrine applies.**[11]
Before reaching the merits of Plaintiffs' request for a preliminary injunction, the Court must determine whether it should dismiss or stay this case pursuant to the primary-jurisdiction doctrine. "Primary jurisdiction is a common-law doctrine that is utilized to coordinate judicial and administrative decision making." *Access Telecomms. v. Sw. Bell Tel. Co.*, 137 F.3d 605, 608 (8th Cir. 1998) (citation omitted). "The doctrine allows a district court to refer a matter to the appropriate administrative agency for ruling in the first instance, even when the matter is initially cognizable by the district court." *Id.* (citation omitted). "There exists no fixed formula for determining whether to apply the doctrine of primary jurisdiction." *Id.* (citing *United States v. W. Pac.*

*R.R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)). Instead, courts must consider in each case "whether the reasons for the doctrine are present and whether applying the doctrine will aid the purposes for which the doctrine was created." *Id.* (citation omitted). In undertaking this analysis, a court must be mindful that the primary-jurisdiction doctrine "is to be invoked sparingly, as it often results in added expense and delay." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005). "Once a district court decides to refer an issue or claim to an administrative agency under the doctrine of primary jurisdiction, it may either dismiss or stay the action." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 913 (8th Cir. 2015).

**\*8** There are two primary reasons courts apply the primary-jurisdiction doctrine. First, "to obtain the benefit of an agency's expertise and experience ... 'in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion....' " *Access Telecomms.*, 137 F.3d at 608 (noting " 'agencies created by Congress for regulating the subject matter should not be passed over' ") (quoting *Far E. Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952)). Second, "to promote uniformity and consistency within the particular field of regulation." *Id.* (citation omitted). Thus, in deciding whether to apply the doctrine, courts focus on two questions: (1) "whether the issues raised in the case 'have been placed within the special competence of an administrative body,' " and (2) whether the court's disposition of the case could lead to inconsistent regulation of businesses in the same industry. *Sprint Spectrum L.P. v. AT & T Corp.*, 168 F. Supp. 2d 1095, 1098 (W.D. Mo. 2001) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. at 64, 77 S.Ct. 161). In this case, the answer to both questions is yes.

Plaintiffs allege that because the Plant is not abiding by the Joint Guidance, it constitutes a public nuisance and has created an unreasonably unsafe workplace. Thus, Plaintiffs' claims both succeed or fail on the determination of whether the Plant is complying with the Joint Guidance. Due to its expertise and experience with workplace regulation, OSHA (in coordination with the USDA per the Executive Order) is better positioned to make this determination than the Court is. Indeed, this determination goes to the heart of OSHA's special competence: its mission includes "enforcing" occupational safety and health standards. In fact, OSHA has already shown interest in determining whether the Plant is abiding by the Joint Guidance. The day before Plaintiffs filed this lawsuit, OSHA sent Smithfield a request for information regarding its COVID-19 work

practices and infection at the Plant.

Turning to the second question, the Court finds only deference to OSHA/USDA will ensure uniform national enforcement of the Joint Guidance. If the Court ruled on whether the Plant is complying with the Joint Guidance, this ruling would be binding on Smithfield but not other meat-processing facilities because the Court lacks personal jurisdiction over them. Thus, any determination by this Court whether the Plant is complying with the Joint Guidance could easily lead to inconsistent regulation of businesses in the same industry. And under these circumstances, where the guidelines are rapidly evolving, maintaining a uniform source for guidance and enforcement is crucial.

Plaintiffs' argue that deference will add delay. But OSHA has already requested information about the Plant's safety measures. And if OSHA fails to act quickly on this information, Plaintiffs have a remedy: they may receive emergency relief through OSHA's statutory framework. Section 662(a) of the Occupational Safety and Health Act ("the Act"), *29 U.S.C. §§ 651 et seq.*, permits the Secretary of Labor to petition the court "to restrain any [dangerous] conditions or practices in any place of employment ... which could reasonably be expected to cause death or serious physical harm immediately or before the imminence of such danger can be eliminated through the enforcement procedures otherwise provided by [the Act]." Upon the filing of such petition, "the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order pending the outcome of an enforcement proceeding." *Id.* at § 662(b). If the Secretary "arbitrarily or capriciously fails to seek relief," a worker can file a writ of mandamus to compel the Secretary to seek such an order. *Id.* at § 662(d). Granted, there may be some delay before Plaintiffs can invoke this procedure, but following this procedure ensures the USDA and OSHA can take a measured and uniform approach to the meat-processing plants under its oversight. The Court's intervention at this point, on the other hand, would only risk haphazard application of the Joint Guidance.

**\*9** In sum, the Court holds that the issue of Smithfield's compliance with OSHA's guidelines and regulations falls squarely within OSHA/USDA's jurisdiction. The Court finds dismissal without prejudice is preferable to a stay here so that Plaintiffs may seek relief through the appropriate administrative and regulatory framework.

## II. Plaintiffs' have not met their burden for a preliminary injunction.

Although the Court's ruling on the primary-jurisdiction doctrine is dispositive, to aid in any appellate review, the Court will consider whether Plaintiffs have met their extraordinary burden of proving an affirmative preliminary injunction is proper in this case.

In determining whether to grant injunctive relief the Court considers the following factors, which were set forth in the seminal decision *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981): 1) the threat of irreparable harm to the movant; 2) the balance between this harm and any injury that granting the injunction will inflict on the non-moving party; 3) the likelihood that the moving party will prevail on the merits; and 4) the public interest. *Phelps-Roper v. Nixon*, 509 F.3d 480, 484 (8th Cir. 2007). No single factor is determinative; they must be "balanced to determine whether they tilt towards or away" from granting the injunction. *Noodles Dev., LP. v. Ninth St. Partners, LLP*, 507 F. Supp. 2d 1030, 1034 (E.D. Mo. 2007).

Preliminary injunctive relief "is an 'extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *North Dakota v. U.S. Army Corps of Eng'rs*, 264 F. Supp. 2d 871, 878 (D.N.D. 2003) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). This burden is particularly great where, as here, Plaintiffs seek a preliminary injunction requiring an affirmative act. *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 484 (8th Cir. 1993).

### 1. Plaintiffs have not demonstrated a threat of irreparable harm.

To demonstrate a sufficient threat of irreparable harm, the moving party must show that there is no adequate remedy at law; that is, that an award of damages cannot compensate the movant for the harm. *See Noodles Dev.*, 507 F.Supp.2d at 1036-37. But, when analyzing this factor, the Eighth Circuit has held that "[m]erely demonstrating the 'possibility of harm' is not enough." *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015); *see also S.J.W. ex rel. Wilson v. Lee's Summit R–7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction."). In the context of a global pandemic, this Court must consider the threat after "accounting for the protective measures" defendant has already implemented.

Rural Community Workers Alliance v. Smithfield Foods, Inc., --- F.Supp.3d ---- (2020)

*Valentine v. Collier*, 956 F.3d 797, 804 (5th Cir. 2020).

Plaintiffs argue that their injury is potentially contracting COVID-19, which could result in serious illness or even death. But this type of injury is too speculative under Eighth Circuit precedent.

Plaintiffs' claim otherwise, citing two cases from the Eighth Circuit, which they argue held the possibility of "death or serious illness" constitutes an irreparable injury (Doc. 3 at 24). Plaintiffs' cite *Kai v. Ross*, 336 F.3d 650, 656 (8th Cir. 2003), a case in which the state of Nebraska revoked a program providing medical care for the needy. The plaintiffs, who suffered from physical and mental disabilities and received their prescription medications through the program, sought to enjoin revocation of the program. *Id.* The Eighth Circuit held that the present danger to plaintiffs' health without their medications is an irreparable harm. *Id.* Plaintiffs also cite *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993), which similarly held that denial of coverage for the treatment of a life-threating illness is an irreparable injury. These two cases are inapposite, since the plaintiffs were already suffering from illnesses, and would undoubtedly suffer serious illness or death in the absence of an injunction.[12] In other words, the threat of serious injury or death was a certainty and not merely a possibility.

**\*10** The Court is not unsympathetic to the threat that COVID-19 presents to the Plant's workers. But in conducting its analysis, the Court must determine whether Plaintiffs will suffer an actual, imminent harm if the injunction is denied. This is not the same as analyzing whether employees risk exposure if they continue to work, and, unfortunately, no one can guarantee health for essential workers—or even the general public—in the middle of this global pandemic. But given the significant measures Smithfield is now taking to protect its essential workers from COVID-19 and the fact that there are no confirmed cases of COVID-19 currently at the Plant, the Court cannot conclude that the spread of COVID-19 at the Plant is inevitable or that Smithfield will be unable to contain it if it occurs. Thus, Plaintiffs have not established an immediate threat of irreparable harm.

