ANNE MARIE MURPHY (SBN 202540)
amurphy@cpmlegal.com
ANDREW F. KIRTLEY (SBN 328023)
akirtley@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
840 Malcolm Road
Burlingame, California 94010
Telephone: (650) 697-6000

GARY ALLAN PRAGLIN (SBN 101256)
gpraglin@cpmlegal.com
LESLIE A. HAKALA (SBN 199414)
lhakala@cpmlegal.com
**COTCHETT, PITRE & McCARTHY, LLP**
2716 Ocean Park Blvd Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EMMA MARTIN, ELIZABETH GAGLIANO** and **KATHRYN SESSINGHAUS,** individually and as heirs of **VINCENT PAUL MARTIN**, deceased,<br><br>Plaintiffs,<br><br>v.<br><br>Serrano Post Acute LLC d/b/a **HOLLYWOOD PREMIER HEALTHCARE CENTER,** a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital; **BENJAMIN LANDA**, an individual; **MARCEL ADRIAN SOLERO FILART**, an individual; and, **DOES 1-50,**<br><br>Defendants. | Case No. 2:20-cv-05937-DSF-SK<br><br>[Removal from Superior Court California, County of Los Angeles, Case No. 20STCV19545]<br><br>**FIRST AMENDED COMPLAINT**<br><br>1. **VIOLATIONS OF THE ELDER AND DEPENDENT ADULT CIVIL PROTECTION ACT** (Welfare & Institutions Code §15600 *et seq.*)<br><br>2. **NEGLIGENCE**<br><br>3. **WRONGFUL DEATH**<br><br>4. **FRAUDULENT CONCEALMENT**<br><br>5. **FRAUDULENT MISREPRESENTATION**<br><br><u>**JURY TRIAL DEMANDED**</u> |

# Table of Contents

Page(s)

I.   INTRODUCTION .......................................................................................... 1

II.   JURISDICTION AND VENUE ................................................................... 7

III.   PARTIES ....................................................................................................... 8

  A. Plaintiffs .................................................................................................... 8

  B. Defendant HPHC ...................................................................................... 9

  C. Defendant Benjamin Landa ..................................................................... 9

  D. Defendant Marcel Adrian Solero Filart ................................................. 9

  E. DOE Defendants ..................................................................................... 10

IV.   AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY ........... 10

V.   STANDING TO BRING THIS SURVIVAL ACTION .............................. 11

VI.   FACTUAL BACKGROUND ...................................................................... 11

  A. The Background of Elder Abuse and Neglect In California and at HPHC ...................... 11

  B. Understaffing at HPHC ........................................................................... 13

  C. Mr. Martin Entered HPHC for Post-Surgery Care ................................ 14

  D. The Family's Final Visits to Mr. Martin in February 2020 .................. 14

  E. COVID-19 Takes Hold at HPHC and HPHC Goes Into Lockdown ...... 15

  F. Timeline of Vince Martin's Last Days .................................................. 15

  G. Staff Admits to Mr. Martin's Family That There Is a Staffing Crisis: Two Nurses Were Caring for Eighty-Three Residents ........................... 17

VII.   CAUSES OF ACTION ............................................................................... 19

    FIRST CAUSE OF ACTION: ELDER ABUSE AND NEGLECT UNDER THE .......... 19

    ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT. ............... 19

    (Against All Defendants) ............................................................................ 19

    SECOND CAUSE OF ACTION:  NEGLIGENCE ............................................ 21

    THIRD CAUSE OF ACTION: WRONGFUL DEATH ...................................... 22

    FOURTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT ................... 25

    FIFTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION .............. 26

**VIII. PRAYER FOR RELIEF**..................................................................................**27**

DEMAND FOR JURY TRIAL ..........................................................................28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1        Plaintiffs **Emma Martin**, **Elizabeth Gagliano** and **Kathryn Sessinghaus**, individually

2 and as heirs, and successors in interest of **Vincent Paul Martin**, deceased, bring this action for

3 damages against defendants **Serrano Post Acute LLC d/b/a Hollywood Premier Healthcare**

4 **Center a/k/a Serrano Healthcare, a/k/a Serrano North Convalescent Hospital** or

5 ("HPHC"); **Benjamin Landa** ("Landa"); and **Dr. Marcel Filart** ("Filart", and collectively

6 with HPHC and Landa, "Defendants").

7 **I.**     <u>**INTRODUCTION**</u>

8      1.     This case involves one of the worst outbreaks of COVID-19 in any nursing home

9 in the United States.  Licensed to have just 99 residents, at one point, HPHC had the incredible

10 number of sixteen (16) elderly residents **dead** and seventy-two (72) residents infected, along

11 with thirty-seven (37) staff (109 infections)—as well as others **hidden** from the public.

12      2.     This case involves just one of the individuals that has died—eighty-four-year-old

13 Vincent Paul Martin ("Mr. Martin" or "Vince"). Mr. Martin's wife and daughters intend to

14 uncover how COVID-19 was allowed to rage uncontrolled through Hollywood Premier

15 Healthcare Center ("HPHC").

16

17

18

19

20 

21

22

23

24

25

26

27

28

(Source: Family picture of Mr. Martin celebrating his birthday at HPHC in August 2015)

3.    Mr. Martin did not lose his life because of an unavoidable Act-of-God, rather he lost his life because HPHC's owners and managers had a long-standing practice of keeping the nursing home understaffed and skirting safety and infection controls as set forth below. Several of the individuals responsible for HPHC have had past brushes with the law – Defendant Landa was found liable for human trafficking of Filipino nursing staff, and Defendant Filart was named as having received kickbacks in an illegal Medicare-Medi-Cal scam that resulted in a $42 million dollar settlement with the U.S. Government.

4.    Mr. Martin died in the early hours of Saturday April 4, 2020.  As of at least April 1, 2020, HPHC and its staff had known that some of the nursing home's other residents had tested positive for COVID-19, and also had known that Mr. Martin displayed symptoms consistent with COVID-19.  Nonetheless, HPHC did not automatically test Mr. Martin for COVID-19 based on his symptoms.  In fact, Defendants did not test Mr. Martin for the virus until it was too late—Mr. Martin's positive test result came back the day **after** he died.