### 2. Plaintiffs have not shown that the balance of harms favors issuing injunctive relief.

The second factor "examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the

public." *Noodles Dev., 507 F. Supp. 2d at 1038* (citing *Dataphase*, 640 F.2d at 114). "To determine what must be weighed, ... courts of this circuit have looked at the threat to each of the parties' rights that would result from granting or denying the injunction." *Id.* The "potential economic harm to the parties" is a relevant consideration, as is "whether the defendant has already voluntarily taken remedial action." *Id.*

Here, there is no doubt that if workers at the Plant contract COVID-19, the harm to Plaintiffs could be great. But Plaintiffs have alleged only that—potential harm—and, in this time, no essential-business employer can completely eliminate the risk that COVID-19 will spread to its employees through the workplace. Thus, it is important that employers make meaningful, good faith attempts to reduce the risk. Here, Smithfield has taken significant remedial steps in accordance with the Joint Guidance to protect its workers from COVID-19.

Moreover, national and local guidance on COVID-19 is continuously evolving and changing. An injunction would deny Smithfield the flexibility needed to quickly alter workplace procedures to remain safe during the ever-changing circumstances of this pandemic. *Valentine*, 956 F.3d at 803 (staying injunction that would "interfer[e] with the rapidly changing and flexible system-wide approach that [defendant] has used to respond to the pandemic so far" and "[defendant's] ability to continue to adjust its policies is significantly hampered by the preliminary injunction, which locks in place a set of policies for a crisis that defies fixed approaches") (citing *Jacobson v. Massachusetts*, 197 U.S. 11, 28–29, 25 S.Ct. 358, 49 L.Ed. 643 (1905); *In re Abbott*, 954 F.3d 772, 791 (5th Cir. 2020)). Thus, the remedial measures Smithfield has implemented convince the Court that the balance of harms weighs in its favor.

### 3. Plaintiffs have not shown a likelihood of success on the merits.

To demonstrate likelihood of success on the merits, a movant does not need to show that it ultimately will succeed on its claims, only that the movant's prospects for success is *sufficiently likely* to support the kind of relief it requests. *See Noodles Dev., 507 F.Supp.2d at 1036–37* (emphasis added) (citations omitted). That is, the movant need only show "a fair chance of prevailing." *Phelps-Roper*, 509 F.3d at 485. On this record, Plaintiffs have not shown a fair chance of prevailing on either of their claims.

### a. Plaintiffs have not shown they are likely to succeed on their public-nuisance claim.

Under Missouri law, "a public nuisance is an offense against the public order and economy of the state and violates the public's right to life, health, and the use of property, while, 'at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons.' " *State ex rel. Schmitt v. Henson*, ED 107970, ⸺ S.W.3d ⸺, ⸺, 2020 WL 1862001, at *4 (Mo. Ct. App. April 14, 2020) (citations omitted).

**\*11** The parties agree that the Plant cannot be a public nuisance simply by virtue of the fact that it is a meat-processing plant during a global pandemic. Moreover, in this case, Smithfield has implemented substantial health and safety measures to protect Plant workers, and no employees of the Plant have been diagnosed with COVID-19. While Plaintiffs argue that Smithfield could do more to protect its workers, that is not the issue before this Court. The issue is whether the Plant, as it is currently operating, constitutes an offense against the public order. Because of the significant measures Smithfield has implemented to combat the disease and the lack of COVID-19 at the facility, the Plant cannot be said to violate the public's right to health and safety. Thus, the Court finds that Plaintiffs are unlikely to be succeed on their public nuisance claim.

### b. Plaintiffs have shown they are unlikely to succeed on their right to a safe workplace claim.

Under Missouri law, Plaintiffs must prove that Smithfield negligently breached its duty to provide a safe place to work and that such negligence was the direct and proximate cause of the Plaintiffs injuries. *Hamilton v. Palm*, 621 F.3d 816, 818 (8th Cir. 2010). As discussed, Smithfield has taken substantial steps to reduce the potential for COVID-19 exposure at the Plant and appears to the Court to be complying with the Joint Guidance regarding the same. Thus, Plaintiffs are not substantially likely to prove Smithfield breached any duty.

More importantly, however, Plaintiffs have not alleged they have suffered any injury, only that they may suffer an injury in the future. A potential injury is insufficient to state a claim of the breach of the duty to provide a safe

workplace under Missouri law. Plaintiffs citation to *Smith v. W. Elec. Co.*, 643 S.W.2d 10 (Mo. Ct. App. 1982), to establish that they have stated a sufficient injury is unavailing. In *Smith*, the plaintiff proved that he had been exposed to harmful second-hand smoke in the workplace which caused him to suffer a severe adverse reaction. *Id.* at 12. The adverse reaction was the actual injury he suffered, and he suffered this harm—and sought relief through an administrative process—before seeking an injunction. Thus, *Smith* is not analogous to this case, and Plaintiffs have not shown they are likely to be successful on their breach of a safe workplace claim.

### 4. The public interest factor is neutral.

Certainly, the spread of COVID-19 is a public-health matter of great concern, and, so, preventing transmission of the virus which causes COVID-19 is within the public interest. At the same time, the public has an interest in maintaining the food-supply chain and access to meat products, an interest which might be impaired if the Court granted the injunction. Because Smithfield's current policies and procedures temper public health worries, the Court finds a preliminary injunction is not in the public interest at this time.

Thus, Plaintiffs have not met their extraordinary burden of showing an affirmative preliminary injunction is warranted in this case.

### III. Plaintiffs' requested relief lacks the specificity required for a preliminary injunction.

Finally, the Court finds that Plaintiffs requested relief is impermissibly vague. Federal Rule of Civil Procedure 65(d) states that an injunction must be "specific in [its] terms" and describe in reasonable detail the actions sought to be enjoined. Fed. R. Civ. P. 65(d). This specificity requirement is "designed to prevent uncertainty and confusion on the part of those to whom the injunction is directed and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Helzberg's Diamond Shops, Inc. v. Valley W. Des Moines Shopping Ctr., Inc.*, 564 F.2d 816, 820 (8th Cir. 1977).

In this case, Plaintiffs request this Court enter an injunction requiring Smithfield to "make all reasonable changes to its 'production practices,' including potentially

**Rural Community Workers Alliance v. Smithfield Foods, Inc., --- F.Supp.3d ---- (2020)**

lowering its line speeds, to place as many workers as possible at least six feet apart" (Doc. 46 at 10). Plaintiffs do not explain what changes would be "reasonable," except for "potentially" reducing line speeds. In other words, they do not specify in reasonable detail what Smithfield should do. They demand workers have "reasonable additional breaks to allow workers to care for their personal hygiene without penalty, including blowing their noses, using tissues, and hand washing," but they do not specify how often or how long such breaks should take place, or what would constitute a reasonable break. Finally, Plaintiffs request the Court order Smithfield to change its policies to "not require workers to come to the Plant to obtain COVID-19-related sick leave and take all reasonable steps to communicate that policy clearly to workers." But Plaintiffs do not identify which policies should be eliminated, what constitutes "reasonable steps," or why Smithfield's current policies are insufficient. Because "a person of ordinary intelligence" would not understand what is prohibited based on Plaintiffs' proposed preliminary injunction, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 383, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), it is impermissibly vague, and thus unenforceable.

## Conclusion

**\*12** Plaintiffs are naturally concerned for their health and the health of their community in these unprecedented times. The Court takes their concern seriously. Nevertheless, the Court cannot ignore the USDA's and OSHA's authority over compliance with the Joint Guidance or the significant steps Smithfield has taken to reduce the risk of a COVID-19 outbreak at the Plant.

For the reasons discussed above, Defendants motion to dismiss is GRANTED, and the case is DISMISSED without prejudice.

**IT IS SO ORDERED.**

## All Citations

--- F.Supp.3d ----, 2020 WL 2145350

## Footnotes

1    The Court notes that there is currently a motion pending to allow Jane Doe to proceed using a pseudonym (Doc. 42). Given the Court's dismissal of this action and the denial of injunctive relief, the Court finds that requiring Plaintiff to reveal her identity would serve no important purpose, especially given that another named plaintiff appears in this case. The issues presently before the Court are—for the most part—purely legal, and the majority of Plaintiff's allegations are not individualized. Thus, the public's interest in Plaintiff's identity and the prejudice to Smithfield in allowing Plaintiff to proceed anonymously for purposes of deciding the instant motions is minimal. Plaintiff Doe may therefore use a pseudonym for purposes of the motions presently before this Court. This Court reserves judgment on her ability to do so should this case proceed to further stages of litigation.

2    Ctrs. for Disease Control and Prev. & Occ. Safety and Health Admin., Meat and Poultry Processing Workers and Employers, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (April 26, 2020).