5.    Defendants knew that there was a serious outbreak at HPHC by mid-March 2020 when HPHC's Administrator Juhn Cayabyab, NHA, contracted COVID-19, yet HPHC did not test its residents and staff for COVID-19. It was only at the insistence of Mr. Martin's family that he was tested at all, despite the obvious COVID symptoms Mr. Martin was exhibiting.

6.    HPHC, individually and through its staff and employees, **admitted** to the family that the 99-bed nursing home had only two nurses working, just days before Mr. Martin's death. Shortly after Mr. Martin's death, HPHS made national news due to the severity of the COVID-19 outbreak at the facility, yet the families of numerous residents were left in the dark about the true situation within HPHC. The fraudulent concealment of the conditions was overwhelming.

7.    This situation at the HPHC nursing home eventually became so serious and deadly that HPHC was one of a handful of facilities in LA County where the National Guard was deployed in late April. Tragically, this help came too late for Mr. Martin and many of the other residents to prevent their deaths.

1

2

3

4

5

6

7

8

9

10

11

12

13



National Guard Sgt. Joseph Schlitz enters the Hollywood Premier Healthcare Center, which has seen 25 coronavirus cases among staff and 29 among residents. (Brian van der Brug/Los Angeles Times)



14

15

16

17

18

19

20

21

22

23

24   ///

25   ///

26   ///

27   ///

28   ///



8.     Mr. Martin's own attending physician, Dr. Marcel Filart, HPHC's Medical Director, failed to put COVID-19 on Mr. Martin's death certificate, despite Mr. Martin's positive COVID-19 test result. (**Exhibit 2**). In addition, HPHC intentionally did not inform the funeral home that Mr. Martin was COVID-19 positive or COVID-19 suspected, putting the funeral home staff in grave danger. Undisputedly, HPHC knew that it was experiencing an outbreak at this point – even its own Administrator was out sick with COVID-19 since March.

9.     Mr. Martin's wife, Plaintiff Emma Martin is a pediatric nurse practitioner.  She was deeply troubled when she last visited the facility in early March to drop off items for her husband and observed the lack of personal protective equipment ("PPE") being used at HPHC despite the emerging pandemic. What she did not know at the time was that HPHC had been cited by the State of California in June 2019 for deficient PPE practices, as discussed in greater detail in **Exhibit 3**, pages 4-5.  Again, this is not a situation where a well-run nursing home was caught off guard by the pandemic—HPHC's deficient and dangerous practices predate the pandemic.

10.     Just three days after Mr. Martin's death, one of the HPHC nursing staff posted the following picture on Facebook – which is notable both for the claim that this staff member had been working 20 hour shifts – and because she was at a nursing station with no PPE:



11.     Mr. Martin's family had been requesting HPHC's nursing records pertaining to Mr. Martin's care since April 10, 2020. As of the date this litigation began on July 1, 2020, **HPHC had still refused** to provide them, saying that medical records requests must go through "corporate offices" per facility policies. The records department staff told Lisa that "corporate" needs to approve the disclosure of records before they are provided to family

members. HPHC's delay was illegal under state and federal law. *See*, 42 CFR § 483.10; Cal. Health and Safety Code § 123110.

12.    There are many heroes among our Country's nurses, however, the owners and operators of HPHC are not heroes. They have profited on the backs of senior citizens, their families, as well as Medicare and Medi-Cal – and on the backs of their overworked staff. According to court records, one of the owners of HPHC, Benjamin Landa, was found liable for human trafficking of Filipino nursing staff last year. (See, **Exhibit 4**)[1]

13.    Mr. Martin necessarily contracted COVID-19 from the HPHC staff—the very group that had a legal obligation to protect him from health and safety hazards.  His death, therefore, was preventable, as was much of his pain and suffering.  His last days were spent in horrific circumstances, in a room with at least two other residents and without his wife and daughters by his side.

14.    It was entirely foreseeable that COVID-19 would rage like a wildfire through the rooms of Hollywood Premier Healthcare Center, given that there were not enough staff to isolate and care for positive residents. When staff were forced to travel between COVID-19 positive and COVID-19 negative seniors, they spread highly infectious disease in their wake. Also contributing to the firestorm was HPHC's practice of cramming small resident rooms with multiple elderly residents. Mr. Martin was housed in a small room with two other residents.

15.    As a nursing home, HPHC was charged with providing much needed care and rehabilitation services to dependent and elderly adults in Los Angeles County.  Like other skilled nursing facilities ("SNFs"), HPHC was entrusted with highly vulnerable individuals who often had multiple physical and cognitive impairments that required extensive assistance in the basic activities of daily living such as dressing, feeding, and bathing.

---

[1] *See*, **Exhibit 4**, which includes the cover sheets of the relevant court rulings: *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17-cv-1302 (NG) (JO), 2019 U.S. Dist. LEXIS 165587 (E.D.N.Y. Sep. 23, 2019), *Paguirigan v. Prompt Nursing Emp't Agency LLC*, No. 17-cv-1302 (NG) (JO), 2020 U.S. Dist. LEXIS 4837 (E.D.N.Y. Jan. 9, 2020). Only discovery will tell whether such human rights abuses extended to HPHC's nursing staff.

16. Like the other residents housed at HPHC, Mr. Martin was entirely dependent on HPHC. HPHC's most important duty was to protect its residents from health and safety hazards. HPHC failed to provide this adequate care and, as a result, Mr. Martin contracted COVID-19, succumbed to the disease, and died without family by his side. HPHC must be held accountable.

17. The California Legislature has recognized the important role of civil litigation in remedying abuse and neglect of elders and dependent adults. As stated in the "Elder Abuse and Dependent Adult Civil Protection Act" ("EADCPA"):

> The Legislature … finds and declares that infirm elderly persons and dependent adults are a disadvantaged class, that cases of abuse of these persons are seldom prosecuted as criminal matters, and few civil cases are brought in connection with this abuse due to problems of proof, court delays, and the lack of incentives to prosecute these suits.

(California Welfare & Institutions Code Section 15600.)

18. Plaintiffs want to ensure that Mr. Martin's death is not just another sad statistic.

## II.   JURISDICTION AND VENUE

19. Venue is proper in this County because Defendant is located and/or performs business in this County, and a substantial part of the events, acts, omissions, and transactions complained of herein occurred in this County. Defendants operate the SNF at issue in this case at 5401 Fountain Avenue Los Angeles, CA 90029.