3    *Id.*

4    *Id.*

5    Mo. Dep't of Health & Senior Servs., Stay at Home Order, https://governor.mo.gov/priorities/stay-home-order (Apr. 3, 2020).

6    U.S. Dep't of Homeland Sec., Cybersec. & Infrastructure Sec. Agency, Guidance on the Essential Critical Infrastructure Workforce, https://www.cisa.gov/sites/default/files/publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_Workers_3.pdf (April 17, 2020).

7    Ctrs. for Disease Control and Prev. & Occ. Safety and Health Admin., Meat and Poultry Processing Workers and

Employers, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/meat-poultry-processing-workers-employers.html (Apr. 26, 2020).

8   Exec. Order on Delegating Authority Under the DPA with Respect to Food Supply Chain Resources During the National Emergency Caused by the Outbreak of COVID-19, https://www.whitehouse.gov/presidential-actions/executive-order-delegating-authority-dpa-respect-food-supply-chain-resources-national-emergency-caused-outbreak-covid-19/ (Apr. 28, 2020).

9   Smithfield filed a motion to strike Plaintiffs' five declarations attached to the motion for a temporary restraining order and/or preliminary injunction (Doc. 34). The Court denies the motion, since, in considering these motions, the issues it complains of go to the weight of the evidence rather than its admissibility.

10  Primary symptoms include fever, persistent dry cough, and shortness of breath, while secondary symptoms include chills, repeated shaking with chills, muscle pain/extreme fatigue, headache, sore throat, and/or loss of taste or smell (Doc. 46-2 at 8).

11  Although Smithfield previously argued *Burford* abstention also applied here, it conceded during the preliminary-injunction hearing that that argument no longer applies due to the President's Executive Order. Accordingly, the Court does not address it. Because this Court finds the primary jurisdiction doctrine applies, it does not address Smithfield's preemption arguments, which were asserted after the preliminary-injunction hearing.

12  Plaintiffs also cite *Mertzlufft v. Bunker Res. Recycling & Reclamation, Inc.*, 760 S.W.2d 592 (Mo. Ct. App. 1988) as persuasive authority. In *Mertzlufft*, the plaintiffs sought to enjoin a business which was illegally transporting, storing, and incinerating hazardous waste without a permit. *Id.* at 595. The plaintiffs brought a citizen's suit to enjoin the defendant from charging and loading the incinerator with hospital wastes, or otherwise operating it, which the trial court granted. *Id.* The Missouri court of appeals, reviewing the case under a standard deferential to the trial court's judgment—not operating under the preliminary injunction standard set forth in *Dataphase*—held that the preliminary injunction was warranted. *Id.* at 598. It did not, however, address whether the plaintiffs proved there was a threat of irreparable harm. *Id.* at 598. To the contrary, the court held that plaintiffs were "not obligated to allege and prove they had suffered irreparable harm in order to obtain injunctive relief, but were only required to prove that they were adversely affected in fact by the unlicensed operation, which they did." *Id.* Accordingly, this case is also inapplicable because the court of appeals did not consider—and plaintiffs were not required to prove—a threat of irreparable harm. But, even if they were, the defendant was illegally operating a hazardous waste facility, and thus presented a present threat of certain harm to the plaintiffs.

---

**End of Document**                                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT 4

Ohio, Court of Federal Claims No: 20–0225V

71. Shannon Pyers, Dresher, Pennsylvania, Court of Federal Claims No: 20–0231V

72. Lisa Macon, Englewood, New Jersey, Court of Federal Claims No: 20–0232V

[FR Doc. 2020–05525 Filed 3–16–20; 8:45 am]

**BILLING CODE 4165–15–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of the Secretary**

**Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID–19**

**ACTION:** Notice of declaration.

**SUMMARY:** The Secretary is issuing this Declaration pursuant to section 319F–3 of the Public Health Service Act to provide liability immunity for activities related to medical countermeasures against COVID–19.

**DATES:** The Declaration was effective as of February 4, 2020.

**FOR FURTHER INFORMATION CONTACT:** Robert P. Kadlec, MD, MTM&H, MS, Assistant Secretary for Preparedness and Response, Office of the Secretary, Department of Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201; Telephone: 202–205–2882.

**SUPPLEMENTARY INFORMATION:** The Public Readiness and Emergency Preparedness Act (PREP Act) authorizes the Secretary of Health and Human Services (the Secretary) to issue a Declaration to provide liability immunity to certain individuals and entities (Covered Persons) against any claim of loss caused by, arising out of, relating to, or resulting from the manufacture, distribution, administration, or use of medical countermeasures (Covered Countermeasures), except for claims involving ''willful misconduct'' as defined in the PREP Act. This Declaration is subject to amendment as circumstances warrant.

The PREP Act was enacted on December 30, 2005, as Public Law 109–148, Division C, Section 2. It amended the Public Health Service (PHS) Act, adding Section 319F–3, which addresses liability immunity, and Section 319F–4, which creates a compensation program. These sections are codified at 42 U.S.C. 247d-6d and 42 U.S.C. 247d–6e, respectively.

The Pandemic and All-Hazards Preparedness Reauthorization Act (PAHPRA), Public Law 113–5, was enacted on March 13, 2013. Among other things, PAHPRA added sections 564A and 564B to the Federal Food, Drug, and Cosmetic (FD&C) Act to provide new authorities for the emergency use of approved products in emergencies and products held for emergency use. PAHPRA accordingly amended the definitions of ''Covered Countermeasures'' and ''qualified pandemic and epidemic products'' in Section 319F–3 of the Public Health Service Act (PREP Act provisions), so that products made available under these new FD&C Act authorities could be covered under PREP Act Declarations. PAHPRA also extended the definition of qualified pandemic and epidemic products that may be covered under a PREP Act Declaration to include products or technologies intended to enhance the use or effect of a drug, biological product, or device used against the pandemic or epidemic or against adverse events from these products.

COVID–19 is an acute respiratory disease caused by the SARS-CoV-2 betacoronavirus or a virus mutating therefrom. This virus is similar to other betacoronaviruses, such as Middle Eastern Respiratory Syndrome (MERS) and Severe Acute Respiratory Syndrome (SARS). Although the complete clinical picture regarding SARS-CoV-2 or a virus mutating therefrom is not fully understood, the virus has been known to cause severe respiratory illness and death in a subset of those people infected with such virus(es).

In December 2019, the novel coronavirus was detected in Wuhan City, Hubei Province, China. Today, over 101 countries, including the United States have reported multiple cases. Acknowledging that cases had been reported in five WHO regions in one month, on January 30, 2020, WHO declared the COVID–19 outbreak to be a Public Health Emergency of International Concern (PHEIC) following a second meeting of the Emergency Committee convened under the International Health Regulations (IHR).

To date, United States traveler-associated cases have been identified in a number of States and community-based transmission is suspected. On January 31, 2020, Secretary Azar declared a public health emergency pursuant to section 319 of the PHS Act, 42 U.S.C. 247d, for the entire United States to aid in the nation's health care community response to the COVID–19 outbreak.[1] The outbreak remains a significant public health challenge that requires a sustained, coordinated proactive response by the Government in order to contain and mitigate the spread of COVID–19.[2]

## Description of This Declaration by Section

*Section I. Determination of Public Health Emergency or Credible Risk of Future Public Health Emergency*

Before issuing a Declaration under the PREP Act, the Secretary is required to determine that a disease or other health condition or threat to health constitutes a public health emergency or that there is a credible risk that the disease, condition, or threat may constitute such an emergency. This determination is separate and apart from the Declaration issued by the Secretary on January 31, 2020 under Section 319 of the PHS Act that a disease or disorder presents a public health emergency or that a public health emergency, including significant outbreaks of infectious diseases or bioterrorist attacks, otherwise exists, or other Declarations or determinations made under other authorities of the Secretary. Accordingly in Section I of the Declaration, the Secretary determines that the spread of SARS-CoV-2 or a virus mutating therefrom and the resulting disease, COVID–19, constitutes a public health emergency for purposes of this Declaration under the PREP Act.

*Section II. Factors Considered by the Secretary*

In deciding whether and under what circumstances to issue a Declaration with respect to a Covered Countermeasure, the Secretary must consider the desirability of encouraging the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, and use of the countermeasure. In Section II of the Declaration, the Secretary states that he has considered these factors.

*Section III. Activities Covered by This Declaration Under the PREP Act's Liability Immunity*

The Secretary must delineate the activities for which the PREP Act's liability immunity is in effect. These activities may include, under conditions as the Secretary may specify, the manufacture, testing, development, distribution, administration, or use of one or more Covered Countermeasures

---

[1] *https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.*

[2] CDC COVID–19 Summary; *https://www.cdc.gov/coronavirus/2019-ncov/summary.html,* accessed 27Feb2020,

(Recommended Activities). In Section III of the Declaration, the Secretary sets out the activities for which the immunity is in effect.