20. Each Defendant has sufficient minimum contacts with California, and has purposely availed itself of benefits and protections of California, and does business in California so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

21. The amount in controversy exceeds the jurisdictional minimum of this Court.

///

///

///

## III.   PARTIES

### A.   Plaintiffs

22.   Plaintiff Emma Martin ("Emma") is, and at all times herein mentioned was, the wife and successor in interest and heir of the decedent, Vince Martin.   Emma Martin was actively involved in her husband's care and visited Mr. Martin frequently.  Emma Martin is 82-years old and is a retired pediatric nurse practitioner. Plaintiff Emma Martin is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48.  (Her declaration to this effect pursuant to CCP sec. 377.32 is attached as **Exhibit 5** to this First Amended Complaint.)

23.   Plaintiff Elizabeth Gagliano ("Lisa") is, and at all times herein mentioned was, the daughter and successor in interest and heir of the decedent, Vince Martin.  Elizabeth Gagliano was involved in her father's care and visited Mr. Martin when in town. Plaintiff Elizabeth Gagliano is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48.  (Her declaration to this effect pursuant to CCP sec. 377.32 is attached as **Exhibit 6** to this First Amended Complaint.)

24.   Plaintiff Kathryn Sessinghaus ("Kathy") is, and at all times herein mentioned was, the daughter and successor in interest and heir of the decedent, Vince Martin.  Kathy was actively involved in her father's care and visited Mr. Martin frequently.  Plaintiff Kathy Sessinghaus is lawfully entitled to pursue all claims and causes of actions for damages pursuant to Code of Civil Procedure sections 377.32, 377.60, 377.61, Welfare and Institution Code section 15657.3(d), and Probate Code section 48. (Her declaration to this effect pursuant to CCP sec. 377.32 is attached as **Exhibit 7** to this First Amended Complaint.)

25.   Plaintiffs Elizabeth Gagliano and Kathy Sessinghaus are the only surviving children of Vince Martin.

///

///

**B.** <u>**Defendant HPHC**</u>



26.     Serrano Post Acute LLC d/b/a Hollywood Premier Healthcare Center was, at all times relevant herein, a skilled nursing facility which provides services at 5401 Fountain Avenue Los Angeles, CA 90029, which is also its principal place of business.

**C.** <u>**Defendant Benjamin Landa**</u>

27.     Mr. Landa owns and/or controls HPHC. Mr. Landa is a resident of Brooklyn, New York.

**D.** <u>**Defendant Marcel Adrian Solero Filart**</u>

28.     Defendant Marcel Adrian Solero Filart ("Filart") is, and at all times relevant hereto was, a resident of Los Angeles County, California; a physician licensed to practice medicine in the State of California; and Medical Director at HPHC. As reflected in <u>**Exhibit 8**</u>, Filart was named in a 2016 False Claims Act case as having received kickbacks—the case was later settled by the Department of Justice for $42 million dollars.

29.     In or about June 2018, he assumed direct responsibility for serving as Mr. Martin's attending physician. However, medical records obtained only after this case was filed, reveal that Filart never actually visited Mr. Martin in person in complete abrogation of his duties, both as Medical Director and as Mr. Martin's physician.

30.     As Medical Director of HPHC, he was also responsible for reviewing and evaluating administrative and patient care policies and procedures. CCR 22 CA ADC § 72305.

### E.     DOE Defendants

31.     Plaintiffs are ignorant of the names of those Defendants sued as DOES 1 through 50 and for that reason have sued DOE Defendants by fictitious names.  Plaintiffs further allege that each of said fictitious DOE Defendants is in some manner responsible for the acts and occurrences hereinafter set forth.  Plaintiffs will seek leave of the court to amend this Complaint to show their true names and capacities when the DOE Defendants are ascertained, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Plaintiffs.

## IV.     AGENCY/JOINT VENTURE/AIDING AND ABETTING/CONSPIRACY

32.     Plaintiffs are informed and believe, and upon such basis allege, that at all times herein mentioned, each of the Defendants, including those named as DOE defendants, herein was an agent, servant, employee and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of said agency, service, employment, and/or joint venture.

33.     Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance in accomplishing the wrongful conduct and their wrongful goals and other wrongdoing complained of herein.  In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of his/her primary wrongdoing and realized that his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

34.     Defendants, and each of them, conspired with each other and with others, to perpetrate the unlawful scheme on Plaintiffs, as alleged in this Complaint.  In so doing, each of the Defendants have performed acts and/or made statements in furtherance of the said conspiracy, while at all times acting within the scope of and in furtherance of the conspiracy alleged in this Complaint, and with full knowledge of the goals of that conspiracy.

## V.   STANDING TO BRING THIS SURVIVAL ACTION

35.   Pursuant to the provisions of Code of Civil Procedure section 377.32 and Welfare Institutions Code section 15657.3(d), Plaintiffs Emma Martin, Lisa Gagliano and Kathy Sessinghaus ("Plaintiffs"), as successors-in-interest to decedent Vince Martin, are lawfully entitled to pursue all survival claims and causes of action for damages on behalf of decedent Vince Martin.

36.   Additionally, pursuant to the provisions of Welfare and Institutions Code section 15657.3(d) and section 48 of the Probate Code, Plaintiffs are interested persons, as defined by section 48 of the Probate Code, and are thus each lawfully entitled to pursue all claims and causes of action in a survival action on behalf of decedent Vince Martin. Successor-in-Interest Declarations are attached as **Exhibits 5-7.**

## VI.   FACTUAL BACKGROUND

37.   84-year old, Vince Paul Martin died of COVID-19 on Saturday April 4, 2020. He was a resident of HPHC, which is located in Hollywood (5401 Fountain Avenue Los Angeles, CA 90029). Vince was born in Brooklyn, New York. He served in both the U.S. Army and the Army Reserve in the 1950s and 1960s. After getting out of the Army, he attended the Pratt Institute in New York and became a graphic designer. He then worked in advertising in the entertainment industry, including time on the Jack Parr Show, and worked at advertising agencies in New York and Los Angeles.  In the 1960s, he moved to Los Angeles where he worked as a graphic artist for the City of Los Angeles, both with the Los Angeles Public Libraries and the Department of Water and Power. He retired in the mid-1990s.