*Section IV. Limited Immunity*

The Secretary must also state that liability protections available under the PREP Act are in effect with respect to the Recommended Activities. These liability protections provide that, "[s]ubject to other provisions of [the PREP Act], a covered person shall be immune from suit and liability under federal and state law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a covered countermeasure if a Declaration has been issued with respect to such countermeasure." In Section IV of the Declaration, the Secretary states that liability protections are in effect with respect to the Recommended Activities.

*Section V. Covered Persons*

Section V of the Declaration describes Covered Persons, including Qualified Persons. The PREP Act defines Covered Persons to include, among others, the United States, and those that manufacture, distribute, administer, prescribe or use Covered Countermeasures. This Declaration includes all persons and entities defined as Covered Persons under the PREP Act (PHS Act 317F–3(i)(2)) as well as others set out in paragraphs (3), (4), (6), (8)(A) and (8)(B).

The PREP Act's liability immunity applies to "Covered Persons" with respect to administration or use of a Covered Countermeasure. The term "Covered Persons" has a specific meaning and is defined in the PREP Act to include manufacturers, distributors, program planners, and qualified persons, and their officials, agents, and employees, and the United States. The PREP Act further defines the terms "manufacturer," "distributor," "program planner," and "qualified person" as described below.

A manufacturer includes a contractor or subcontractor of a manufacturer; a supplier or licenser of any product, intellectual property, service, research tool or component or other article used in the design, development, clinical testing, investigation or manufacturing of a Covered Countermeasure; and any or all the parents, subsidiaries, affiliates, successors, and assigns of a manufacturer.

A distributor means a person or entity engaged in the distribution of drugs, biologics, or devices, including but not limited to: Manufacturers; re-packers;

common carriers; contract carriers; air carriers; own-label distributors; private-label distributors; jobbers; brokers; warehouses and wholesale drug warehouses; independent wholesale drug traders; and retail pharmacies.

A program planner means a state or local government, including an Indian tribe; a person employed by the state or local government; or other person who supervises or administers a program with respect to the administration, dispensing, distribution, provision, or use of a Covered Countermeasure, including a person who establishes requirements, provides policy guidance, or supplies technical or scientific advice or assistance or provides a facility to administer or use a Covered Countermeasure in accordance with the Secretary's Declaration. Under this definition, a private sector employer or community group or other "person" can be a program planner when it carries out the described activities.

A qualified person means a licensed health professional or other individual authorized to prescribe, administer, or dispense Covered Countermeasures under the law of the state in which the Covered Countermeasure was prescribed, administered, or dispensed; or a person within a category of persons identified as qualified in the Secretary's Declaration. Under this definition, the Secretary can describe in the Declaration other qualified persons, such as volunteers, who are Covered Persons. Section V describes other qualified persons covered by this Declaration.

The PREP Act also defines the word "person" as used in the Act: A person includes an individual, partnership, corporation, association, entity, or public or private corporation, including a federal, state, or local government agency or department.

*Section VI. Covered Countermeasures*

As noted above, Section III of the Declaration describes the activities (referred to as "Recommended Activities") for which liability immunity is in effect. Section VI of the Declaration identifies the Covered Countermeasures for which the Secretary has recommended such activities. The PREP Act states that a "Covered Countermeasure" must be a "qualified pandemic or epidemic product," or a "security countermeasure," as described immediately below; or a drug, biological product or device authorized for emergency use in accordance with Sections 564, 564A, or 564B of the FD&C Act.

A qualified pandemic or epidemic product means a drug or device, as defined in the FD&C Act or a biological product, as defined in the PHS Act that is (i) manufactured, used, designed, developed, modified, licensed or procured to diagnose, mitigate, prevent, treat, or cure a pandemic or epidemic or limit the harm such a pandemic or epidemic might otherwise cause; (ii) manufactured, used, designed, developed, modified, licensed, or procured to diagnose, mitigate, prevent, treat, or cure a serious or life-threatening disease or condition caused by such a drug, biological product, or device; (iii) or a product or technology intended to enhance the use or effect of such a drug, biological product, or device.

A security countermeasure is a drug or device, as defined in the FD&C Act or a biological product, as defined in the PHS Act that (i)(a) The Secretary determines to be a priority to diagnose, mitigate, prevent, or treat harm from any biological, chemical, radiological, or nuclear agent identified as a material threat by the Secretary of Homeland Security, or (b) to diagnose, mitigate, prevent, or treat harm from a condition that may result in adverse health consequences or death and may be caused by administering a drug, biological product, or device against such an agent; and (ii) is determined by the Secretary of Health and Human Services to be a necessary countermeasure to protect public health.

To be a Covered Countermeasure, qualified pandemic or epidemic products or security countermeasures also must be approved or cleared under the FD&C Act; licensed under the PHS Act; or authorized for emergency use under Sections 564, 564A, or 564B of the FD&C Act.

A qualified pandemic or epidemic product also may be a Covered Countermeasure when it is subject to an exemption (that is, it is permitted to be used under an Investigational Drug Application or an Investigational Device Exemption) under the FD&C Act and is the object of research for possible use for diagnosis, mitigation, prevention, treatment, or cure, or to limit harm of a pandemic or epidemic or serious or life-threatening condition caused by such a drug or device.

A security countermeasure also may be a Covered Countermeasure if it may reasonably be determined to qualify for approval or licensing within 10 years after the Department's determination that procurement of the countermeasure is appropriate.

Section VI lists medical countermeasures against COVID–19 that

are Covered Countermeasures under this declaration.

Section VI also refers to the statutory definitions of Covered Countermeasures to make clear that these statutory definitions limit the scope of Covered Countermeasures. Specifically, the Declaration notes that Covered Countermeasures must be ''qualified pandemic or epidemic products,'' or ''security countermeasures,'' or drugs, biological products, or devices authorized for investigational or emergency use, as those terms are defined in the PREP Act, the FD&C Act, and the Public Health Service Act.

*Section VII. Limitations on Distribution*

The Secretary may specify that liability immunity is in effect only to Covered Countermeasures obtained through a particular means of distribution. The Declaration states that liability immunity is afforded to Covered Persons for Recommended Activities related to (a) present or future federal contracts, cooperative agreements, grants, other transactions, interagency agreements, or memoranda of understanding or other federal agreements; or (b) activities authorized in accordance with the public health and medical response of the Authority Having Jurisdiction to prescribe, administer, deliver, distribute, or dispense the Covered Countermeasures following a Declaration of an emergency.

Section VII defines the terms ''Authority Having Jurisdiction'' and ''Declaration of an emergency.'' We have specified in the definition that Authorities having jurisdiction include federal, state, local, and tribal authorities and institutions or organizations acting on behalf of those governmental entities.

For governmental program planners only, liability immunity is afforded only to the extent they obtain Covered Countermeasures through voluntary means, such as (1) donation; (2) commercial sale; (3) deployment of Covered Countermeasures from federal stockpiles; or (4) deployment of donated, purchased, or otherwise voluntarily obtained Covered Countermeasures from state, local, or private stockpiles. This last limitation on distribution is intended to deter program planners that are government entities from seizing privately held stockpiles of Covered Countermeasures. It does not apply to any other Covered Persons, including other program planners who are not government entities.

*Section VIII. Category of Disease, Health Condition, or Threat*

The Secretary must identify in the Declaration, for each Covered Countermeasure, the categories of diseases, health conditions, or threats to health for which the Secretary recommends the administration or use of the countermeasure. In Section VIII of the Declaration, the Secretary states that the disease threat for which he recommends administration or use of the Covered Countermeasures is COVID–19 caused by SARS-CoV-2 or a virus mutating therefrom.

*Section IX. Administration of Covered Countermeasures*

The PREP Act does not explicitly define the term ''administration'' but does assign the Secretary the responsibility to provide relevant conditions in the Declaration. In Section IX of the Declaration, the Secretary defines ''Administration of a Covered Countermeasure,'' as follows:

Administration of a Covered Countermeasure means physical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures.

The definition of ''administration'' extends only to physical provision of a countermeasure to a recipient, such as vaccination or handing drugs to patients, and to activities related to management and operation of programs and locations for providing countermeasures to recipients, such as decisions and actions involving security and queuing, but only insofar as those activities directly relate to the countermeasure activities. Claims for which Covered Persons are provided immunity under the Act are losses caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a Covered Countermeasure consistent with the terms of a Declaration issued under the Act. Under the definition, these liability claims are precluded if they allege an injury caused by a countermeasure, or if the claims are due to manufacture, delivery, distribution, dispensing, or management and operation of countermeasure programs at distribution and dispensing sites.