38.   Vince was married to Plaintiff Emma from 1964 until his death at HPHC. He and Emma had two daughters (Plaintiffs Lisa and Kathy) and five grandchildren.

### A.   The Background of Elder Abuse and Neglect In California and at HPHC

39.   While SNFs are expected to keep their residents safe from harm, the truth is that abuse and neglect in such facilities has become a problem throughout the nation and the State of California. HPHC has a history of providing sub-standard care.

40.     In 2019 alone, the United States Department of Health and Social Services cited HPHC for the following deficiencies:

- Nursing staff failed to don a gown and mask when caring for an infected resident who was in isolation, instead the staff member touched the resident and then did not wash their hands;

- Failed to ensure proper infection controls due to failure to remove and clean equipment with the "potential to spread infection and transmission of communicable disease";

- Failed to label oxygen tubing with a resident's name, a "deficient practice" that "had the potential to result in infection to the resident";

- Putting four residents in a 420 square foot room (HPHC actually had a fifth unoccupied bed in this small space);

- Not reporting an injury of unknown source to the State;

- Failed to protect from fall hazards;

- Illegally implementing advance care directives (end of life plans) without needed consent, with the potential of denying residents necessary treatments;

- Keeping call lights out of reach of residents;

- Improper use of physical restraints;

- Failing to put care plans in place for residents;

- Failing to provide needed eyewear, and instead allowing a resident to use glasses that were taped together with packaging tape and duct tape;

- Failing to properly angle a resident's bed to prevent the development of pneumonia;

- Failing to post daily staffing information for review by residents and visitors.

41.     Again, HPHC was cited for all the above deficiencies in 2019 (plus additional deficiencies that are not listed). The situation was equally bleak in 2018. Given the circumstances that prevailed at HPHC pre-COVID-19, it was inevitable that the nursing home would be ravaged by COVID-19. This is supported by a GAO study dated May 20, 2020, which explored the prevalence of infection prevention and control deficiencies in nursing homes prior to the COVID-19 pandemic and drew a correlation between facilities with

deficiencies in 2018-2019 and current COVID-19 outbreaks. *Infection Control Deficiencies Were Widespread and Persistent in Nursing Homes Prior to COVID-19 Pandemic*, GAO-20-576R: Published: May 20, 2020 (accessible at https://www.gao.gov/assets/710/707069.pdf).

**B.**    **Understaffing at HPHC**

42.    According to a 2016 UCSF study, HPHC (f/k/a Serrano North Convalescent Hospital), had 95.80% turnover—among the worst in the State of California.[2] That same report noted that the facility had below average staffing of supervisors, Registered Nurses ("RNs"), Licensed Vocational Nurses ("LVNs") and Licensed Practical Nurse ("LPN"), instead relying on Nursing Assistants with minimal qualifications. HPHC chose to staff the nursing home with underqualified staff in order to save money and increase profits for the owners.

43.    In keeping with the earlier UCSF study, Medicare.gov currently rates HPHC as "below average":

## HOLLYWOOD PREMIER HEALTHCARE CENTER

Overall rating ⓘ:    ★★●●●

Below Average

Also, per Medicare.gov, HPHC has overall below average staffing levels:

**Staffing**

The information in this section includes registered nurses (RN), licensed practical/vocational nurses (LPN/LVN), nurse aides, and physical therapists (PT). Physical therapists aren't included in the "all staffing" star rating.

The "staffing" star rating takes into account that some nursing homes have sicker residents and may therefore need more staff than other nursing homes whose residents aren't as sick.

| | HOLLYWOOD PREMIER HEALTHCARE CENTER | CALIFORNIA AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| **Staffing rating** | ★★●●● Below Average | | |
| Average number of residents per day | 97.4 | 86.6 | 85.9 |
| Total number of licensed nurse staff hours per resident per day | 1 hour and 19 minutes | 1 hour and 46 minutes | 1 hour and 34 minutes |
| RN hours per resident per day | 22 minutes | 38 minutes | 41 minutes |
| LPN/LVN hours per resident per day | 57 minutes | 1 hour and 8 minutes | 52 minutes |
| Nurse aide hours per resident per day ⓘ | 2 hours and 25 minutes | 2 hours and 35 minutes | 2 hours and 18 minutes |
| Physical therapist staff hours per resident per day ⓘ | 4 minutes | 6 minutes | 5 minutes |

**Registered Nurse (RN) staffing only**

Registered nurses (RNs) are licensed healthcare professionals who are responsible for the coordination, management and overall delivery of care to the residents. Some nursing home residents who are sicker than others may require a greater level of care, and nursing homes that have more RN staff may be better able to meet the needs of those residents.

| | HOLLYWOOD PREMIER HEALTHCARE CENTER | CALIFORNIA AVERAGE | NATIONAL AVERAGE |
|---|---|---|---|
| **Registered Nurse (RN) staffing rating** | ★★●●● Below Average | | |
| Average number of residents per day | 97.4 | 86.6 | 85.9 |
| RN hours per resident per day | 22 minutes | 38 minutes | 41 minutes |

44.     As noted by a leading UCSF study, "[m]any California studies have demonstrated that serious quality of care problems have been associated with inadequate staffing levels, and most importantly, low RN staffing (Kim, *et al.*, 2009a 2009b; Schnelle, *et al.*, 2004)." *California Nursing Home Chains by Ownership Type Facility and Resident Characteristics, Staffing, and Quality Outcomes in 2015.* UCSF, Dr. Charlene Harrington and Dr. Leslie Ross.

45.     HPHC's chronic problems with understaffing continued—even worsened—during the COVID-19 crisis within HPHC.  Plaintiffs were told by nurses that the facility was short-staffed, and at least one HPHC nurse complained repeatedly on her Facebook page that she was being forced to work 2 to 3 shifts back-to-back, and that she'd been working for 20 hours straight.

## C.      Mr. Martin Entered HPHC for Post-Surgery Care

46.     Vince Martin went to HPHC in January 2014 due to spinal stenosis after undergoing surgery. At the time, Mr. Martin required more daily in-home care than his elderly wife was able to provide, and the entire family agreed that a nursing home was the best option.

47.     Prior to the outbreak, Plaintiffs visited Mr. Martin frequently. Given Mr. Martin's normal routines, and given the fact that family was not permitted to visit, the only way that Mr. Martin contracted COVID-19 was from the HPHC staff, third parties that HPHC brought into the facility, or other residents.