Thus, it is the Secretary's interpretation that, when a Declaration is in effect, the Act precludes, for example, liability claims alleging negligence by a manufacturer in creating a vaccine, or negligence by a health care provider in prescribing the wrong dose, absent willful misconduct. Likewise, the Act precludes a liability claim relating to the management and operation of a countermeasure distribution program or site, such as a slip-and-fall injury or vehicle collision by a recipient receiving a countermeasure at a retail store serving as an administration or dispensing location that alleges, for example, lax security or chaotic crowd control. However, a liability claim alleging an injury occurring at the site that was not directly related to the countermeasure activities is not covered, such as a slip and fall with no direct connection to the countermeasure's administration or use. In each case, whether immunity is applicable will depend on the particular facts and circumstances.

*Section X. Population*

The Secretary must identify, for each Covered Countermeasure specified in a Declaration, the population or populations of individuals for which liability immunity is in effect with respect to administration or use of the countermeasure. Section X of the Declaration identifies which individuals should use the countermeasure or to whom the countermeasure should be administered—in short, those who should be vaccinated or take a drug or other countermeasure. Section X provides that the population includes ''any individual who uses or who is administered a Covered Countermeasure in accordance with the Declaration.''

It should be noted that under the PREP Act, liability protection extends beyond the Population specified in the Declaration. Specifically, liability immunity is afforded (1) To manufacturers and distributors without regard to whether the countermeasure is used by or administered to this population, and (2) to program planners and qualified persons when the countermeasure is either used by or administered to this population or the program planner or qualified person reasonably could have believed the recipient was in this population. Section X of the Declaration includes these statutory conditions in the Declaration for clarity.

*Section XI. Geographic Area*

The Secretary must identify, for each Covered Countermeasure specified in the Declaration, the geographic area or areas for which liability immunity is in effect, including, as appropriate, whether the Declaration applies only to

individuals physically present in the area or, in addition, applies to individuals who have a described connection to the geographic area. Section XI of the Declaration provides that liability immunity is afforded for the administration or use of a Covered Countermeasure without geographic limitation. This could include claims related to administration or use in countries outside the U.S. It is possible that claims may arise in regard to administration or use of the Covered Countermeasures outside the U.S. that may be resolved under U.S. law.

In addition, the PREP Act specifies that liability immunity is afforded (1) to manufacturers and distributors without regard to whether the countermeasure is used by or administered to individuals in the geographic areas, and (2) to program planners and qualified persons when the countermeasure is either used or administered in the geographic areas or the program planner or qualified person reasonably could have believed the countermeasure was used or administered in the areas. Section XI of the Declaration includes these statutory conditions in the Declaration for clarity.

*Section XII. Effective Time Period*

The Secretary must identify, for each Covered Countermeasure, the period or periods during which liability immunity is in effect, designated by dates, milestones, or other description of events, including factors specified in the PREP Act. Section XII of the Declaration extends the effective period for different means of distribution of Covered Countermeasures through October 1, 2024.

*Section XIII. Additional Time Period of Coverage*

The Secretary must specify a date after the ending date of the effective time period of the Declaration that is reasonable for manufacturers to arrange for disposition of the Covered Countermeasure, including accepting returns of Covered Countermeasures, and for other Covered Persons to take appropriate actions to limit administration or use of the Covered Countermeasure. In addition, the PREP Act specifies that, for Covered Countermeasures that are subject to a Declaration at the time they are obtained for the Strategic National Stockpile (SNS) under 42 U.S.C. 247d-6b(a), the effective period of the Declaration extends through the time the countermeasure is used or administered. Liability immunity under the provisions of the PREP Act and the conditions of the Declaration continue during these additional time periods. Thus, liability immunity is afforded during the "Effective Time Period," described under Section XII of the Declaration, plus the "Additional Time Period" described under Section XIII of the Declaration.

Section XIII of the Declaration provides for 12 months as the Additional Time Period of coverage after expiration of the Declaration. Section XIII also explains the extended coverage that applies to any product obtained for the SNS during the effective period of the Declaration.

*Section XIV. Countermeasures Injury Compensation Program*

Section 319F–4 of the PHS Act, 42 U.S.C. 247d-6e, authorizes the Countermeasures Injury Compensation Program (CICP) to provide benefits to eligible individuals who sustain a serious physical injury or die as a direct result of the administration or use of a Covered Countermeasure. Compensation under the CICP for an injury directly caused by a Covered Countermeasure is based on the requirements set forth in this Declaration, the administrative rules for the Program, and the statute. To show direct causation between a Covered Countermeasure and a serious physical injury, the statute requires "compelling, reliable, valid, medical and scientific evidence." The administrative rules for the Program further explain the necessary requirements for eligibility under the CICP. Please note that, by statute, requirements for compensation under the CICP may not align with the requirements for liability immunity provided under the PREP Act. Section XIV of the Declaration, "Countermeasures Injury Compensation Program," explains the types of injury and standard of evidence needed to be considered for compensation under the CICP.

Further, the administrative rules for the CICP specify that if countermeasures are administered or used outside the United States, only otherwise eligible individuals at United States embassies, military installations abroad (such as military bases, ships, and camps) or at North Atlantic Treaty Organization (NATO) installations (subject to the NATO Status of Forces Agreement) where American servicemen and servicewomen are stationed may be considered for CICP benefits. Other individuals outside the United States may not be eligible for CICP benefits.

*Section XV. Amendments*

Section XV of the Declaration confirms that the Secretary may amend any portion of this Declaration through publication in the **Federal Register.**

Declaration

Declaration for Public Readiness and Emergency Preparedness Act Coverage for medical countermeasures against COVID–19.

I. Determination of Public Health Emergency

42 U.S.C. 247d–6d(b)(1)

I have determined that the spread of SARS-CoV–2 or a virus mutating therefrom and the resulting disease COVID–19 constitutes a public health emergency.

II. Factors Considered

42 U.S.C. 247d–6d(b)(6)

I have considered the desirability of encouraging the design, development, clinical testing, or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, and use of the Covered Countermeasures.

III. Recommended Activities

42 U.S.C. 247d–6d(b)(1)

I recommend, under the conditions stated in this Declaration, the manufacture, testing, development, distribution, administration, and use of the Covered Countermeasures.

IV. Liability Immunity

42 U.S.C. 247d–6d(a), 247d–6d(b)(1)

Liability immunity as prescribed in the PREP Act and conditions stated in this Declaration is in effect for the Recommended Activities described in Section III.

V. Covered Persons

42 U.S.C. 247d–6d(i)(2), (3), (4), (6), (8)(A) and (B)

Covered Persons who are afforded liability immunity under this Declaration are "manufacturers," "distributors," "program planners," "qualified persons," and their officials, agents, and employees, as those terms are defined in the PREP Act, and the United States.

In addition, I have determined that the following additional persons are qualified persons: (a) Any person authorized in accordance with the public health and medical emergency response of the Authority Having Jurisdiction, as described in Section VII below, to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures, and their officials, agents, employees, contractors and

volunteers, following a Declaration of an emergency; (b) any person

authorized to prescribe, administer, or dispense the Covered Countermeasures or who is otherwise authorized to perform an activity under an Emergency Use Authorization in accordance with Section 564 of the FD&C Act; and (c) any person authorized to prescribe, administer, or dispense Covered Countermeasures in accordance with Section 564A of the

FD&C Act.

## VI. Covered Countermeasures

42 U.S.C. 247d–6b(c)(1)(B), 42 U.S.C. 247d–6d(i)(1) and (7)

Covered Countermeasures are any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID–19, or the transmission of SARS-CoV–2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product.

Covered Countermeasures must be "qualified pandemic or epidemic products," or "security countermeasures," or drugs, biological products, or devices authorized for investigational or emergency use, as those terms are defined in the PREP Act, the FD&C Act, and the Public Health Service Act.

## VII. Limitations on Distribution

42 U.S.C. 247d–6d(a)(5) and (b)(2)(E)

I have determined that liability immunity is afforded to Covered Persons only for Recommended Activities involving Covered Countermeasures that are related to:

(a) Present or future federal contracts, cooperative agreements, grants, other transactions, interagency agreements, memoranda of understanding, or other federal agreements; or

(b) Activities authorized in accordance with the public health and medical response of the Authority Having Jurisdiction to prescribe, administer, deliver, distribute or dispense the Covered Countermeasures following a Declaration of an emergency.