48.     As the COVID-19 pandemic began to emerge in California in February, Plaintiffs noted the apparent lack of infection control protocols in place at HPHC to deal with the outbreak.

## D.      The Family's Final Visits to Mr. Martin in February 2020

49.     Because of the COVID-19 pandemic, the last time the family was able to visit in person with Vince was in February. More specifically, Emma visited her husband either February 27 or 28. Emma did not observe PPE worn by any member of the staff.

50.      On or about February 29, 2020, Kathy visited her father – she also noticed the lack of PPE on the staff.

51.     Subsequently in early March 2020, Emma went to visit Vince, but she was met by an HPHC staff member who told her that the facility was not allowing visitors. Emma was distressed when she observed that that staff member did not have PPE on—that HPHC was not taking basic precautions—especially given that the facility was in lock-down.

**E.     COVID-19 Takes Hold at HPHC and HPHC Goes Into Lockdown**

52.     By the first week of March the family was told that visitors were no longer allowed in HPHC, but that family members could still bring supplies and presents to the door of the facility. During the week of March 2, Kathy brought a book and snacks to HPHC – she was met by a staff member at the door who took the items – this staff member was not wearing a mask.

53.     During March, Emma called regularly to check in on her husband.  Sometimes the staff answered, and sometimes they did not. It was a frustrating and scary time for the Martin family since they had no way of really knowing how Mr. Martin was doing day to day.

54.     On March 19, 2020, Lisa called HPHC and asked if she could mail Vince a care package of historical magazines (Mr. Martin took immense pleasure in reading) but was told that it was best not to mail anything.

**F.     Timeline of Vince Martin's Last Days**

55.     On or about Wednesday April 1, 2020, HPHC's staff called Emma Martin and said that Vince had a fever, was not eating or drinking and was confused. This was the first time that Vince's family was informed that he was sick. Emma Martin called her daughters.

56.     Later that same day, April 1, 2020, Kathy called HPHC and spoke with HPHC Director of Nursing Elizabeth Edra ("Elizabeth") to check on her father.  Elizabeth said that Mr. Martin had a fever of 100/101 degrees, was confused, was having trouble breathing, and was not eating or drinking.  **Kathy asked if any tests had been ordered for her father, but Elizabeth said nothing had been ordered.**  Kathy requested that her father undergo certain tests – including a COVID-19 test – but Elizabeth said that she'd have to get a physician to order the tests the following day.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

57.     During that same conversation on April 1, 2020, Kathy also asked if there were any active COVID-19 cases at HPHC. Elizabeth reluctantly told her that there was at least one case.  Later in the conversation, Elizabeth admitted to Kathy that there were actually *four* active cases in the facility. The family was very concerned in part because HPHC is not a large facility; there is not a lot of space and the residents were packed into tight quarters. Elizabeth told Kathy that the facility was managing the situation by keeping all the COVID-19 cases on the other side of the facility from Mr. Martin.

58.     There is no record that Filart attempted to aid Mr. Martin in any meaningful way; indeed, according to Mr. Martin's medical records, Filart's only action was to give Mr. Martin oxygen 3 hours prior to his death, failing to even investigate the cause of Mr. Martin's illness. This is particularly appalling given Mr. Martin's symptoms, consistent with the COVID-19 virus, and the nationwide pandemic that has proven to be especially deadly in nursing homes much like HPHC. Had Filart shown any interest in visiting his dying patient, or in attempting to diagnose Mr. Martin's illness, it is possible Mr. Martin would still be alive today, or else would not have suffered a horrific death from COVID-19 complications. Filart, and HPHC's tacit approval of his recklessness, likely have proven to be fatal for many more residents' deaths.

59.     Unbeknownst to Mr. Martin's family, Juhn Cayabyab, the Administrator of HPHC, had been out battling COVID-19 himself since March 2020.  In other words, even after its own Administrator became infected with COVID-19, HPHC failed to take steps to protect residents and staff and failed to test its residents and staff for COVID-19.

60.     Moreover, prior to learning of Mr. Martin's symptoms on April 1, 2020, neither Lisa, Emma, nor Kathy had any clue that there were positive cases of COVID-19 at HPHC. In mid-March HPHC acknowledged that COVID-19 was spreading around the world, but assured families of residents that the risk to their loved ones was actually low. Further, HPHC promised it was making an "enormous" effort to protect residents—citing screening and work restrictions and PPE.  HPHC went into great detail about the infection control efforts it would employ. However, Mr. Martin's case clearly illustrates multiple violations of their own policies, and thus the misrepresentations made to Emma Martin were clearly fraudulent in nature.

Defendants had a motive to make these fraudulent representations, as they wanted to keep their resident beds full and continue to receive thousands of dollars per month per resident. Mr. Martin's family, and surely others, relied on the representations on HPHC in deciding to keep their loved ones at HPHC. Had they known the truth about the situation—that potential COVID-19 residents would share rooms with uninfected residents, that symptomatic residents would not be tested promptly, and that standard infection control procedures would not be followed—they would have moved Mr. Martin to a safer facility immediately.

## G.   Staff Admits to Mr. Martin's Family That There Is a Staffing Crisis: Two Nurses Were Caring for Eighty-Three Residents

61.   At about 10:00 pm on April 1, 2020, Lisa also called Elizabeth to confirm what Kathy had been told earlier.  She asked to speak to her father via speakerphone, but Elizabeth said that another day would be better because, at that moment, there were only two nurses available to care for eighty-three residents.  Lisa was alarmed, because she knew that there was no way that two nurses could care for eighty-three residents without transmitting COVID-19 between them. Elizabeth, sounding exhausted, told Lisa that "more staff are coming."

62.   This understaffing caused harm to both Mr. Martin and Lisa by depriving them of the last chance to speak with one another before Mr. Martin's death.

63.   Sometime on April 2, 2020, as requested by Kathy, a COVID-19 test was collected from Mr. Martin.  However, the lab did not receive the test kit until April 3, at about 2:10 pm.  The results would not be reported back to HPHC until the morning of April 5, 2020, the day after Mr. Martin died.