As used in this Declaration, the terms Authority Having Jurisdiction and Declaration of Emergency have the following meanings:

i. The Authority Having Jurisdiction means the public agency or its delegate that has legal responsibility and authority for responding to an incident, based on political or geographical (*e.g.,* city, county, tribal, state, or federal

boundary lines) or functional (*e.g.,* law enforcement, public health) range or sphere of authority.

ii. A Declaration of Emergency means any Declaration by any authorized local, regional, state, or federal official of an emergency specific to events that indicate an immediate need to administer and use the Covered Countermeasures, with the exception of a federal Declaration in support of an Emergency Use Authorization under Section 564 of the FD&C Act unless such Declaration specifies otherwise;

I have also determined that, for governmental program planners only, liability immunity is afforded only to the extent such program planners obtain Covered Countermeasures through voluntary means, such as (1) donation; (2) commercial sale; (3) deployment of Covered Countermeasures from federal stockpiles; or (4) deployment of donated, purchased, or otherwise voluntarily obtained Covered Countermeasures from state, local, or private stockpiles.

## VIII. Category of Disease, Health Condition, or Threat

42 U.S.C. 247d–6d(b)(2)(A)

The category of disease, health condition, or threat for which I recommend the administration or use of the Covered Countermeasures is COVID–19 caused by SARS-CoV–2 or a virus mutating therefrom.

## IX. Administration of Covered Countermeasures

42 U.S.C. 247d–6d(a)(2)(B)

Administration of the Covered Countermeasure means physical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients, management and operation of countermeasure programs, or management and operation of locations for purpose of distributing and dispensing countermeasures.

## X. Population

42 U.S.C. 247d–6d(a)(4), 247d–6d(b)(2)(C)

The populations of individuals include any individual who uses or is administered the Covered Countermeasures in accordance with this Declaration.

Liability immunity is afforded to manufacturers and distributors without regard to whether the countermeasure is used by or administered to this population; liability immunity is afforded to program planners and

qualified persons when the countermeasure is used by or administered to this population, or the program planner or qualified person reasonably could have believed the recipient was in this population.

## XI. Geographic Area

42 U.S.C. 247d–6d(a)(4), 247d–6d(b)(2)(D)

Liability immunity is afforded for the administration or use of a Covered Countermeasure without geographic limitation.

Liability immunity is afforded to manufacturers and distributors without regard to whether the countermeasure is used by or administered in any designated geographic area; liability immunity is afforded to program planners and qualified persons when the countermeasure is used by or administered in any designated geographic area, or the program planner or qualified person reasonably could have believed the recipient was in that geographic area.

## XII. Effective Time Period

42 U.S.C. 247d–6d(b)(2)(B)

Liability immunity for Covered Countermeasures through means of distribution, as identified in Section VII(a) of this Declaration, other than in accordance with the public health and medical response of the Authority Having Jurisdiction and extends through October 1, 2024.

Liability immunity for Covered Countermeasures administered and used in accordance with the public health and medical response of the Authority Having Jurisdiction begins with a Declaration and lasts through (1) the final day the emergency Declaration is in effect, or (2) October 1, 2024, whichever occurs first.

## XIII. Additional Time Period of Coverage

42 U.S.C. 247d–6d(b)(3)(B) and (C)

I have determined that an additional 12 months of liability protection is reasonable to allow for the manufacturer(s) to arrange for disposition of the Covered Countermeasure, including return of the Covered Countermeasures to the manufacturer, and for Covered Persons to take such other actions as are appropriate to limit the administration or use of the Covered Countermeasures.

Covered Countermeasures obtained for the SNS during the effective period of this Declaration are covered through the date of administration or use pursuant to a distribution or release from the SNS.

## XIV. Countermeasures Injury Compensation Program

42 U.S.C 247d–6e

The PREP Act authorizes the Countermeasures Injury Compensation Program (CICP) to provide benefits to certain individuals or estates of individuals who sustain a covered serious physical injury as the direct result of the administration or use of the Covered Countermeasures, and benefits to certain survivors of individuals who die as a direct result of the administration or use of the Covered Countermeasures. The causal connection between the countermeasure and the serious physical injury must be supported by compelling, reliable, valid, medical and scientific evidence in order for the individual to be considered for compensation. The CICP is administered by the Health Resources and Services Administration, within the Department of Health and Human Services. Information about the CICP is available at the toll-free number 1–855–266–2427 or *http://www.hrsa.gov/cicp/*.

## XV. Amendments

42 U.S.C. 247d–6d(b)(4)

Amendments to this Declaration will be published in the **Federal Register**, as warranted.

**Authority:** 42 U.S.C. 247d–6d.

Dated: March 10, 2020.

**Alex M. Azar II,**
*Secretary of Health and Human Services.*
[FR Doc. 2020–05484 Filed 3–12–20; 4:15 pm]
**BILLING CODE P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### National Institute of Diabetes and Digestive and Kidney Diseases; Notice of Closed Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute of Diabetes and Digestive and Kidney Diseases Special Emphasis Panel; PAR–18–423: NIDDK Multi-Center Clinical Study Implementation Planning Cooperative Agreements (U34) in Digestive Diseases.

*Date:* May 22, 2020.

*Time:* 11:00 a.m. to 1:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, Two Democracy Plaza, 6707 Democracy Boulevard, Bethesda, MD 20892 (Telephone Conference Call).

*Contact Person:* Dianne Camp, Ph.D., Scientific Review Officer, Review Branch, Division of Extramural Activities, NIDDK, National Institutes of Health, Room 7013, 6707 Democracy Boulevard, Bethesda, MD 20892–2542, (301) 594–7682, *campd@extra.niddk.nih.gov*.

(Catalogue of Federal Domestic Assistance Program Nos. 93.847, Diabetes, Endocrinology and Metabolic Research; 93.848, Digestive Diseases and Nutrition Research; 93.849, Kidney Diseases, Urology and Hematology Research, National Institutes of Health, HHS)

Dated: March 10, 2020.

**Miguelina Perez,**
*Program Analyst, Office of Federal Advisory Committee Policy.*
[FR Doc. 2020–05361 Filed 3–16–20; 8:45 am]
**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### Center for Scientific Review; Amended Notice of Meeting

Notice is hereby given of a change in the meeting of the Center for Scientific Review Special Emphasis Panel, Small Business: Cardiovascular Sciences, March 19, 2020 08:00 a.m. to March 20, 2020, 01:00 p.m., Embassy Suites Alexandria Old Town, 1900 Diagonal Road, Alexandria, VA 22314 which was published in the **Federal Register** on February 20, 2020, 85 FR 9791.

The meeting location is being held at the National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, at 09:00 a.m. The meeting date remains the same. The meeting is closed to the public.

Dated: March 11, 2020.

**Miguelina Perez,**
*Program Analyst, Office of Federal Advisory Committee Policy.*
[FR Doc. 2020–05417 Filed 3–16–20; 8:45 am]
**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### Center for Scientific Review; Amended Notice of Meeting

Notice is hereby given of a change in the meeting of the Center for Scientific Review Special Emphasis Panel, PAR 19–059: Global Noncommunicable Diseases and Injury Across the Lifespan (R21), March 23, 2020, 8:00 a.m. to 5:00 p.m., at the Hotel Palomar, 2121 P Street NW, Washington, DC 20037, which was published in the **Federal Register** on February 25, 2020, 85 FR 10708.

The meeting will be held at the National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892. The format of the meeting has been changed to a Video Assisted Meeting. The meeting date and time remain the same. The meeting is closed to the public.

Dated: March 11, 2020.

**Ronald J. Livingston, Jr.,**
*Program Analyst, Office of Federal Advisory Committee Policy.*
[FR Doc. 2020–05419 Filed 3–16–20; 8:45 am]
**BILLING CODE 4140–01–P**

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### National Institute of Diabetes and Digestive and Kidney Diseases; Notice of Closed Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute of Diabetes and Digestive and Kidney Diseases Special Emphasis Panel; Consortium for the Study of Chronic Pancreatitis, Diabetes, and Pancreatic Cancer Clinical Centers Special Emphasis Panel.

*Date:* April 2, 2020.

*Time:* 10:00 a.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

EXHIBIT 5

document entitled, ''Agency Information Collection Activities: Proposed Collection; Comment Request''. That notice invited public comments on five separate information collection requests, under Document Identifiers: CMS–10468, CMS–10418, CMS–10488, CMS–R–290, and CMS–10525. Through the publication of this document, we are withdrawing the portion of the notice requesting public comment on the information collection request titled, ''PACE Quality Data Monitoring and Reporting.'' Form number: CMS–10525 (OMB control number: 0938–1264).

**DATES:** The original comment period for the document that published on March 24, 2020, remains in effect and ends May 26, 2020.

**SUPPLEMENTARY INFORMATION:** In FR document, 2020–06077, published on March 24, 2020 (85 FR 16631), we are withdrawing item 6 ''PACE Quality Data Monitoring and Reporting'' which begins on page 16633.

Dated: April 9, 2020.