64.   Meanwhile, on April 2, 2020, at about 1:12 pm, HPHC nurse Joanne Pineda ("Joanne") attempted to contact Filart about Mr. Martin's current condition.  Unfortunately, she was only able to reach Physician Assistant Joel Mandilay ("Mandilay") who told Joanne to give Mr. Martin some over-the-counter anti-diarrheal medicine.  At about 2:38 pm, Joanne left a message asking Filart to call her back about Mr. Martin, but she'd have to wait over twelve hours – until 3:37 am on April 3, 2020 – for Filart to return the call.  At about 3:46 pm on April 2, 2020, the LVN caring for Mr. Martin noted that he was very confused/disoriented, still

refusing to eat or drink, had a fever, and still had episodes of diarrhea—despite Mr. Martin's clearly serious and worsening condition, however, neither his physician, Filart, nor anyone at HPHC took any meaningful steps to help him.

65.     When Filart finally did call in at 3:37 am on April 3, 2020, he simply instructed Joanne to give Mr. Martin IV fluids; he did nothing to diagnose or treat Mr. Martin's underlying condition.

66.     At about 3:57 pm on April 3, 2020 – when Mr. Martin had less than twelve hours left to live – Joanne again spoke to Mandilay about a skin problem and an unstageable pressure sore on Mr. Martin's coccyx, as well as Mr. Martin's overall condition.  Mandilay ordered antibiotics for the skin wounds but did nothing else for Mr. Martin.

67.     About 5:15 pm that day, Lisa called to check on her father.  Joanne updated Lisa on her father's condition, they discussed a change in the antibiotics being given her father, and Lisa asked that her father have a urinalysis.  Joanne promptly got Mandilay to order the urinalysis, and the urine sample was collected about 9:15 pm that evening.

68.     Also, on April 3, 2020, at about 10:29 pm, (albeit by phone) Filart himself finally got involved, and ordered that Mr. Martin be given supplemental oxygen to keep his oxygen saturation above 90%.  Despite the extra oxygen, Mr. Martin passed away at 1:51 am on April 4, 2020.

69.     The funeral home picked up Vince's body two hours after Vince died. The funeral home was not told by the facility that Vince was COVID-19-positive or COVID-19-suspected, thus their staff did not know to don PPE. Upon information and belief, HPHC had a practice of bringing in outside vendors and not informing them that there was a COVID-19 outbreak.

70.     On Sunday April 5, 2020, after Vince had died, the COVID-19 positive test result came back.  Nonetheless, HPHC did not tell the family until Emma specifically called to ask on April 7, 2020.

71.     As noted above, during relevant time periods, Mr. Martin literally only interacted with HPHC staff. Thus, he could have only been infected with the COVID-19 virus by a member

of the HPHC staff, who negligently and/or recklessly failed to follow appropriate infection control measures to protect the vulnerable residents of HPHC.

72.     Mr. Martin's death certificate, issued on April 9, 2020, and certified by Dr. Marcel Filart, lists cardiac arrest, hypertension, and coronary artery disease as the cause of death. (**Exhibit 2**). Mr. Martin's COVID-19 test result was reported on April 5 before Dr. Filart signed off on the causes of death on April 9. Further, it was Dr. Filart who authorized the COVID-19 test (after Mr. Martin's family insisted on the test), so there is no doubt that he was aware that Mr. Martin had been tested and that the results would be available when he fraudulently prepared the death certificate. It was only at the insistence of Mr. Martin's family that Dr. Filart sought to amend Mr. Martin's death certificate. (**Exhibit 9**). More specifically, Dr. Filart had no intention of correcting Mr. Martin's death certificate until Lisa Gagliano insisted that it was fraudulent to leave COVID-19 off Mr. Martin's death certificate. Defendants intended to hide COVID-19 results in order to keep vital information from residents, families, staff and the government.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION: ELDER ABUSE AND NEGLECT UNDER THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT.

(Against All Defendants)

73.     Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

74.     At all relevant times, Vincent Paul Martin was an elder as defined by Welfare & Institutions Code section 15610.27.  He was 84 years old at the time of Defendants' conduct.

75.     The actions described above constitute abuse of an elder as defined by the Welfare and Institutions Code section 15610.07.  Defendants HPHC and Filart neglected Mr. Martin, abandoned their obligations to Mr. Martin and engaged in other mistreatment that resulted in physical harm, pain and mental suffering. Defendants HPHC and Filart, as Mr. Martin's care custodians, deprived Mr. Martin of services that were necessary to avoid physical harm and mental suffering. Defendants HPHC and Benjamin Landa failed to provide adequate funding and staffing to ensure that HPHC provided necessary care to Mr. Martin.

76.     The actions described above constitute neglect as defined by the Welfare and Institutions Code section 15610.57 in that the Defendants negligently failed to exercise a degree of care that a reasonable person in a like position would exercise.   Among other things, Defendants failed to: (1) exercise the degree of care that a reasonable person in a like position would exercise; (2) protect Mr. Martin from health and safety hazards; (3) provide necessary care and protection; (4) provide medical care for physical and mental health needs; (5) prevent malnutrition and dehydration; (6) create and update an adequate plan of care to protect Mr. Martin given the COVID-19 outbreak at HPHC; (7) provide adequate staffing levels to provide Mr. Martin with the assistance that he needed; and (8) adequately train staff to assess and respond to infectious outbreaks.   As described in this Complaint, Defendants' conduct constitutes neglect of an elder under Welfare and Institutions Code section 15610.57 (a)(1) and (b)(1)-(4).

77.     Mr. Martin has been harmed by Defendants' conduct as described herein.   The pattern of substandard care and neglect to Mr. Martin put him at extremely high risk for infections and resulting complications, including injury and death. Defendants' conduct was a substantial factor in causing Mr. Martin to suffer physical, emotional, and economic harm, as well as other damages in an amount to be determined according to proof.

78.     Defendants acted with recklessness, malice, oppression, and/or fraud.   Among other things, Defendants neglected to take the necessary precautions to prevent or treat Mr. Martin's injuries.   Plaintiffs, individually and as successors-in interest to Mr. Martin are entitled to compensatory damages, as well as punitive damages in an amount to be determined according to proof, as well as attorney's fees and costs pursuant to Welfare and Institutions Code section 15657.

79.     Defendants either personally committed acts of elder abuse or ratified the acts of elder abuse committed by their employees.