**William N. Parham, III,**

*Director, Paperwork Reduction Staff, Office of Strategic Operations and Regulatory Affairs.*

[FR Doc. 2020–07886 Filed 4–14–20; 8:45 am]

**BILLING CODE 4120–01–P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Administration for Children and Families

## Submission for OMB Review; Intergovernmental Reference Guide (IRG) OMB #0970–0209

**AGENCY:** Office of Child Support Enforcement; Administration for Children and Families; HHS

**ACTION:** Request for public comment.

**SUMMARY:** The Intergovernmental Reference Guide (IRG) is a centralized and automated repository of state and tribal profiles that contains high-level descriptions of each state and tribal child support enforcement (CSE) program. These profiles provide state, tribal, and foreign country CSE agencies with an effective and efficient method for updating and accessing information needed to process intergovernmental child support cases.

**DATES:** *Comments due within 30 days of publication.* The Office of Management and Budget (OMB) is required to make a decision concerning the collection of information between 30 and 60 days after publication of this document in the **Federal Register**. Therefore, a comment is best assured of having its full effect if OMB receives it within 30 days of publication.

**ADDRESSES:** Written comments and recommendations for the proposed

information collection should be sent directly to the following: Office of Management and Budget, Paperwork Reduction Project, Email: *OIRA_ SUBMISSION@OMB.EOP.GOV,* Attn: Desk Officer for the Administration for Children and Families.

Copies of the proposed collection may be obtained by emailing *infocollection@ acf.hhs.gov.* Alternatively, copies can also be obtained by writing to the Administration for Children and Families, Office of Planning, Research and Evaluation, 330 C Street SW, Washington, DC 20201, Attn: ACF Reports Clearance Officer. All requests, emailed or written, should be identified by the title of the information collection.

**SUPPLEMENTARY INFORMATION:**

*Description:* The Office of Child Support Enforcement (OCSE) is proposing to add a new section (Section O) with six questions pertaining to family violence in the state profile. This will help process intergovernmental cases with family violence and will help ensure the safety of children and families. OCSE is also proposing to delete Sections A–L (140 questions) from the tribal profile and create new sections (Sections A–D) with 11 questions regarding case processing. This will assist in the efficient processing of paternity and support obligations.

*Respondents:* State and tribal CSE agencies.

ANNUAL BURDEN ESTIMATES

| Information collection instrument | Total number of respondents | Number of responses per respondent | Average burden hour per response | Annual burden hours |
|---|---|---|---|---|
| IRG: State Profile Guide (states and territories) ................................................. | 54 | 18 | 0.3 | 292 |
| IRG: Tribal Profile Guide ..................................................................... | 62 | 18 | 0.3 | 335 |

*Estimated Total Annual Burden Hours:* 627.

Authority for the IRG information collection activities is: (1) 42 U.S.C. 652(a)(7), which requires the federal OCSE to provide technical assistance to state child support enforcement agencies to help them establish effective systems for collecting child and spousal support; (2) 42 U.S.C. 666(f), which requires states to enact the Uniform Interstate Family Support Act; (3) 45 CFR. 301.1, which defines an intergovernmental case to include cases between states and tribes; (4) 45 CFR. 303.7, which requires state CSE agencies to provide services in intergovernmental cases; and (5) 45 CFR. 309.120, which requires a tribal child support program

to include intergovernmental procedures in its tribal IV–D plan.

**Mary B. Jones,**

*ACF/OPRE Certifying Officer.*

[FR Doc. 2020–07885 Filed 4–14–20; 8:45 am]

**BILLING CODE 4184–41–P**

# DEPARTMENT OF HEALTH AND HUMAN SERVICES

## Office of the Secretary

## Amendment to Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID–19

**ACTION:** Notice of amendment.

**SUMMARY:** The Secretary is issuing this amendment pursuant to section 319F–3 of the Public Health Service Act to extend liability immunity for activities related to medical countermeasures against COVID–19 authorized under the Coronavirus Aid, Relief, and Economic Security Act.

**DATES:** The amendment to the Declaration published on March 17, 2020 (85 FR 15198) was effective as of March 27, 2020.

**FOR FURTHER INFORMATION CONTACT:** Robert P. Kadlec, MD, MTM&H, MS, Assistant Secretary for Preparedness and Response, Office of the Secretary, Department of Health and Human Services, 200 Independence Avenue

SW, Washington, DC 20201; Telephone: 202–205–2882.

**SUPPLEMENTARY INFORMATION:** The Public Readiness and Emergency Preparedness Act (PREP Act) authorizes the Secretary of Health and Human Services (the Secretary) to issue a Declaration to provide liability immunity to certain individuals and entities (Covered Persons) against any claim of loss caused by, arising out of, relating to, or resulting from the manufacture, distribution, administration, or use of medical countermeasures (Covered Countermeasures), except for claims involving ''willful misconduct'' as defined in the PREP Act. Under the PREP Act, a Declaration may be amended as circumstances warrant.

The PREP Act was enacted on December 30, 2005, as Public Law 109– 148, Division C, Section 2. It amended the Public Health Service (PHS) Act, adding Section 319F–3, which addresses liability immunity, and Section 319F–4, which creates a compensation program. These sections are codified at 42 U.S.C. 247d–6d and 42 U.S.C. 247d–6e, respectively. The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law 116– 136 was enacted on March 27, 2020. The CARES Act amended section 319F– 3(i)(1)(D) of the PHS Act, first added by the Families First Coronavirus Response Act, Public Law 116–127 on March 18, 2020. These amendments created a new category of covered countermeasures eligible for liability immunity under the PREP Act, namely, respiratory protective devices approved by the National Institute for Occupational Safety and Health (NIOSH) under 42 CFR part 84, or any successor regulations, that the Secretary determines to be a priority for use during a public health emergency declared under section 319 of the PHS Act.

On January 31, 2020, the Secretary declared a public health emergency, pursuant to section 319 of the PHS Act, 42 U.S.C. 247d, for the entire United States to aid in the response of the nation's health care community to the COVID–19 outbreak. On March 10, 2020, the Secretary issued a Declaration under the PREP Act for medical countermeasures against COVID–19 (85 FR 15198 (March 17, 2020)). The Secretary is amending the March 10, 2020 Declaration under the PREP Act to extend liability immunity to covered countermeasures authorized under the CARES Act. This amendment is made in accordance with section 319F–3 of the PHS Act, which authorizes the Secretary

to amend a PREP Act declaration at any time.

**Description of This Amendment by Section**

*Section I. Determination of Public Health Emergency or Credible Risk of Future Public Health Emergency*

Before issuing a Declaration under the PREP Act, the Secretary is required to determine that a disease or other health condition or threat to health constitutes a public health emergency or that there is a credible risk that the disease, condition, or threat may constitute such an emergency. This determination is separate and apart from the Declaration issued by the Secretary on January 31, 2020 under section 319 of the PHS Act that a disease or disorder presents a public health emergency or that a public health emergency, including significant outbreaks of infectious diseases or bioterrorist attacks, otherwise exists, or other Declarations or determinations made under other authorities of the Secretary. As amended by the CARES Act, to extend the Declaration to respiratory protective devices approved by NIOSH, the Secretary must also determine that a respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations, is a priority for use during the public health emergency declared by the Secretary under section 319 of the PHS Act.

Accordingly, in Section I of the Declaration, the Secretary is amending his determination that the spread of SARS–CoV–2 or a virus mutating therefrom and the resulting disease, COVID–19, constitutes a public health emergency for purposes of this Declaration under the PREP Act to include the determination that the use of any respiratory protective devices approved by NIOSH under 42 CFR part 84, or any successor regulations, is a priority for use during the public health emergency declared by the Secretary on January 31, 2020 under section 319 of the PHS Act for the entire United States to aid in the nation's health care community response to the COVID–19 outbreak.

*Section VI. Covered Countermeasures*

Section VI of the Declaration identifies the Covered Countermeasures for which the Secretary has recommended such activities. As amended by the CARES Act, the PREP Act states that a ''Covered Countermeasure'' must be a ''qualified pandemic or epidemic product,'' a ''security countermeasure,'' a drug, biological product, or device authorized

for emergency use in accordance with sections 564, 564A, or 564B of the Federal Food, Drug, and Cosmetic (FD&C) Act, or a respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations, that the Secretary determines to be a priority for use during a public health emergency declared under section 319 of the PHS Act. Accordingly, in Section VI of the Declaration, the Secretary is amending the list of medical countermeasures against COVID–19 that are covered countermeasures under the declaration to include covered countermeasures authorized by the CARES Act, namely respiratory protective devices approved by NIOSH under 42 CFR part 84, or any successor regulations, that the Secretary determines to be a priority for use during a public health emergency declared under section 319 of the PHS Act.

*Section XII. Effective Time Period*

The Secretary must identify, for each Covered Countermeasure, the period or periods during which liability immunity is in effect, designated by dates, milestones, or other description of events, including factors specified in the PREP Act. Accordingly, the Secretary is amending Section XII of the Declaration to specify the effective time period for covered countermeasures authorized by the CARES Act.