///

///

///

///

## SECOND CAUSE OF ACTION:  NEGLIGENCE

### (Against All Defendants)

80.     Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

81.     By virtue of their roles as caretakers and by virtue of the fact that Mr. Martin was a dependent adult residing at the HPHC, Defendants had a duty to exercise a degree of care that a reasonable person in a like position would exercise.  Defendants failed to do so.  Among other things Defendants had a duty to:

a.   Adequately staff HPHC;

b.   Ensure that each worker received adequate training before working with Mr. Martin;

c.   Provide services that meet professional standards of quality;

d.   Ensure that an adequate patient care plan was developed, reviewed, revised and carried out, including specifically, because Mr. Martin was exposed to COVID-19 at HPHC;

e.   Take all reasonable and necessary precautions to ensure that Mr. Martin did not contract COVID-19;

f.   Provide Mr. Martin with necessary tests promptly and report those results promptly;

g.   Protect Mr. Martin from health and safety hazards;

h.   Treat Mr. Martin with respect, dignity, and without abuse.

82.     During the period of his residency at HPHC, Defendants breached their duty to Mr. Martin.  Among other things, and without limiting the generality of the foregoing, Defendants failed to:

a.   Adequately staff HPHC;

b.   Ensure that each worker received adequate training before working with Mr. Martin;

c.   Provide services that meet professional standards of quality;

   d.   Ensure that an adequate patient care plan was developed, reviewed, revised and carried out, including specifically, because Mr. Martin was exposed to COVID-19 at HPHC;

   e.   Take all reasonable and necessary precautions to ensure that Mr. Martin did not contract COVID-19;

   f.   Protect Mr. Martin from health and safety hazards;

   g.   Provide Mr. Martin with necessary tests promptly and report those results to his promptly;

   h.   Treat Mr. Martin with respect, dignity, and without abuse.

83.   Defendants' negligence, carelessness, recklessness, and unlawfulness was a substantial factor in causing Mr. Martin to suffer tremendous physical, emotional, economic, and fatal harm as well as other damages to be proven at the time of the trial.

84.   As a direct and legal result of the wrongful acts and omissions of Defendant and DOES 1-50, Mr. Martin was harmed.

85.   By reason of the wrongful death of Mr. Martin that resulted from the wrongful acts and omissions of Defendants, Plaintiffs suffered and continue to suffer loss of love, companionship, comfort, affection, solace, and moral support of Mr. Martin in the amount to be determined at trial.

86.   By reason of the wrongful death of Mr. Martin, resulting from the wrongful acts and/or omissions of Defendants and DOES 1-50, and each of them, Plaintiffs hereby seek recovery of other such relief as may be just, including as provided for under the Civil Code section 377.61.

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CAUSE OF ACTION: WRONGFUL DEATH

(Against All Defendants)

87.   Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

88.     Defendants and DOES 1-50, and each of them, negligently, carelessly, recklessly, and/or unlawfully operated HPHC so as to cause the death of Vince Martin.

89.     Defendants HPHC, Dr. Marcel Filart, Benjamin Landa and DOES 1-50 were agents, servants, employees, successors in interest, and/or joint venturers of one another, and were, as such, acting within the course, scope, and authority of said agency, employment and/or venture when they negligently, carelessly, recklessly, and/or unlawfully withheld necessary care from Vince Martin so as to cause the death of Vince Martin.

90.     As a direct and legal result of the wrongful acts and omissions of Defendants, Vince Martin died.

91.     By reason of the wrongful death of Vince Martin resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, Plaintiffs have incurred funeral and burial expenses, and related medical expenses, in an amount to be determined at trial.

92.     By reason of the wrongful death of Vince Martin, resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, and each of them, Plaintiffs suffered, and continue to suffer, loss of love, companionship, comfort, affection, solace and the moral and economic support of their husband and father.

93.     As a direct and legal result of the aforementioned acts of Defendants HPHC, Dr. Filart, Mr. Landa and DOES 1 through 50, inclusive, Plaintiffs, by reason of the wrongful death of Vince Martin, resulting from the wrongful acts and/or omissions of Defendants, hereby seek recovery of other such relief as may be just and provided for under Code of Civ. Proc. § 377.61.

94.     Plaintiffs are informed and believe, and thereon allege, that in the days leading up to Vince Martin's death, and continuing through his death, Defendants HPHC, Dr. Filart, Mr. Landa and DOES 1 through 50, and each of them, at all times mentioned, were under a statutory duty to comply with all applicable federal and state laws and regulations governing nursing homes in California, including but not limited to the following:

- 42 CFR §483.10(a) & (e) (respect, dignity, & without abuse);
- 42 CFR §483.21 (care plan);
- 42 CFR §483.25 (quality care must be provided; protecting for health and safety hazards);

- 42 CFR §483.30 (adequate physician oversight);
- Cal Health & Safety Code § 1279.6 (safety plan);
- Cal Health & Safety Code § 1337.1 (adequate training);
- Cal Health & Safety Code §1599.1(a) (adequate and qualified staff);
- Title 22 CCR §72311 (care plan and prompt reporting);
- Title 22 CCR §72315 (required services);
- Title 22 CCR §§72329(a) & 72501(e) (adequate staffing);
- Title 22 CCR § 72517 (adequate training);
- Title 22 CCR §72523(adequate policies and procedures);
- Title 22 CCR § 72527(a)(11) (respect, dignity, & without abuse);
- Title 22 CCR § 72537 (reporting of communicable diseases);
- Title 22 CCR § 72539 (reporting of outbreaks);
- Title 22 CCR § 72541 (reporting of unusual occurrences);
- 42 USC §1396r(b)(2) (adequate plan of care);

Defendants' violations of these laws and regulations caused or contributed to the death of Vince Martin.

95.     Vince Martin was one of the class of persons whose protection, the aforementioned laws and regulations, as well as Welfare and Institutions Code §§ 15600 *et seq.* was afforded.

96.     As a direct and legal result of the wrongful acts and omissions of Defendants, including DOES 1 through 50, and each of them, Vince Martin died.

97.     By reason of the wrongful death of Vince Martin resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, Plaintiffs have incurred funeral and burial expenses, and related medical expenses, in an amount to be determined at trial.

98.     By reason of the wrongful death of Vince Martin, resulting from the wrongful acts and omissions of Defendants, and DOES 1 through 50, and each of them, Plaintiffs suffered, and continue to suffer, loss of love, companionship, comfort, affection, solace and the moral and economic support of their husband and father.