**Amendments to Declaration**

Amended Declaration for Public Readiness and Emergency Preparedness Act Coverage for medical countermeasures against COVID–19.

Sections I, VI and XII of the March 10, 2020, Declaration under the PREP Act for medical countermeasures against COVID–19 are amended pursuant to section 319F–3(b)(4) of the PHS Act as described below. All other Sections of the Declaration remain in effect as published at 85 FR 15198 (March 17, 2020).

1. Determination of Public Health Emergency, Section I: Delete in full and replace with:

I. Determination of Public Health Emergency

42 U.S.C. 247d–6d(b)(1)

I have determined that the spread of SARS–CoV–2 or a virus mutating therefrom and the resulting disease COVID–19 constitutes a public health emergency. I further determine that use of any respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations, is a priority for use during the public health emergency that I declared on January

31, 2020 under section 319 of the PHS Act for the entire United States to aid in the response of the nation's health care community to the COVID–19 outbreak.

2. Covered Countermeasures, Section VI, delete in full and replace with:

VI. Covered Countermeasures

42 U.S.C. 247d–6b(c)(1)(B), 42 U.S.C. 247d–6d(i)(1) and (7)

Covered Countermeasures are any antiviral, any other drug, any biologic, any diagnostic, any other device, any respiratory protective device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID–19, or the transmission of SARS–CoV–2 or a virus mutating therefrom, or any device used in the administration of any such product, and all components and constituent materials of any such product.

Covered Countermeasures must be "qualified pandemic or epidemic products," or "security countermeasures," or drugs, biological products, or devices authorized for investigational or emergency use, as those terms are defined in the PREP Act, the FD&C Act, and the Public Health Service Act, or any respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations.

3. Effective Time Period, Section XII, delete in full and replace with:

XII. Effective Time Period

42 U.S.C. 247d–6d(b)(2)(B)

Liability immunity for any respiratory protective device approved by NIOSH under 42 CFR part 84, or any successor regulations, through means of distribution, as identified in Section VII(a) of this Declaration, other than in accordance with the public health and medical response of the Authority Having Jurisdiction, begins on March 27, 2020 and extends through October 1, 2024.

Liability immunity for all other Covered Countermeasures identified in Section VI of this Declaration, through means of distribution, as identified in Section VII(a) of this Declaration, other than in accordance with the public health and medical response of the Authority Having Jurisdiction, begins February 4, 2020 and extends through October 1, 2024.

Liability immunity for all Covered Countermeasures administered and used in accordance with the public health and medical response of the Authority Having Jurisdiction begins with an emergency declaration and lasts through (1) the final day the emergency Declaration is in effect, or (2) October 1, 2024, whichever occurs first.

**Authority:** 42 U.S.C. 247d–6d.

Dated: April 10, 2020.

**Alex M. Azar II,**
*Secretary of Health and Human Services.*
[FR Doc. 2020–08040 Filed 4–13–20; 4:15 pm]
**BILLING CODE 4150–28–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**National Institutes of Health**

**National Institute of Environmental Health Sciences; Notice of Closed Meeting**

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute of Environmental Health Sciences Special Emphasis Panel; Mechanism for Time Sensitive Research Opportunities in Environmental Health Sciences.

*Date:* April 30, 2020.

*Time:* 11:00 a.m. to 1:30 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institute of Environmental Health Sciences, National Institutes of Health, Keystone Building, 530 Davis Drive, Research Triangle Park, NC 27709 (Virtual Meeting).

*Contact Person:* Janice B Allen, Ph.D., Scientific Review Officer, Scientific Review Branch, Division of Extramural Research and Training, Nat. Institute of Environmental Health Science, P. O. Box 12233, MD EC–30/Room 3170 B, Research Triangle Park, NC 27709 919–541–7556.

(Catalogue of Federal Domestic Assistance Program Nos. 93.115, Biometry and Risk Estimation—Health Risks from Environmental Exposures; 93.142, NIEHS Hazardous Waste Worker Health and Safety Training; 93.143, NIEHS Superfund Hazardous Substances—Basic Research and Education; 93.894, Resources and Manpower Development in the Environmental Health Sciences; 93.113, Biological Response to Environmental Health Hazards; 93.114, Applied Toxicological Research and Testing, National Institutes of Health, HHS)

Dated: April 9, 2020.

**Tyeshia M. Roberson,**
*Program Analyst, Office of Federal Advisory Committee Policy.*
[FR Doc. 2020–07917 Filed 4–14–20; 8:45 am]
**BILLING CODE 4140–01–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**National Institutes of Health**

**Center for Scientific Review; Notice of Closed Meetings**

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended, notice is hereby given of the following meetings.

The meetings will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* Center for Scientific Review Special Emphasis Panel RFA–RM–20–006: 4DN Organization and Function in Human Health and Disease, New Investigators (U01).

*Date:* May 14, 2020.

*Time:* 9:00 a.m. to 3:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892, (Virtual Meeting).

*Contact Person:* Jessica Smith, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (301) 402–3717, *jessica.smith6@nih.gov.*

*Name of Committee:* Center for Scientific Review Special Emphasis Panel RFA–RM–20–005: 4DN Organization and Function in Human Health and Disease (U01).

*Date:* May 14–15, 2020.

*Time:* 1:00 p.m. to 6:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institutes of Health, Rockledge II, 6701 Rockledge Drive, Bethesda, MD 20892, (Virtual Meeting).

*Contact Person:* Jessica Smith, Ph.D., Scientific Review Officer, Center for Scientific Review, National Institutes of Health, 6701 Rockledge Drive, Bethesda, MD 20892, (301) 402–3717, *jessica.smith6@nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.306, Comparative Medicine; 93.333, Clinical Research, 93.306, 93.333, 93.337, 93.393–93.396, 93.837–93.844,

*Emma Martin, Elizabeth Gagliano and Kathryn Sessinghaus, individually and as heirs of Vincent Paul Martin v. Serrano Post Acute, LLC dba Hollywood Premier Healthcare Center, et. al.*
**United States District Court, Central District of California**
**Case No.**
**\*\*\***
**PROOF OF SERVICE**

I am employed in San Diego County.  I am over the age of 18 and not a party to this action.  My business address is 12555 High Bluff Drive, Suite 270, San Diego, California 92130.

On **July 1, 2020**, I served the foregoing documents, described in this action as:

**SERRANO POST ACUTE, LLC dba HOLLYWOOD PREMIER HEALTHCARE CENTER and BENJAMIN LANDA'S NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. §§ 1331, 1441, 1442(a)(1) and 1446**

As follows:

***SEE ATTACHED SERVICE LIST***

**[X]     BY E-MAIL or ELECTRONIC TRANSMISSION**     I caused based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, the documents to be sent to the persons at the e-mail addresses.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**[X]     By CM/ECF ELECTRONIC DELIVERY:**     In accordance with the registered case participants and in accordance with the procedures set forth at the Court's website www.ecf.cacd.uscourts.gov.

**[X]**     I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **July 1, 2020** at San Diego, California.

_____
Tonya Jambis

1

## SERVICE LIST

2

3   Anne Marie Murphy, Esq.                  Dena J. Hadyen Lambirth, Esq.
    Andrew F. Kirtley, Esq.                  Patrick W. Mayer, Esq.
4   Cotchett, Pitre & McCarthy, LLP          Schmid & Voiles
    840 Malcolm Road                         333 South Hope Street, 8th floor
5   Burlingame, CA 94010                     Los Angeles, CA 90071
    T: 650.697.6000                          T: 213.473.8668
6   F: 650.697.0577                          Cell: 213.473.8777
7   Email: amurphy@cpmlegal.com              Email: dlambirth@schmidvoiles.com
    Email: akirtley@cpmlegal.com             pmayer@schmidvoiles.com
8
9   *Counsel for Plaintiffs*                 *Counsel for Marcel Adrian Solero Filart, MD*

10

11  Gary Allan Praglin, Esq.                 Kevn Eng., Esq.
    Kelly Winter Weil, Esq.                  Lewis Brisbois Bisgaard & Smith LLP
12  Cotchett, Pitre & McCarthy, LLP          633 West 5th Street, Suite 4000
    2716 Ocean Park Blvd., Suite 3088        Los Angeles, CA 90071
13  Santa Monica, CA 90405                   T: 213.580.7981
14  T: 310.392.2008                          F: 213.250.7900
    F: 310.392.0111                          Email: kevin.eng@lewisbrisbois.com
15  Email: gpraglin@cpmlegal.com
    Email: kweil@cpmlegal.com                *Counsel for Marcel Adrian Solero Filart, MD*
16
17  *Counsel for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

## SERVICE LIST