99.    As a direct and legal result of the aforementioned acts of Defendants HPHC. Dr. Marcel Filart, Benjamin Landa, and DOES 1 through 50, inclusive, Plaintiffs, by reason of the wrongful death of Vince Martin, resulting from the wrongful acts and/or omissions of Defendants, hereby seek recovery of other such relief as may be just and provided for under Code of Civ. Proc. § 377.61.

## FOURTH CAUSE OF ACTION: FRAUDULENT CONCEALMENT

### (Against Defendants HPHC and Marcel Filart)

100.    Plaintiffs incorporate by reference and re-allege all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

101.    Mr. Martin was an elderly resident of the nursing home run by HPHC. Mr. Martin relied upon Defendants HPHC and Dr. Filart for his care needs.

102.    Prior to Vince Martin's death, HPHC and Dr. Filart became aware that they could not provide adequate care to Mr. Martin and knew of their duty to disclose these matters. In fact, Plaintiffs were repeatedly told that Mr. Martin was "doing ok" or words to that effect prior to April 1, 2020. Further, Plaintiffs were told that Mr. Martin would be cared for. This was untrue. By March 2020, Defendants HPHC and Dr. Filart knew that there was an outbreak of COVID-19 at HPHC, yet they kept the fact of the outbreak and the severity of the outbreak concealed.

103.    When a member of HPHC's staff eventually told Plaintiffs that there were one or more COVID-19 cases at HPHC, they intentionally failed to disclose the full extent of the outbreak, making the disclosure deceptive.

104.    Defendants intentionally failed to disclose, first the fact that there was COVID-19 in the facility, then that there was a serious outbreak of COVID-19, and then that Mr. Martin had been exposed to COVID-19, then that Mr. Martin was likely COVID-19 positive. These facts were known only to Defendants and are not facts that Plaintiffs could have discovered. Plaintiffs did not learn that Mr. Martin was COVID-19 positive until after his death. Even after the COVID-19 positive test, Defendants HPHC and Dr. Filart concealed that Mr. Martin's

1   death was caused by COVID-19—instead, COVID-19 was left off of Mr. Martin's death

2   certificate.

3       105.   Defendants HPHC and Dr. Filart breached their duties to disclose these facts to

4   Plaintiffs and engaged in the above-listed concealments and misrepresentations with the

5   intention of deceiving and misleading Plaintiffs.

6       106.   Had the omitted information been disclosed, Plaintiffs would have behaved

7   differently, including that they would have insisted that Mr. Martin receive a COVID-19 test

8   earlier and that he be treated for COVID-19.

9       107.   Mr. Martin was injured and died as a result of Defendants HPHC's and Dr.

10   Filart's acts of misrepresentation and concealment. Plaintiffs also sustained damages and/or

11   injuries, including emotional distress.

12       **FIFTH CAUSE OF ACTION: FRAUDULENT MISREPRESENTATION**

13       (Against Defendants HPHC and Marcel Filart)

14       108.   Plaintiffs incorporate by reference and re-allege all of the allegations contained in

15   the preceding paragraphs of this Complaint as though fully set forth herein.

16       109.   Mr. Martin was an elderly resident of the nursing home run by HPHC. Mr.

17   Martin relied upon Defendant HPHC and its staff for his care needs.

18       110.   HPHC and its staff repeatedly represented to Plaintiffs that Mr. Martin was

19   "doing ok" or words to that effect during the lockdown prior to April 1, 2020. Further, HPHC

20   and its staff represented to Plaintiffs that Mr. Martin would be cared for. This was untrue.

21       111.   HPHC and its staff told Plaintiffs that there were less COVID-19 cases in the

22   facility than there really were. HPHC and its staff further assured Plaintiffs that all COVID-19

23   positive residents were placed in a separate part of the nursing home from Mr. Martin, which

24   was not correct.

25       112.   Dr. Marcel Filart misrepresented the cause of Mr. Martin's death on Mr. Martin's

26   death certificate dated April 9, 2020, as cardiorespiratory arrest, essential hypertension and

27   coronary artery disease, hiding Mr. Martin's COVID-19 positive result and the real cause of

28   death.

113.   HPHC and its staff falsely claimed that labs were completed when they were not in fact done.

114.   HPHC and its staff falsely claimed that Mr. Martin could not be transferred to a hospital for care in the days leading up to his death, that he would unlikely be accepted, and would be harmed.

115.   Defendants HPHC and Dr. Filart breached their duties to disclose true facts to Plaintiffs and engaged in the above-listed misrepresentations with the intention of deceiving and defrauding Plaintiffs.  Defendants HPHC and Dr. Filart knew that these representations were false when they made them or made the representations recklessly and without regard for its truth.  Defendants intended that Plaintiffs rely on these representations to hide what harm Mr. Martin was suffering.  Plaintiffs reasonably relied on Defendants' representations, and Mr. Martin was thus injured and harmed.  Plaintiffs' reliance on HPHC and Dr. Filart's representations was a substantial factor in causing Mr. Martin's death.

116.   Had the omitted information been disclosed, Plaintiffs would have behaved differently, including that they would have insisted that Mr. Martin receive a COVID-19 test earlier and that he be treated for COVID-19.

117.   Mr. Martin was harmed and died as a result of Defendants HPHC's and Dr. Filart's acts of misrepresentation. Plaintiffs also sustained damages and injuries, including emotional distress.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Emma Martin, Elizabeth Gagliano and Kathy Sessinghaus pray for relief as follows:

1.   General and special compensatory damages according to proof;

2.   Punitive damages according to proof, including treble punitive damages per Civil Code section 3345;

3.   For prejudgment and post-judgment interest upon such judgment at the maximum rate provided by law;

4.      Reasonable costs of suit;

5.      Attorney's fees and costs per Welfare and Institutions Code section 15657; and

6.      Such other further relief as the Court may deem proper.

Dated:  August 24, 2020                    **COTCHETT, PITRE & McCARTHY, LLP**


By: _____*/s/ Anne Marie Murphy*_____
        ANNE MARIE MURPHY
        *Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues so triable.

Dated:  August 24, 2020                    **COTCHETT, PITRE & McCARTHY, LLP**


By: _____*/s/ Anne Marie Murphy*_____
        ANNE MARIE MURPHY
        *Attorneys for Plaintiffs*